RECORD NO. 13-1316

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO,

*Petitioner*,

**v.**

## MICHAEL P. HUERTA; FEDERAL AVIATION ADMINISTRATION,

*Respondents*.

## ON APPEAL FROM THE FEDERAL AVIATION ADMINISTRATION

_____

## ADDENDUM TO PAGE PROOF BRIEF OF PETITIONER

_____

Michael J. Pangia
Amanda C. Dure
PANGIA LAW GROUP
1717 N Street, NW
Washington, DC 20036
(202) 955-6450

*Counsel for Petitioner*

# ADDENDUM TABLE OF CONTENTS

**Addendum Page**

5 U.S.C. § 553 ................................................................Add. 1

5 U.S.C. § 706 ................................................................Add. 3

49 U.S.C. § 46110 ...........................................................Add. 5

14 C.F.R. § 121.589 .........................................................Add. 7

Department of Transportation
Federal Aviation Administration
14 C.F.R. Parts 91, 121, 125 and 135
Docket No. FAA-2012-0752 ............................................Add. 9

Amendment 121-194
    52 FR 214472 (June 5, 1987) .........................................Add. 23

Volume III General Technical Administration
Chapter 33 Cabin Safety and Flight Attendant Management
Section 6 Operations—Cabin Safety ................................Add. 31

Portable Electronic Device (PED) Aviation Rulemaking Committee
PED Stowage Policy Assessment and Considerations ...................Add. 82

Federal Aviation Administration Information for Operations InFO 09018,
    dated November 12, 2009................................................Add. 108

Federal Aviation Administration Information for Operations InFO 13010SUP,
FAA Aid to Operators for the Expanded Use of Passengers PEDs,
    dated February 24, 2014 ................................................Add. 109

(m) Nothing in this section authorizes any agency to withhold from any individual any record, including transcripts, recordings, or minutes required by this section, which is otherwise accessible to such individual under section 552a of this title.

(Added Pub. L. 94–409, §3(a), Sept. 13, 1976, 90 Stat. 1241; amended Pub. L. 104–66, title III, §3002, Dec. 21, 1995, 109 Stat. 734.)

REFERENCES IN TEXT

Section 552(e) of this title, referred to in subsec. (a)(1), was redesignated section 552(f) of this title by section 1802(b) of Pub. L. 99–570.

180 days after the date of enactment of this section, referred to in subsec. (g), means 180 days after the date of enactment of Pub. L. 94–409, which was approved Sept. 13, 1976.

AMENDMENTS

1995—Subsec. (j). Pub. L. 104–66 amended subsec. (j) generally. Prior to amendment, subsec. (j) read as follows: "Each agency subject to the requirements of this section shall annually report to Congress regarding its compliance with such requirements, including a tabulation of the total number of agency meetings open to the public, the total number of meetings closed to the public, the reasons for closing such meetings, and a description of any litigation brought against the agency under this section, including any costs assessed against the agency in such litigation (whether or not paid by the agency)."

EFFECTIVE DATE

Section 6 of Pub. L. 94–409 provided that:

"(a) Except as provided in subsection (b) of this section, the provisions of this Act [see Short Title note set out below] shall take effect 180 days after the date of its enactment [Sept. 13, 1976].

"(b) Subsection (g) of section 552b of title 5, United States Code, as added by section 3(a) of this Act, shall take effect upon enactment [Sept. 13, 1976]."

SHORT TITLE OF 1976 AMENDMENT

Section 1 of Pub. L. 94–409 provided: "That this Act [enacting this section, amending sections 551, 552, 556, and 557 of this title, section 10 of Pub. L. 92–463, set out in the Appendix to this title, and section 410 of Title 39, and enacting provisions set out as notes under this section] may be cited as the 'Government in the Sunshine Act'."

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which the report required by subsec. (j) of this section is listed on page 151), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

TERMINATION OF ADMINISTRATIVE CONFERENCE OF UNITED STATES

For termination of Administrative Conference of United States, see provision of title IV of Pub. L. 104–52, set out as a note preceding section 591 of this title.

DECLARATION OF POLICY AND STATEMENT OF PURPOSE

Section 2 of Pub. L. 94–409 provided that: "It is hereby declared to be the policy of the United States that the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government. It is the purpose of this Act [see Short Title note set out above] to provide the public with such information while protecting the rights of individuals and the ability of the Government to carry out its responsibilities."

§ 553. Rule making

(a) This section applies, according to the provisions thereof, except to the extent that there is involved—

(1) a military or foreign affairs function of the United States; or

(2) a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts.

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

(B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—

(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;

(2) interpretative rules and statements of policy; or

(3) as otherwise provided by the agency for good cause found and published with the rule.

(e) Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 383.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1003. | June 11, 1946, ch. 324, §4, 60 Stat. 238. |

In subsection (a)(1), the words "or naval" are omitted as included in "military".

In subsection (b), the word "when" is substituted for "in any situation in which".

In subsection (c), the words "for oral presentation" are substituted for "to present the same orally in any manner". The words "sections 556 and 557 of this title apply instead of this subsection" are substituted for "the requirements of sections 1006 and 1007 of this title shall apply in place of the provisions of this subsection".

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

CODIFICATION

Section 553 of former Title 5, Executive Departments and Government Officers and Employees, was transferred to section 2245 of Title 7, Agriculture.

EXECUTIVE ORDER NO. 12044

Ex. Ord. No. 12044, Mar. 23, 1978, 43 F.R. 12661, as amended by Ex. Ord. No. 12221, June 27, 1980, 45 F.R. 44249, which related to the improvement of Federal regulations, was revoked by Ex. Ord. No. 12291, Feb. 17, 1981, 46 F.R. 13193, formerly set out as a note under section 601 of this title.

## § 554. Adjudications

(a) This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing, except to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court;

(2) the selection or tenure of an employee, except a[1] administrative law judge appointed under section 3105 of this title;

(3) proceedings in which decisions rest solely on inspections, tests, or elections;

(4) the conduct of military or foreign affairs functions;

(5) cases in which an agency is acting as an agent for a court; or

(6) the certification of worker representatives.

(b) Persons entitled to notice of an agency hearing shall be timely informed of—

(1) the time, place, and nature of the hearing;

(2) the legal authority and jurisdiction under which the hearing is to be held; and

(3) the matters of fact and law asserted.

When private persons are the moving parties, other parties to the proceeding shall give prompt notice of issues controverted in fact or law; and in other instances agencies may by rule require responsive pleading. In fixing the time and place for hearings, due regard shall be had for the convenience and necessity of the parties or their representatives.

(c) The agency shall give all interested parties opportunity for—

(1) the submission and consideration of facts, arguments, offers of settlement, or proposals of adjustment when time, the nature of the proceeding, and the public interest permit; and

(2) to the extent that the parties are unable so to determine a controversy by consent, hearing and decision on notice and in accordance with sections 556 and 557 of this title.

(d) The employee who presides at the reception of evidence pursuant to section 556 of this title shall make the recommended decision or initial decision required by section 557 of this title, unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not—

(1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title, except as witness or counsel in public proceedings. This subsection does not apply—

(A) in determining applications for initial licenses;

(B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

(C) to the agency or a member or members of the body comprising the agency.

(e) The agency, with like effect as in the case of other orders, and in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 384; Pub. L. 95–251, § 2(a)(1), Mar. 27, 1978, 92 Stat. 183.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1004. | June 11, 1946, ch. 324, § 5, 60 Stat. 239. |

In subsection (a)(2), the word "employee" is substituted for "officer or employee of the United States" in view of the definition of "employee" in section 2105.

In subsection (a)(4), the word "naval" is omitted as included in "military".

In subsection (a)(5), the word "or" is substituted for "and" since the exception is applicable if any one of the factors are involved.

In subsection (a)(6), the word "worker" is substituted for "employee", since the latter is defined in section 2105 as meaning Federal employees.

In subsection (b), the word "When" is substituted for "In instances in which".

In subsection (c)(2), the comma after the word "hearing" is omitted to correct an editorial error.

In subsection (d), the words "The employee" and "such an employee" are substituted in the first two sentences for "The same officers" and "such officers" in view of the definition of "employee" in section 2105. The word "officer" is omitted in the third and fourth sentences as included in "employee" as defined in section 2105. The prohibition in the third and fourth sentences is restated in positive form. In paragraph (C) of the last sentence, the words "in any manner" are omitted as surplusage.

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

---
[1] So in original.

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

§ 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

§ 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

§ 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801.    Congressional review.
802.    Congressional disapproval procedure.
803.    Special rule on statutory, regulatory, and judicial deadlines.
804.    Definitions.
805.    Judicial review.
806.    Applicability; severability.
807.    Exemption for monetary policy.
808.    Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46108 .......... | 49 App.:1487(a) (related to party in interest). | Aug. 23, 1958, Pub. L. 85–726, §1007(a) (related to party in interest), 72 Stat. 796. |

The words "interested person" are substituted for "party in interest" for consistency. The words "may bring a civil action" are substituted for "may apply" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The text of 49 App.:1487(a) (words after semicolon related to party in interest) is omitted as surplus because of 28:1651 and rule 81(b) of the Federal Rules of Civil Procedure.

## § 46109. Joinder and intervention

A person interested in or affected by a matter under consideration in a proceeding before the Secretary of Transportation or civil action to enforce this part or a requirement or regulation prescribed, or an order or any term of a certificate or permit issued, under this part may be joined as a party or permitted to intervene in the proceeding or civil action.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46109 .......... | 49 App.:1489. | Aug. 23, 1958, Pub. L. 85–726, §1009, 72 Stat. 796. |
|  | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |

The words "proceeding . . . or civil action" are substituted for "proceeding . . . whether such proceedings be instituted . . . or be begun originally in any court of the United States" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The words "prescribed . . . issued" are added for consistency in the revised title and with other titles of the Code. The words "condition, or limitation" are omitted as being included in "term". The words "may be joined as a party or permitted to intervene" are substituted for "it shall be lawful to include as parties, or to permit the intervention of" for clarity. The text of 49 App.:1489 (words after semicolon) is omitted as surplus.

## § 46110. Judicial review

(a) FILING AND VENUE.—Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) JUDICIAL PROCEDURES.—When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Under Secretary, or Administrator, as appropriate. The Secretary, Under Secretary, or Administrator shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) AUTHORITY OF COURT.—When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

(d) REQUIREMENT FOR PRIOR OBJECTION.—In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

(e) SUPREME COURT REVIEW.—A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230; Pub. L. 107–71, title I, §140(b)(1), (2), Nov. 19, 2001, 115 Stat. 641; Pub. L. 108–176, title II, §228, Dec. 12, 2003, 117 Stat. 2532.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46110(a) ...... | 49 App.:1486(a), (b) (as 1486(a), (b) relates to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(a), (b), (e), (f) (as §1006(a), (b), (e), (f) relates to Administrator and CAB), 72 Stat. 795. |
|  | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |
|  | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 46110(b) ...... | 49 App.:1486(c) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(c) (related to Administrator and CAB), 72 Stat. 795; restated June 29, 1960, Pub. L. 86–546, §1, 74 Stat. 255. |
|  | 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). |  |
| 46110(c) ...... | 49 App.:1486(d) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(d) (related to Administrator and CAB), 72 Stat. 795; restated Sept. 13, 1961, Pub. L. 87–225, §2, 75 Stat. 497. |
|  | 49 App.:1486(e) (1st sentence related to Secretary and CAB). |  |

USCA Case #13-1316    Document #1491488    Filed: 05/05/2014    Page 8 of 126

HISTORICAL AND REVISION NOTES—CONTINUED

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46110(d) ...... | 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). 49 App.:1486(e) (last sentence) (related to Secretary and CAB). | |
| 46110(e) ...... | 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). 49 App.:1486(f) (related to Secretary and CAB). 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). | |

In subsections (a)–(d), the word "Administrator" in section 1006 of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 795) is retained on authority of 49:106(g).

In subsection (a), the words "affirmative or negative" are omitted as surplus. The words "is issued" are substituted for "the entry of" for consistency in the revised title and with other titles of the United States Code.

In subsection (b), the words "if any" are omitted as surplus. The words "of any proceeding" are added for clarity. The words "complained of" are omitted as surplus.

In subsection (c), the word "amend" is added for consistency in the revised title. The word "interim" is substituted for "interlocutory" for clarity. The words "taking other appropriate action" are substituted for "by such mandatory or other relief as may be appropriate" for clarity and to eliminate unnecessary words.

In subsection (d), the words "made in the proceeding conducted by" are substituted for "urged before" for clarity.

AMENDMENTS

2003—Subsec. (a). Pub. L. 108–176, in first sentence, struck out "safety" before "duties and powers designated to be carried out by the Administrator)" and substituted "in whole or in part under this part, part B, or subsection (l) or (s) of section 114" for "under this part".

2001—Subsec. (a). Pub. L. 107–71, §140(b)(1), inserted "the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or" after "(or".

Subsecs. (b) to (d). Pub. L. 107–71, §140(b)(2), substituted ", Under Secretary, or Administrator" for "or Administrator" wherever appearing.

EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–176 applicable only to fiscal years beginning after Sept. 30, 2003, except as otherwise specifically provided, see section 3 of Pub. L. 108–176, set out as a note under section 106 of this title.

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the Transportation Security Administration of the Department of Transportation, including the functions of the Secretary of Transportation, and of the Under Secretary of Transportation for Security, relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(2), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

§ 46111. Certificate actions in response to a security threat

(a) ORDERS.—The Administrator of Federal Aviation Administration shall issue an order amending, modifying, suspending, or revoking any part of a certificate issued under this title if the Administrator is notified by the Under Secretary for Border and Transportation Security of the Department of Homeland Security that the holder of the certificate poses, or is suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety. If requested by the Under Secretary, the order shall be effective immediately.

(b) HEARINGS FOR CITIZENS.—An individual who is a citizen of the United States who is adversely affected by an order of the Administrator under subsection (a) is entitled to a hearing on the record.

(c) HEARINGS.—When conducting a hearing under this section, the administrative law judge shall not be bound by findings of fact or interpretations of laws and regulations of the Administrator or the Under Secretary.

(d) APPEALS.—An appeal from a decision of an administrative law judge as the result of a hearing under subsection (b) shall be made to the Transportation Security Oversight Board established by section 115. The Board shall establish a panel to review the decision. The members of this panel (1) shall not be employees of the Transportation Security Administration, (2) shall have the level of security clearance needed to review the determination made under this section, and (3) shall be given access to all relevant documents that support that determination. The panel may affirm, modify, or reverse the decision.

(e) REVIEW.—A person substantially affected by an action of a panel under subsection (d), or the Under Secretary when the Under Secretary decides that the action of the panel under this section will have a significant adverse impact on carrying out this part, may obtain review of the order under section 46110. The Under Secretary and the Administrator shall be made a party to the review proceedings. Findings of fact of the panel are conclusive if supported by substantial evidence.

(f) EXPLANATION OF DECISIONS.—An individual who commences an appeal under this section shall receive a written explanation of the basis for the determination or decision and all relevant documents that support that determination to the maximum extent that the national security interests of the United States and other applicable laws permit.

(g) CLASSIFIED EVIDENCE.—

(1) IN GENERAL.—The Under Secretary, in consultation with the Administrator and the Director of Central Intelligence, shall issue regulations to establish procedures by which the Under Secretary, as part of a hearing conducted under this section, may provide an unclassified summary of classified evidence upon which the order of the Administrator was based to the individual adversely affected by the order.

(2) REVIEW OF CLASSIFIED EVIDENCE BY ADMINISTRATIVE LAW JUDGE.—

(A) REVIEW.—As part of a hearing conducted under this section, if the order of the Administrator issued under subsection (a) is based on classified information (as defined in section 1(a) of the Classified Information

§ 121.586                                    14 CFR Ch. I (1–1–12 Edition)

safety aspects of the certificate holder's procedures.

[Doc. No. 25821, 55 FR 8072, Mar. 6, 1990, as amended by Amdt. 121–232, 57 FR 48663, Oct. 27, 1992; Amdt. 121–253, 61 FR 2614, Jan. 26, 1996]

### § 121.586  Authority to refuse transportation.

(a) No certificate holder may refuse transportation to a passenger on the basis that, because the passenger may need the assistance of another person to move expeditiously to an exit in the event of an emergency, his transportation would or might be inimical to safety of flight unless—

(1) The certificate holder has established procedures (including reasonable notice requirements) for the carriage of passengers who may need the assistance of another person to move expeditiously to an exit in the event of an emergency; and

(2) At least one of the following conditions exist:

(i) The passenger fails to comply with the notice requirements in the certificate holder's procedures.

(ii) The passenger cannot be carried in accordance with the certificate holder's procedures.

(b) Each certificate holder shall provide the certificate-holding district office with a copy of each procedure it establishes in accordance with paragraph (a)(2) of this section.

(c) Whenever the Administrator finds that revisions in the procedures described in paragraph (a)(2) of this section are necessary in the interest of safety or in the public interest, the certificate holder, after notification by the Administrator, shall make those revisions in its procedures. Within 30 days after the certificate holder receives such notice, it may file a petition to reconsider the notice with the certificate-holding district office. The filing of a petition to reconsider stays the notice pending a decision by the Administrator. However, if the Administrator finds that there is an emergency that requires immediate action in the interest of safety in air commerce, he may, upon a statement of the reasons, require a change effective without stay.

(d) Each certificate holder shall make available to the public at each airport it serves a copy of each procedure it establishes in accordance with paragraph (a)(1) of this section.

[Doc. No. 12881, 42 FR 18394, Apr. 7, 1977, as amended by Amdt. 121–174, 46 FR 38051, July 23, 1981; Amdt. 121–207, 54 FR 39293, Sept. 25, 1989; Amdt. 121–253, 61 FR 2614, Jan. 26, 1996]

### § 121.587  Closing and locking of flightcrew compartment door.

(a) Except as provided in paragraph (b) of this section, a pilot in command of an airplane that has a lockable flightcrew compartment door in accordance with § 121.313 and that is carrying passengers shall ensure that the door separating the flightcrew compartment from the passenger compartment is closed and locked at all times when the aircraft is being operated.

(b) The provisions of paragraph (a) of this section do not apply at any time when it is necessary to permit access and egress by persons authorized in accordance with § 121.547 and provided the part 119 operator complies with FAA approved procedures regarding the opening, closing and locking of the flightdeck doors.

[Doc. No. FAA–2001–11032, 67 FR 2128, Jan. 15, 2002]

### § 121.589  Carry-on baggage.

(a) No certificate holder may allow the boarding of carry-on baggage on an airplane unless each passenger's baggage has been scanned to control the size and amount carried on board in accordance with an approved carry-on baggage program in its operations specifications. In addition, no passenger may board an airplane if his/her carry-on baggage exceeds the baggage allowance prescribed in the carry-on baggage program in the certificate holder's operations specifications.

(b) No certificate holder may allow all passenger entry doors of an airplane to be closed in preparation for taxi or pushback unless at least one required crewmember has verified that each article of baggage is stowed in accordance with this section and § 121.285 (c) and (d).

(c) No certificate holder may allow an airplane to take off or land unless each article of baggage is stowed:

194

**Federal Aviation Administration, DOT**

**§ 121.590**

(1) In a suitable closet or baggage or cargo stowage compartment placarded for its maximum weight and providing proper restraint for all baggage or cargo stowed within, and in a manner that does not hinder the possible use of any emergency equipment; or

(2) As provided in §121.285 (c) and (d); or

(3) Under a passenger seat.

(d) Baggage, other than articles of loose clothing, may not be placed in an overhead rack unless that rack is equipped with approved restraining devices or doors.

(e) Each passenger must comply with instructions given by crewmembers regarding compliance with paragraphs (a), (b), (c), (d), and (g) of this section.

(f) Each passenger seat under which baggage is allowed to be stowed shall be fitted with a means to prevent articles of baggage stowed under it from sliding forward. In addition, each aisle seat shall be fitted with a means to prevent articles of baggage stowed under it from sliding sideward into the aisle under crash impacts severe enough to induce the ultimate inertia forces specified in the emergency landing condition regulations under which the airplane was type certificated.

(g) In addition to the methods of stowage in paragraph (c) of this section, flexible travel canes carried by blind individuals may be stowed—

(1) Under any series of connected passenger seats in the same row, if the cane does not protrude into an aisle and if the cane is flat on the floor; or

(2) Between a nonemergency exit window seat and the fuselage, if the cane is flat on the floor; or

(3) Beneath any two nonemergency exit window seats, if the cane is flat on the floor; or

(4) In accordance with any other method approved by the Administrator.

[Doc. No. 24996, 52 FR 21476, June 5, 1987, as amended by Amdt. 121–251, 60 FR 65935, Dec. 20, 1995]

## § 121.590  Use of certificated land airports in the United States.

(a) Except as provided in paragraphs (b) or (c) of this section, or unless authorized by the Administrator under 49 U.S.C. 44706(c), no air carrier and no pilot being used by an air carrier may operate, in the conduct of a domestic type operation, flag type operation, or supplemental type operation, an airplane at a land airport in any State of the United States, the District of Columbia, or any territory or possession of the United States unless that airport is certificated under part 139 of this chapter. Further, after June 9, 2005 for Class I airports and after December 9, 2005 for Class II, III, and IV airports, when an air carrier and a pilot being used by the air carrier are required to operate at an airport certificated under part 139 of this chapter, the air carrier and the pilot may only operate at that airport if the airport is classified under part 139 to serve the type airplane to be operated and the type of operation to be conducted.

(b)(1) An air carrier and a pilot being used by the air carrier in the conduct of a domestic type operation, flag type operation, or supplemental type operation may designate and use as a required alternate airport for departure or destination an airport that is not certificated under part 139 of this chapter.

(2) Until December 9, 2005, an air carrier and a pilot being used by the air carrier in the conduct of domestic type operations and flag type operations, may operate an airplane designed for more than 9 but less than 31 passenger seats, at a land airport, in any State of the United States, the District of Columbia, or any territory or possession of the United States, that does not hold an airport operating certificate issued under part 139 of this chapter, and that serves small air carrier aircraft (as defined under "Air carrier aircraft" and "Class III airport" in §139.5 of this Chapter).

(c) An air carrier and a pilot used by the air carrier in conducting a domestic type operation, flag type operation, or supplemental type operation may operate an airplane at an airport operated by the U.S. Government that is not certificated under part 139 of this chapter, only if that airport meets the equivalent—

(1) Safety standards for airports certificated under part 139 of this chapter; and

195

Add. 8

**[4910-13]**

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Parts 91, 121, 125 and 135**

**Docket No. FAA-2012-0752**

**Passenger Use of Portable Electronic Devices On Board Aircraft**

**AGENCY:**  Federal Aviation Administration (FAA), DOT.

**ACTION:**  Notice of policy; request for comments.

**SUMMARY:**  The FAA seeks comments on current policy, guidance, and procedures that aircraft operators (ranging from pilots of general aviation aircraft up to and including air carrier certificate holders at the major airlines) use when determining if passenger use of portable electronic devices (PEDs) may be allowed during any phase of flight on their aircraft.    Current FAA regulations generally prohibit the use of all PEDs during flight, with the exception of portable voice recorders, hearing aids, heart pacemakers, and electric shavers.  These regulations also provide an exception for any other PED that the aircraft operator has determined will not cause interference with the navigation or communication systems on the aircraft.  To better effectuate the safety purposes of these regulations, this notice requests comments about key areas of policy and guidance that are used by aircraft operators when making these determinations.  It also requests comments about other technical challenges for addressing the problems associated with determining if and when PEDs can be used.   The desired outcome of this solicitation is to have sufficient information to allow operators to better assess whether more widespread use of PEDs during flight is appropriate, while maintaining the highest levels of safety to passengers and aircraft.  The Agency stresses that the existing regulations allow the operator to authorize the

Add. 9

use of PEDs, and that no specific FAA approval is required. The aircraft operator is responsible for assuring that the interference from PEDs does not pose a flight risk. Once all the comments have been collected, the FAA intends to establish an Aviation Rulemaking Committee (ARC) to review the comments and provide recommendations that might permit the more widespread use of PEDs during flight while maintaining the highest levels of safety for the passengers and aircraft. The FCC will be a key partner in this activity working collaboratively with the FAA, airlines and the manufacturers to explore broader use of PEDS in flight.

**DATES:** Written comments must be received on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

**ADDRESSES:** Send comments identified by docket number FAA-2012-0752 using any of the following methods:

- Email: Submit your comments via email to PEDcomment@faa.gov.

- Federal eRulemaking Portal: Go to http://www.regulations.gov and follow the online instructions for sending your comments electronically.

- Mail: Send comments to Docket Operations, M-30; U.S. Department of Transportation (DOT), 1200 New Jersey Avenue, SE, Room W12-140, West Building Ground Floor, Washington, DC 20590-0001.

- Hand Delivery or Courier: Take comments to Docket Operations in Room W12-140 of the West Building Ground Floor at 1200 New Jersey Avenue, SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

- Fax: Fax comments to Docket Operations at 202-493-2251.

  *Privacy:* The FAA will post all comments it receives, without change, to http://www.regulations.gov, including any personal information the commenter provides. Using

the search function of the docket web site, anyone can find and read the electronic form of all comments received into any FAA dockets, including the name of the individual sending the comment (or signing the comment for an association, business, labor union, etc.). DOT's complete Privacy Act Statement can be found in the FEDERAL REGISTER published on April 11, 2000 (65 FR 19477-19478), as well as at http://DocketsInfo.dot.gov.

*Docket*: Background documents or comments received may be read at http://www.regulations.gov at any time. Follow the online instructions for accessing the docket or contact Docket Operations in Room W12-140 of the West Building Ground Floor at 1200 New Jersey Avenue, SE, Washington, DC, between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** For questions concerning this action, contact Timothy W. Shaver, Avionics Maintenance Branch, Flight Standards Service, AFS-360, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone (202) 385-4292; facsimile (202) 385-6474; e-mail tim.shaver@faa.gov.

**SUPPLEMENTARY INFORMATION**

We are reviewing the policies, guidance, and procedures that establish the methods and criteria aircraft operators use to determine if they can allow PED usage during flight. The FAA has long recognized that PEDs have the potential for causing interference with aircraft navigation or communication systems. Title 14, Code of Federal Regulations (14 CFR) §§ 91.21, 121.306, 125.204, and 135.144 establish the requirements prohibiting the use of PEDs without the authorization of the aircraft operator.

The FAA's first published rulemaking[1] to address this issue was in 1966. That rulemaking was prompted after studies of PED interference conducted between 1958 to 1961 concluded that portable frequency modulation (FM) radio receivers caused interference to navigation systems such as very high frequency (VHF) Omni Range (VOR) navigation systems.

During that rulemaking process, the FAA received comments on the subject of FAA involvement in the authorization of use of PEDs. The public expressed concerns that authorization of devices not specifically excepted in the rule (e.g., portable voice recorders, hearing aids, heart pacemakers, and electric shavers) would subject operators to a considerable amount of "red tape." In response to those comments, the FAA concluded that the aircraft operators were best suited to make the determination of which PEDs would not cause interference with the navigation or communication system on their aircraft. The FAA also recognized that for it to place requirements upon itself to conduct or verify tests of every conceivable PED, as an alternative to a determination made by the operator, would thereby place an excessive and unnecessary burden on the agency.

The potential for aircraft interference depends on the aircraft and its electrical and electronic systems, as well as the type of PED being used. Prior to fly-by-wire flight controls, the primary concern was the susceptibility of sensitive aircraft communication and navigation radio receivers to spurious radio frequency emissions from PEDs. Many of these aircraft using this older technology are still in service and are as susceptible today to interference as they were when they first entered service. When aircraft included fly-by-wire controls and electronic displays, the susceptibility of these aircraft systems also became a concern. The FAA defined requirements for high-intensity radiated fields (HIRF) that provide assurance that newer aircraft with such systems have sufficient protection to continue to operate safely when exposed to

---

[1] 14 CFR 91.19, Docket No. 7247; Amdt 91-35 (later superseded by §§ 91.21, 121.306, 125.204, and 135.144).

spurious emissions[2] of PEDs and intentional transmissions[3] from transmitting PEDs.  While the highly critical fly-by-wire controls and electronic displays were designed and certified to withstand the fields from transmitting PEDs, all aircraft electrical and electronic systems were not designed to withstand these fields. These newer aircraft still have sensitive navigation, communication, and surveillance radio receivers that may be susceptible at certain frequencies to spurious radio frequency emissions from PEDs.

PEDs have changed considerably in the past few decades and output a wide variety of signals.  Some devices do not transmit or receive any signals but generate low-power, radio frequency emissions.  Other PEDs, such as e-readers, are only active in this manner during the short time that a page is being changed.  Of greater concern are intentional transmissions from PEDs.  Most portable electronic devices have internet connectivity that includes transmitting and receiving signals wirelessly using radio waves, such as Wi-Fi,[4] Bluetooth,[5] and various other cellular technologies.  These devices transmit high-powered emissions and can generate spurious signals at undesired frequencies, particularly if the device is damaged.

Avionics equipment has also undergone significant changes.  When the regulations were first established, communication and navigations systems were basic systems.  In today's avionics, there are various systems—global positioning, traffic collision and avoidance, transponder, automatic flight guidance and control, and many other advanced avionics systems— that depend on signals transmitted from the ground, other aircraft, and satellites for proper operation.  In addition, there are advanced flight management systems that use these avionics as

---

[2] A spurious emission is any radio frequency not deliberately created or transmitted.
[3] Intentional transmission is the transmission of signals through free space by electromagnetic waves on specific radio frequencies that are used to communicate information between devices.
[4] Wi-Fi is defined as "wireless local area network (WLAN) products that are based on the Institute of Electrical and Electronics Engineers' (IEEE) 802.11 standards."  Wi-Fi is a trademark of the Wi-Fi Alliance.
[5] Bluetooth is managed by the Bluetooth Special Interest Group (SIG). The SIG is the body that oversees the development of Bluetooth standards and the licensing of the Bluetooth technologies and trademarks to manufacturers. The SIG is a privately held, not-for-profit trade association founded in September 1998.

a critical component for performing precision operational procedures. Many of these systems are also essential to realize the capabilities and operational improvements envisioned in the Next Generation airspace system. As such, harmful interference from PEDs cannot be tolerated.

Under FAA regulation, the aircraft operator is responsible for determining which PEDs may be used by the passengers and during which phase of flight this utilization may occur. The aircraft operator is best suited to make the determination of which PEDs would not cause interference with the navigation or communication system on its aircraft. The operators' PED policy determines what types of devices may be used on board their aircraft and during which phase(s) of flight. The responsibility for enforcing an aircraft operator's PED policy typically falls on the cabin crew. On occasion, enforcement of a commercial airline's PED policy results in a conflict between a flight attendant and a passenger. Noncompliance with crewmember safety instructions on the use of PEDs has resulted in passengers being removed from an aircraft and, in some cases, has caused in-flight diversions. The FAA provides oversight of aircraft operators to ensure that they have established and are currently following robust PED-allowance procedures.

**Policy and Guidance**

As aircraft and consumer electronics evolved, the FAA recognized that the industry needed assistance to keep up with the challenges of determining if devices would interfere with the aircraft navigation or communication systems. In 1958, at the FAA's request, the first RTCA, Inc., (previously Radio Technical Commission for Aeronautics) documents[6] were written

---

[6] RTCA is a private, not-for-profit corporation that functions as a Federal Advisory Committee for the FAA. It develops consensus-based recommendations regarding communications, navigation, surveillance, and air traffic management (CNS/ATM) system issues. See FAA Order 1110.77T, RTCA Inc. (utilized as an Advisory Committee) (Apr. 1, 2011). The following are RTCA recommendations and guidance documents regarding PEDS: DO-307, *Aircraft Design and Certification for Portable Electronic Device (PED) Tolerance*, issued 10-11-07, and Change 1, issued 12-16-08. Prepared by SC-202.

to help airlines make the PED allowance determination.  Since that time, the FAA has requested three other activities; the most recent concluded in 2008.  The current guidelines to assist aircraft operators in developing their PED policy are in Advisory Circular (AC) 91-21-1B, *Use of Portable Electronic Devices Aboard Aircraft*, dated August 25, 2006, which references industry-developed guidelines identified in RTCA/DO-233 and RTCA/DO-294.

These joint industry-government committees studied the risks associated with PED usage and are the basis for the FAA's guidance today.  For instance, based on these studies, FAA has recommended that operators allowing passenger use of PEDs do so only during non-critical phases of flight and prohibit PED use during takeoff and landing.  See AC 91-21-1B.  While these recommendations are non-binding, most commercial airlines allow the use of non-transmitting PEDs in flight after the aircraft has reached a safe altitude, and those airlines continue to allow PED usage until near the end of the flight.

The FAA has also published AC 20-164, *Designing and Demonstrating Aircraft Tolerance to Portable Electronic Devices*. This AC is based on RTCA/DO-307, *Aircraft Design and Certification for Portable Electronic Device (PED) Tolerance*, dated October 11, 2007. Further, AC 20-164 provides guidance to demonstrate aircraft electrical and electronic system tolerance to the use of PEDs.  This approach allows the aircraft designers to build in protections to help prevent interference to navigation or communication systems.

**PEDs Today**

---

DO-294C, *Guidance on Allowing Transmitting Portable Electronic Devices (T-PEDs) on Aircraft*, issued 12-16-08. Prepared by SC-202.
DO-233, *Portable Electronic Devices Carried on Board Aircraft*, issued 8-20-96.Prepared by SC-177. Errata Issued 8-18-99
DO-199, *Potential Interference to Aircraft Electronic Equipment from Devices Carried Aboard*, issued 9-16-88. Prepared by SC-156. Supersedes DO-119.
DO-119, *Interference To Aircraft Electronic Equipment From Devices Carried Aboard*, issued 9-16-88. Prepared by SC-88.

Smart phones, personal computers, and wireless technology have become ingrained in peoples' day-to-day lives.  Passengers not only use these devices to remain connected to their work, family, and friends, but also to read books, play games, and accomplish many of their day-to-day tasks.  This has naturally led to the passengers' desire to use PEDs from the time they board an aircraft until they exit the aircraft at their destination.  In some cases, a transmitting radio is embedded in a PED so that the operation of the transmitter is not apparent to the user.  Many of these devices incorporate transmitters such as Bluetooth, Wi-Fi, and cellular phone modems, which may operate without specific actions from the passenger.[7]

While FAA regulations allow aircraft operators to demonstrate when and which PEDs can be safely used, few aircraft operators have allowed use of devices during critical phases of flight (e.g., takeoff and landing).  Recognizing that some passengers may wish to use their devices throughout a flight, the FAA is requesting comments regarding the FAA's policies, guidance, and procedures that aircraft operators use to determine whether to allow a particular PED for usage during flight.

**Request for Information**

<u>Considerations for Comment</u>

The FAA is interested in obtaining comments related to the use of PEDs on aircraft from the viewpoints of aircraft operators, passengers, and other stakeholders.  We are soliciting comments on the following:

- Aircraft operators' concerns, both technical and operational;

- Flight attendants' and pilots' concerns;

- Security concerns;

---

[7] This notice does not address flightcrew member use of PEDs during flight.  Section 44732 of Title 49 of the United States Code generally prohibits flightcrew member use of PEDs on the flightdeck while the aircraft is being operated.

•    Manufacturers and designers of PEDs;

•    Passenger perspectives; and

•    How the FAA can support the aviation industry in considering how to allow greater use of PEDs.

The FAA has identified the following specific areas for comments.

1)  <u>Procedures and methods for operators to allow the use of PEDs</u>.  Guidance on the procedures and methods that an operator can use to determine allowance of PEDs is published in AC 91-21-1B.  This AC references the industry-developed guidelines of RTCA/DO-233 and RTCA/DO-294C.  Those guidelines address testing and analysis procedures for advanced avionics system interference from both transmitting and non-transmitting PEDs.

•    What processes and methods are aircraft operators currently using to evaluate PED technology interference?

•    How can those procedures and methods be improved?

•    Is additional FAA guidance and policy needed?

One concept is for operators to improve the sharing of test and compatibility data, so that the same compatibility testing could be leveraged to support many aircraft operators. Data concerning PED and aircraft compatibility could be used by the operators to analyze incidents involving PED interference.

•    Should the industry develop data sharing for this purpose?

2)  <u>Reliability of aircraft systems</u>.  Future aircraft could be manufactured to be immune to the PED environment.  To support commercial aircraft operators' authorization of PED

use, the FAA has issued AC 20-164 describing criteria for aircraft manufacturers and modifiers to establish PED-tolerance for new and existing aircraft.

- Is it necessary to establish aircraft certification regulations to require new aircraft to be PED-tolerant?

In addition, many aircraft systems have already qualified for operation in high intensity radiated field environments.

- How can these demonstrations best be leveraged to help an operator allow the use of PEDs?

3) <u>Aircraft Immunity to PED Interference</u>.  Some aircraft manufacturers and avionics equipment manufacturers have already demonstrated PED and aircraft system compatibility.

- Should aircraft manufacturers and avionics equipment manufacturers provide documentation of aircraft PED tolerance, aircraft systems that meet RF susceptibility requirements, interference path loss, etc., to the operators to support the operator's PED allowance determination?

- Should it be mandatory that aircraft manufacturers and modifiers provide this information to the operators for new and modified aircraft?

4) <u>Promote aircraft-compatible PED transmissions</u>.  The transmissions from PEDs vary widely, making it very difficult for an aircraft operator to discriminate between PEDs that may be acceptable and those that may not.

- Could the consumer electronics industry develop standards for aircraft-friendly PEDs, or aircraft-compatible modes of operation, that would reduce the risk of

10

interference to aircraft systems by defining maximum emissions in designated bands?

5) <u>Passenger perspectives on use of PEDs</u>.  Increased access and usage of PEDs may distract passengers during crewmember safety briefings and instructions. In addition, PED usage may have an adverse impact on flight and cabin crew responsibilities and duties.  In 2005, the FCC[8] solicited comments on the potential to expand the use of cellular phones in flight and received responses from passengers concerned about the use of cell phones by other passengers.  One of the main concerns expressed by the public comment was the fear of passenger disruptions caused by cell phone use in a crowded public conveyance.

- If some PEDs are found to be compatible with aircraft systems, should there be restrictions on the use of PEDs for other reasons?

- Should voice communications using other technologies such as voice over IP be limited or restricted?

- Should aircraft operators be required to publish their PED policies?

6) <u>PED article retention risk considerations</u>.  Personal belongings must be stowed for take-off, approach and landing, to reduce the risk of injury from projectiles and to ensure rapid egress in the event of an emergency.  Some PEDs are large enough to be of concern for egress, while smaller handheld devices may have risks comparable to a small book.

- If some PEDs are found to be compatible with aircraft systems, should requirements to stow PEDs for takeoff, approach, landing and abnormal conditions exist nonetheless to prevent personal injury?

---

[8] Federal Communications Commission's Notice of Proposed Rulemaking (NPRM), FCC 04-288, in WT Docket No. 04-435, adopted December 15, 2004, and released February 15, 2005.

7) <u>Active monitoring for harmful interference</u>.   A handheld device or installed system could be used by the crewmembers to detect harmful interference from PEDs.  This could allow the crewmembers to identify problems and instruct passengers to disable devices when they generate harmful signals.

- Should the FAA consider working with industry to develop standards for an active PED monitoring system?

8) <u>Technical Challenges</u>.

- What are the technical, operation, and regulatory challenges commercial aircraft operators face in expanding their PED usage policy?

- What are the technical challenges the aircraft manufacturers, modifiers, and avionics equipment manufacturers see with further PED usage allowance?

- What data and support can they provide to commercial aircraft operators to address these technical challenges?

9) <u>Operational Challenges</u>.

- What are the operational, safety and security challenges and concerns associated with expanding PED usage policy?

- What is needed to alleviate those concerns?

Again, this information must be submitted by **[insert date 60 days from publication in the Federal Register]**.

<u>Comments Invited</u>

The FAA invites interested persons to submit written comments, data, or views.  The agency also invites comments relating to the economic, environmental, energy, or federalism impacts that might result from changes in our current policy.  The most helpful comments

reference a specific area of concern, explain the reason for any recommended change, and include supporting data.  To ensure the docket does not contain duplicate comments, commenters should send only one copy of written comments, or if comments are filed electronically, commenters should submit only one time.

The FAA will file in the docket a summary of all comments it receives.  The FAA will consider all comments it receives on or before the closing date for comments.  The FAA will consider comments filed after the comment period has closed if it is possible to do so without incurring expense or delay.

Proprietary or Confidential Business Information:  Commenters should not file proprietary or confidential business information in the docket.  Such information must be sent or delivered directly to the person identified in the FOR FURTHER INFORMATION CONTACT section of this document, and marked as proprietary or confidential.  If submitting information on a disk or CD ROM, mark the outside of the disk or CD ROM as proprietary or confidential, and identify electronically within the disk or CD ROM the specific information that is proprietary or confidential.

Under 14 CFR 11.35(b), if the FAA is aware of proprietary information filed with a comment, the Agency does not place it in the docket.  It is held in a separate file to which the public does not have access, and the FAA places a note in the docket that it has received it.  If the FAA receives a request to examine or copy this information, it treats it as any other request under the Freedom of Information Act (5 U.S.C. 552).  The FAA processes such a request under Department of Transportation procedures found in 49 CFR part 7.

Issued in Washington, DC on August 28, 2012.

Susan Cabler,

Aircraft Engineering Division

| Benefit ($ Million) | Benefit/Cost Ratio | Probability that the Fire Fighting Training Requirement will Equal or Exceed the Benefit/Cost Ratio Shown at Left (in percent) |
|---|---|---|

Expected Benefit/Cost Ratio=1.4 (based on expected benefit of $68.1 million)
Cost of Fire Fighting Training for 1988–1997 $50.3 million

## Conclusion

Under the terms of the RFA, the FAA has reviewed these amendments to determine what impact they may have on small entities. The amendments will have a significant economic impact on a substantial number of small entities. The FAA has evaluated several alternatives and has chosen the only alternative that would accomplish the objective.

These amendments will not result in an annual effect on the economy of $100 million or more, or a major increase in costs for consumers; industry; or Federal, State, or local government agencies. Accordingly, it has been determined that these are not major amendments under Executive Order 12291. In addition, the amendments will have little or no impact on trade opportunities for U.S. firms doing business overseas or for foreign firms doing business in the United States.

Since the amendments concern a matter on which there is a substantial public interest, the FAA has determined that this action is significant under Department of Transportation Regulatory Policies and Procedures (44 FR 11034; February 26, 1979).

A regulatory evaluation of the amendments, including a Regulatory Flexibility Analysis, has been placed in the regulatory docket. A copy may be obtained by contacting the person identified under "FOR FURTHER INFORMATION CONTACT."

Accordingly, Part 121 of the Federal Aviation Regulations (14 CFR Part 121) is amended effective July 6, 1987.

The authority citation for Part 121 is revised to read as set forth below, and the authority citations following all sections in Part 121 are removed:

Authority: 49 U.S.C. 1354(a), 1355, 1356, 1357, 1401, 1421–1430, 1472, 1485, and 1502; 49 U.S.C. 106(g) (Revised Pub. L. 97–449, January 12, 1983).

---

### Amendment 121–194

### Carry-On Baggage Program

**Adopted: May 29, 1987**                    **Effective: July 6, 1987**

### (Published in 52 FR 21472, June 5, 1987)

**SUMMARY:** This rule requires Part 121 air carriers to develop and use approved carry-on baggage programs. The rule also requires air carriers to verify that each article of baggage is properly stowed before the last cabin door is closed prior to pushback or taxi. This rule will enhance safety by controlling the amounts and size of carry-on baggage and ensuring that all such baggage is safely stowed.

**DATES:** Effective date: July 6, 1987. Certificate holders may comply any time after the effective date but before the final compliance date. Passengers must comply with the procedures that are part of the certificate holder's program as soon as it is approved and in place.

Final compliance date: January 1, 1988.

**FOR FURTHER INFORMATION CONTACT:** Mr. David L. Catey, Project Development Branch (AFS–240), Air Transportation Division, Office of Flight Standards, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, DC 20591, Telephone (202) 267–8096.

**SUPPLEMENTARY INFORMATION:**

PART 121                                                                                              P-579

Background

The Federal Aviation Act of 1958 requires the Federal Aviation Administration (FAA) to regulate air carriers, as needed, to ensure the safety of air transportation. As air travel became more popular, carry-on baggage began to pose a safety problem. Many people, used to other modes of transportation where they had to carry all their luggage with them, brought their baggage into the passenger compartment of airplanes where it could not be safely stowed. Excessive carry-on baggage can endanger passengers and crewmembers in a number of ways: carry-on bags that block aisles or the spaces between seats can slow evacuation of the airplane in an emergency; improperly stowed carry-on bags can block access to emergency equipment and to under-the-seat lifevests; carry-on bags that fall from overhead racks or bins can injure passengers and flight crewmembers and hinder evacuation.

To control the problem of too much carry-on baggage, the FAA adopted § 121.589 of the Federal Aviation Regulations (FAR) in 1967 [32 FR 13268; September 20, 1967]. The rule stated that passengers could take to their seats only baggage that could be stowed under a seat. This strict under-the-seat rule was needed at that time because most airplanes in use had only open, overhead racks with no means to restrain items placed on them.

Since 1967, cabin interiors have changed considerably; many now have enclosed overhead bins and substantial closets for hanging bags. As interior configurations changed, the FAA revised § 121.589 to allow passengers to use the storage space the air carriers were adding. Each time it revised the rule, however, the FAA made it clear that its fundamental requirement remained the same: All carry-on baggage must be safely stowed.

The current rule requires air carriers to limit baggage taken aboard to that which can be safely stowed. However, the FAA has found strong evidence that this rule is not specific enough to ensure compliance. Too much carry-on baggage is being taken aboard some flights and the excess is being stowed improperly, creating unsafe conditions. During its National Air Transportation Inspection (NATI) Program in the spring of 1984, the FAA found numerous cases of passengers boarding with bags too large to be stowed and of flights where the quantity of bags exceeded the available storage space. Information collected by the Association of Flight Attendants (AFA) through surveys of its members supports the NATI Program findings that excess carry-on baggage is a serious problem on many flights. Passengers commenting on this rulemaking also testify to the widespread nature of this problem. More people are carrying on more bags and in some cases much larger bags than in the past. Some passengers have evidently come to expect that they will be able to carry on almost anything.

A number of factors have contributed to this situation. Passengers cite slow and unreliable baggage handling by the air carriers as the main reason they carry on baggage. In public comments in this rulemaking, passengers frequently state that they would check their bags and, in fact, would prefer checking bags to carrying them through airports, if they could be sure their bags would not be lost and they could retrieve the bags quickly at the end of the trip.

In response to pressure from passengers who want to be able to carry bags on board, air carriers have allowed more carry-on baggage and often reconfigured airplane cabins to provide more storage space. Carry-on baggage also saves the air carriers money: they need fewer baggage handlers; they have fewer claims for lost luggage; and, they can turn their airplanes around faster if they do not have to unload and load large quantities of baggage. Some carriers have made carry-on baggage a selling point, thereby pressuring their competition to do the same.

On August 31, 1984, AFA petitioned the FAA for a change in § 121.589. AFA asked the FAA to set limits on the size and number of carry-on bags. After publishing a summary of the petition (49 FR 37109, September 21, 1984), the FAA received over 300 comments, most in favor of the petition. On July 11, 1985, the FAA held a public seminar on the carry-on baggage issue at which it circulated a "working paper" outlining a possible carry-on baggage rule for discussion. After the seminar, a number of airlines sent their frequent flyers a letter from the Air Transport Association (ATA) telling them that the FAA was considering regulatory action on carry-on baggage. The letter did not contain specifics of the AFA proposal or the FAA working paper and left many of the frequent flyers with the impression that the FAA was planning to ban carry-on baggage or limit it to a single bag. Several thousand people wrote to the FAA in response to that letter. Although a number of these people opposed a rule change, a large percentage of those opposed said all they wanted to be able to carry on were one or two pieces (e.g., a briefcase and a hanging bag). This would have been permitted under the AFA proposal. A large number of commenters disagreed with the position being taken by the "frequent flyer" letter and, instead, wrote in support of more strict control of carry-on baggage. Although these letters were not written in direct response to the AFA petition, the FAA reviewed them and considered the writers' concerns when developing its Notice of Proposed Rulemaking (NPRM), Notice No. 86-6 (51 FR 19134; May 27, 1986). Because of the public interest in this issue, the FAA held a public meeting on July

16, 1986, to solicit further information from the public and to ensure the broadest possible public participation and knowledge.

In the NPRM, the FAA proposed that each air carrier be required to develop procedures for handling and controlling carry-on baggage and incorporate them in an overall carry-on baggage program that the FAA would approve individually. In addition, the FAA proposed that the last passenger cabin door could not be closed until an employee of the air carrier, other than a required crewmember, verified that all carry-on baggage was properly stowed.

The air carriers' programs would be required to include at least one baggage control point located outside the airplane (but not located at the passenger security screening point). The NPRM stated that the following are some of the areas of concern air carriers should consider in developing their carry-on baggage programs:

(1) Types of airplanes operated by the carrier.

(2) Volume and weight capability of onboard storage.

(3) Consistency with the existing FAR.

(4) Procedures for handling of excess carry;on baggage.

(5) Methods of ensuring proper stowage of all carry-on baggage.

(6) Anticipated load factor.

(7) Methods of stowing carry-on baggage in the passenger compartment.

(8) Airplane weight and balance assessment of carry-on baggage.

(9) Areas of operations including terminal facilities (including charter operations).

(10) Facilities for handling excess carry-on baggage.

(11) Training of crewmembers and station personnel.

The FAA anticipated that the programs would vary considerably depending on these factors. Some programs might include limits on size, weight, or number of bags; others might be geared to load factors. Devising their own programs would give the air carriers the flexibility to develop innovative approaches. The requirement that such a program exist also provides a powerful incentive that airlines comply with its terms.

### Discussion of Comments

The FAA received over 200 comments on the NPRM from air carriers, flight attendant and pilot unions, foreign governments, consumer groups, special interest groups, and the traveling public. About 75 percent of these comments favor controlling carry-on baggage; about 25 percent oppose the proposed rule. Their specific objections are discussed below.

Of the comments from the general traveling public, almost 90 percent approve of the proposal. Besides mentioning the safety hazards of too much carry-on baggage, those in favor of the rule cite the inconvenience of waiting while passengers load and unload their luggage. Those opposed generally cite the problems of retrieving and of losing checked luggage.

The National Transportation Safety Board says that it "supports the intent of this NPRM and believes this rulemaking effort can lead to improvement in passenger protection."

A number of commenters say that the FAA should establish a single standard that would apply to all air carriers or all airplanes of the same type because this would make compliance easier, both for the airlines and for passengers. The Regional Airline Association (RAA) and many business flyers state that allowing each carrier to have different standards will make it difficult for passengers who have to change airlines during their trips. The International Foundation of Airline Passengers Associations states that "the airline passenger whose journey includes a change of planes from domestic carrier to international operator expects consistency of approach as far as safety aspects are concerned."

While the FAA recognizes that a single standard has a certain appeal, a uniform standard for all air carriers and airplanes would necessarily have to be designed for the lowest common denominator (i.e., the smallest available stowage space, fleet-wide) and would therefore drastically and needlessly limit carry-on baggage. Many airplanes covered by this rule do not have enclosed overhead bins or closet space for hanging bags. Even the most commonly cited standard for under-the-seat-bags—16 inches by 20 inches by 9 inches—is too large for some airplanes. In addition to these variations among airplane

types, many air carriers have reconfigured the interiors of their airplanes, some to add storage space, others to remove it and add seats. Given this variety of available storage space, the FAA has decided that a flexible program, designed to accommodate the variations, is preferable. The FAA would be receptive to carriers joining together, consistent with the antitrust laws, to develop standardized programs. In fact, the FAA might perform that function for its members.

Flexible programs will not necessarily make it harder for passengers to know what to expect. At present, carry-on baggage practices and procedures vary from airline to airline; passengers who shift from one type of airplane to another or from one carrier to another must deal with the differing amounts of available onboard storage space. In addition, the FAA expects that each air carrier will develop means to educate its customers and travel agents about the substance of its new programs and the sanctions in the regulations that apply to passengers. Each air carrier should also have a mechanism for informing travelers and travel agents about the specific carry-on requirements of each flight.

The FAA specifically requested comments regarding which person should be responsible for verifying that all carry-on baggage is properly stowed. Air carriers, AFA, other unions, and foreign governments object to the provision in the proposed rule that would have required someone other than a required crewmember to verify that all carry-on baggage was properly stowed. The air carriers cite the costs of hiring and training additional personnel as well as the cost of delays they feel would be inevitable in such a situation. AFA states that the verification ''is logically the job of the flight attendants and it is something they are uniquely qualified to do.''

This requirement was originally included primarily to relieve flight attendants of a duty that the FAA perceived was taking too much time and hindering them from completing their other safety duties. However, after considering AFA's position that preboarding control will make the job much less time-consuming, the FAA has changed the proposal to require air carriers to designate at least one required crewmember to verify that all carry-on baggage is stowed before the last cabin door is closed. In addition, this change will alleviate the air carriers' concerns about increased costs. The FAA is requiring that the person or persons designated be required crewmembers because they are trained and familiar with the airplane and must be on board.

ATA objects to the requirement that all baggage be stowed before the cabin doors are closed. ATA states that flight attendants can use the time after the doors have been closed ''for verifying and repositioning of improperly stowed baggage.'' ATA goes on to say, ''It is unreasonable to presume that all passengers will stow all baggage for pretaxi verification when they know takeoff is still perhaps twenty or more minutes away.''

The FAA does not agree with this position. The rule will require that at least one crewmember must verify that all baggage is properly stowed before the doors are closed. Before the doors close, if an item cannot be stowed, the item can be removed and stowed as checked baggage. If the verification is done after the doors are closed and the airplane has pushed back for taxiing, the airplane would either have to return to the terminal so items that could not be stowed could be checked, or take off, in violation of the rules, with items improperly stowed. While the preboarding check should limit the stowage problems, it may not entirely eliminate them. If an item has to be checked, this can only be done before the doors are closed. Once the doors are closed, the pressure is on the crewmembers to get the flight underway, and there is no access to the cargo compartment.

The majority of commenters in favor of this rulemaking cite the safety hazard caused by excessive amounts of carry-on baggage. A number mention being hit and sometimes seriously hurt by heavy bags falling out of overstuffed overhead bins. Others cite the danger posed when aisles and the spaces between seats are effectively blocked by oversized bags; evacuation would be difficult in these circumstances.

Many commenters raise the question of heavy items in overhead bins. Others question the safety of the overhead bins themselves as opposed to their contents. Each bin is certificated for a maximum weight. If that weight is not exceeded and if the bin is properly packed and latched, the bins are safe and should not open. Many of the accidents involving luggage falling out of overhead bins have occurred because too much has been packed into the bins; when the bins are opened, the contents spill out immediately. If the bins were not too full, this would not occur. Carry-on baggage programs must include procedures to ensure that no bin or authorized stowage space is overloaded with either too much weight or too great a volume of baggage.

A number of commenters, including RAA, question how the FAA will ensure that the principal operations inspectors (POI's) use the same standards when approving programs for different carriers and in different parts of the country. RAA states that the FAA should at least set standards for types of airplanes that do not have significant variations.

The FAA will provide guidance to POI's, which will be available to carriers, that will spell out which elements should be included in the programs and what degree of variation is acceptable. The items listed in this preamble will be part of this guidance. FAA headquarters will monitor the approvals to ensure that they are consistent with this guidance. In addition, because the programs will be included in an air carrier's operations specifications, a means for appealing a POI's decision to headquarters is provided in § 121.79.

A number of commenters, including ATA, state that the only problem with the current rule is that the FAA is not enforcing it adequately. The FAA conducts surveillance of the air carriers, but because the number of FAA inspectors is limited and the range of their responsibilities is broad, the FAA cannot conduct surveillance on every flight. The FAA and the public expect air carriers to comply with all the rules all the time; air carrier compliance should not be proportionate to the FAA's ability to monitor and enforce a particular rule. Normally this expectation is met. In the area of carry-on baggage, however, it is clear that customer pressure and other factors have caused some air carriers to become lax in their compliance practices. At the public hearing on this rule, representatives of air carriers acknowledged that, as a result of these practices, flight attendants were sometimes forced to stow excess baggage in lavatories, galleys, and other unauthorized areas. The representatives dismissed this stowage as no problem although it is a violation of the current rules.

Poor compliance with this rule must be changed because improperly stowed carry-on bags can pose a safety hazard. This rule will require the air carriers to develop procedures for handling carry-on baggage in a way that ensures that every bag taken on board can be properly stowed. With the flexibility to devise their own programs, the air carriers will have the chance to find ways to provide passengers with the services they want while meeting the safety requirement for proper stowage of all bags. Having developed the procedures themselves, the air carriers should find compliance easier. Carriers should expect the FAA to demand strict compliance with the procedures in their carry-on baggage programs. Indeed, continued compliance with the provisions of a carrier's carry-on baggage program is a condition for maintaining the approval of that program.

The International Association of Duty Free Shops, the City of Los Angeles, and the State of Hawaii object to the proposed rule on the grounds that it will discourage people from purchasing duty free items at airport duty free shops because they will be prevented from carrying them on board.

Nothing in this rule will prevent such purchases; this rule will only prevent passengers from taking on board more baggage than can be safely stowed, as should the present rule. Air carriers operating on routes that include duty free shops will be able to adapt their carry-on programs to accommodate their passengers if sufficient stowage space is available, or they may reconfigure the airplanes used on those routes to provide such space.

One commenter objects to applying this rule to cargo-only operators who carry additional crewmembers, other employees, etc. This rule should not cause problems for these carriers. They still must see that baggage is safely stowed, as they must under the current rule. It is unlikely, however, that their program for the management of carry-on baggage will need to be complicated or extensive.

A number of jewelers and musicians object to the proposed rule because they believe the rule would seriously hamper their business. The jewelers state that they must carry on their sample cases; unless they do, their insurance will not cover losses. Musicians state that they must carry on instruments; if checked, the instruments could be seriously damaged.

This rule allows the air carriers to make provisions to accommodate travelers with special baggage problems, provided the baggage can be safely stowed. We would expect that carriers would establish procedures to allow passengers to notify the airlines prior to traveling to see if special baggage needs can be accommodated.

A variation on this problem is the passenger who wants to carry on large, fragile objects that cannot be stowed in accordance with the rules set out in § 121.285. The FAA realizes that airlines many times do not want to check these fragile items. However, the solution is not to carry the items on board and stow them unsafely. The passenger compartment of an airplane is not meant primarily as a cargo stowage area. The best solution, of course, is for passengers to ensure that such fragile objects are securely packed to withstand normal handling. If an item cannot be safely checked or stowed, it should be shipped by some other means.

Some commenters state that the proposed rule would increase boarding time. The FAA disagrees. At present, boarding is often slowed while passengers wait for the people ahead of them to stow baggage and while the last people to board struggle to find space for their carry-ons. Under this rule, people

should know beforehand what they will be able to take on board and will have time to check extra baggage. Boarding itself should be smoother and quicker.

AFA requests additional language in the rule stating: (1) that each AFA requests approved program include specific criteria, set by the air carrier, for the size and amount of carry-on baggage allowed each passenger; and (2) that the air carrier provide baggage screeners with a means to determine if the baggage meets the criteria.

This language is not necessary because the approved programs would be meaningless unless they include criteria about what can be safely stowed and the number of bags that will be permitted and provide baggage scanners with adequate procedures for handling baggage not permitted to be carried on board.

AFA and the Air Line Pilots Association (ALPA) recommend that the FAA extend the proposed rule to include taxiing in the phrase, "no certificate holder may allow an airplane to takeoff or land . . ." unless all baggage is stowed. This problem has been dealt with in the rule by the requirement that all baggage be stowed before the last cabin door is closed. However, once this verification is complete, the passenger should be free to remove stowed items from storage spaces in order to retrieve personal belongings as long as all items are again properly stowed prior to takeoff.

ATA objects to including the carry-on baggage program in the air carriers' operations specifications. ATA states that operations specifications are a pilot and dispatcher working document while the carry-on baggage program is basically a passenger service document.

The FAA disagrees. Operations specifications cover many aspects of an air carrier's operations. One purpose of operations specifications is to document, in a form that is enforceable and is easily accessible to safety inspectors, agreements between the carrier and the FAA on what operations are approved. Approved carry-on baggage programs are an appropriate addition. If the text of a program is very long, it may be included in the air carrier's manual and incorporated by reference in the operations specifications.

ALPA questions whether the weight allotments that the FAA recommends air carriers use for their weight and balance calculations are high enough.

Such questions are outside the scope of this proceeding and cannot be specifically dealt with in this rulemaking. However, it should be noted that weight and balance assessments are one factor in the carry-on baggage program. If, under its program, an air carrier permits passengers on any of its flights to carry such significant amounts of baggage on board that the FAA's carry-on baggage weight allowance guidelines are substantially exceeded, the air carrier is responsible for adjusting its weight allowance calculation for each flight affected to ensure the accuracy of aircraft weight and balance and performance calculations.

The FAA's concern is safety; some of the factors that have contributed to the current problem, such as baggage handling procedures, are beyond the FAA's safety mandate. In general, the FAA believes that fewer bags are better than more bags, and smaller bags are better than larger. Nonetheless, safety is determined by the ability to stow every item properly, not by size or number alone. While passengers must comply with this rule, the ultimate responsibility for safety lies with the air carrier. In this rulemaking the FAA is adopting a flexible regulation to give air carriers a chance to develop programs that suit their needs and ensure safety. The agency believes that this rule strikes a fair balance between these safety concerns and the convenience expected by the traveling public. The FAA will monitor these programs to ensure that the carriers are using the procedures they have developed and that the procedures are effective. If it finds that the air carriers are not complying, the agency will have the option of withdrawing approval of the programs or prescribing more specific standards.

After considering the comments, the FAA is adopting the rule as proposed, except that §121.589(b) will require that at least one required crewmember verify that baggage is properly stowed before the last cabin door is closed. The rule has a compliance date of 180 days after the effective date to give air carriers time to develop, submit, and obtain approval for their programs. All programs must be approved by the compliance date. Airlines without approved programs may not permit carry-on baggage aboard their flights. Passengers will have to comply with the programs as soon as they are approved and put into effect. Since the FAA anticipates that approving the programs may require considerable FAA review, the air carriers should submit their programs as soon as possible (but no later than 180 days from the effective date of this rule) so that the review process may be completed before the compliance date.

## Economic Summary

The FAA will require Part 121 certificate holders that carry passengers to develop and use an approved carry-on baggage program after 180 days after the effective date.

The amendments to §121.589 specify that no certificate holder may allow the boarding of carry-on baggage on aircraft unless each passenger's baggage has been scanned to control the size and amount carried on board in accordance with an approved carry-on baggage program in its operations specifications. The rule also requires air carriers to verify that each article of baggage is properly stowed before the last cabin door is closed prior to pushback or taxi.

These amendments are in part a response to the August 31, 1984, petition submitted by the AFA to amend §121.589 of the FAR to limit the amount and size of carry-on baggage on aircraft. The AFA petition and a recent FAA study of carry-on baggage aboard Part 121 air carriers indicate that the size of articles and overall volume of carry-on baggage frequently exceed the stowage capacity in the passenger compartments. The excess baggage cannot be safely stowed, giving rise to a potential safety hazard. The rule also takes into account the large number of public complaints addressing the unsafe stowage of large and heavy items and the clutter created by excess carry-on baggage.

The FAA anticipates that the affected air carriers will elect to develop FAA-approved carry-on baggage programs prior to the compliance date specified in this amendment. This evaluation estimates that the total cost of compliance to the 146 Part 121 certificate holders affected by the carry-on baggage program requirements of this rule is $540,000 in 1986 dollars.

The primary benefit of this rule will be the prevention of fatalities and injuries resulting from improperly stowed items obstructing rapid passenger egress in otherwise survivable impacts and from improperly stowed items dislodging and striking passengers and crew when abrupt aircraft deceleration or attitudinal changes occur.

Quantification of these benefits is not possible because the safety records of the FAA and the NTSB do not detail the extent to which improperly stowed items have contributed to fatalities and injuries in air carrier accidents.

Economists generally agree that the economic value of a human life is no less than $1 million. Hence, if even one fatality is prevented as a result of this amendment during the 10-year period following implementation of the rule, the $540,000 cost of compliance will be substantially exceeded by the benefits.

## Regulatory Flexibility Determination

The FAA has determined that under the criteria of the Regulatory Flexibility Act (RFA) of 1980, this amendment will not have a significant economic impact on a substantial number of small entities.

FAA's thresholds for significant economic impact vary according to the equipment type operated and the kind of service provided. The annualized cost threshold for scheduled carriers is $92,700 or $51,800, depending on whether the fleet operated includes aircraft having more than or fewer than 60 seats, respectively. The threshold for nonscheduled air carriers is only $3,600.

The cost of compliance with these amendments for a small nonscheduled air carrier is estimated to be $1,104. This is substantially lower than the $3,600 threshold established for small nonscheduled air carriers and far below the threshold of $51,800 for scheduled carriers operating airplanes with 60 or fewer seats. Therefore, small carriers will not incur a significant economic impact as a result of the amendment to §121.589.

## Trade Impact Assessment

This rule affects only U.S. air carriers operating under the rules of Part 121 of the FAR. The regulation will have little or no impact on trade opportunities for U.S. firms doing business overseas and does not apply to foreign firms doing business in the United States.

## Conclusion

Compliance with this rule will involve only a one-time cost on the part of air carriers to develop an FAA-approved carry-on baggage program. Because this amendment will not result in an annual effect on the economy of $100 million or more or a major increase in costs for consumers; industry; or Federal, State, or local government agencies, it has been determined that this is not a major amendment under Executive Order 12291. In addition, the amendment will have little or no impact on trade opportunities for U.S. firms doing business overseas or for foreign firms doing business in the United States.

Since the amendment concerns a matter on which there is a substantial public interest, the FAA has determined that this action is significant under Department of Transportation Regulatory Policies and Procedures (44 FR 11034; February 26, 1979). In addition, as noted above, the FAA certifies that under the criteria of the Regulatory Flexibility Act, this amendment will not have a significant economic impact on a substantial number of small entities.

A regulatory evaluation of the amendment, including a Regulatory Flexibility determination and Trade Impact assessment, has been placed in the regulatory docket. A copy may be obtained by contacting the person identified under "FOR FURTHER INFORMATION CONTACT."

### The Rule

Accordingly, the Federal Aviation Administration amends Part 121 of the Federal Aviation Regulations (14 CFR Part 121) effective July 6, 1987.

The authority citation for Part 121 continues to read as follows: Authority: 49 App. U.S.C. 1354(a), 1355, 1356, 1357, 1401, 1421–1430, 1472, 1485, and 1502; 49 U.S.C. 106(g) (Revised, Pub. L. 97–449, January 12, 1983).

---

### Amendment 121–195

### Mandatory Reporting for Emergency Evacuation Systems and Components

**Adopted: March 10, 1988**                    **Effective: April 15, 1988**

### (Published in 53 FR 8726, March 16, 1988)

**SUMMARY:** The purpose of this amendment is to revise the mechanical reliability reporting requirement contained in Part 121 of the Federal Aviation Regulations to require certificate holders to report each failure, malfunction, or defect of emergency evacuation systems and components. This amendment is necessary to collect, record, analyze, and disseminate data concerning those failures, malfunctions, or defects that occur during training, testing, or actual emergency conditions to improve the levels of emergency evacuation system reliability and safety.

**FOR FURTHER INFORMATION CONTACT:** Mr. George R. Johnson, Project Development Branch (AFS–360), Office of Flight Standards, Federal Aviation Administration, 800 Independence Avenue, SW., Washington, D.C. 20591, Telephone (202) 267–3798.

**SUPPLEMENTARY INFORMATION:**

### Background

On May 22, 1987, the Federal Aviation Administration (FAA) issued Notice of Proposed Rulemaking (NPRM) No. 87–5 (52 FR 20982; June 3, 1987). The notice proposed to amend the mechanical reliability reporting requirement contained in Part 121 of the Federal Aviation Regulations (FAR) to require certificate holders to report each failure, malfunction, or defect of emergency evacuation systems and components. Section 121.703(a) of the FAR requires each certificate holder to report the occurrence or detection of failures, malfunctions, or defects of 16 specified categories. Section 121.703(c) requires the certificate holder to report any other failure, malfunction or defect in an aircraft that occurs, or is detected at any time if, in its opinion, that failure, malfunction or defect has endangered, or may endanger, the safe operation of an aircraft used by the certificate holder.

The ability to evacuate an airplane safely and quickly during an emergency is a major concern to the FAA, the aviation industry and the public. As part of an effort to collect information about and address these concerns, the FAA sponsored a technical conference in Seattle, Washington, from September 3–6, 1985, related to emergency evacuation of transport category airplanes. Discussions covered the number, capacity distribution and marking of emergency exits, full-scale evacuation demonstrations, the validity of the data derived from full-scale evacuation tests versus that data obtained from mathematical analysis. Also discussed were the criteria to be used to decide when the mathematical analysis method (used because of full-scale demonstration cost, impracticality, or other reasons) would be acceptable in lieu of a full-scale demonstration. The discussions also covered escape slides and the design standards and certification testing requirements for these slides, slide maintenance failure reporting, and other related topics. Working groups were established to review and discuss each listing regulations in Parts 25 and 121 of the FAR and recommended regulatory and non-regulatory changes.

## VOLUME 3  GENERAL TECHNICAL ADMINISTRATION

## CHAPTER 33  CABIN SAFETY AND FLIGHT ATTENDANT MANAGEMENT

### Section 6  Operations—Cabin Safety

**3-3546.     SERVICE OF ALCOHOLIC BEVERAGES.** The boarding of a passenger who appears to be intoxicated is a violation of Title 14 of the Code of Federal Regulations (14 CFR).

**A.**  Further, passenger noncompliance with Federal Aviation Administration (FAA) safety regulations may result in interference with a crewmember. This is a violation of 14 CFR part 121 and may also be a criminal violation under Title 49 of the United States Code (U.S.C.) section 46318(a). Air Carriers should have procedures in their manuals to ensure that crewmembers know what actions to take if a passenger does not comply with the safety regulations and/or interferes with a crewmember.

**B.**  Title 14 CFR part 121 requires air carriers to report passenger disturbances associated with alcohol within 5 working days. Due to safety implications, 14 CFR part 135 air carriers should also report these disturbances to the FAA within 5 days. The appropriate air carrier manuals should contain the crewmember procedures used to report these occurrences. The FAA suggests the following procedures:

    1)  The pilot-in-command (PIC) and/or the flight attendant in charge of the cabin should fill out a report that, if feasible, both of them should sign.

    2)  The report should include:

- The name and address of the individual

- A physical description of the individual, individual's seat number

- The location of the individual's boarding and destination

- Names, addresses, and phone numbers of witnesses

- Names, addresses, and domiciles of the other crewmembers

- A brief narrative of the incident, the airline, flight number, and date

    3)  This report should be sent to the designated personnel, which will be in the air carrier's and crewmember's manuals.

**C.**  Air carriers should have adequate procedures contained in crewmember manuals and training programs outlining the specific duties of crewmembers and ground personnel regarding the use and service of alcohol. For example:

- Procedures to handle disturbances that may occur involving the service of alcoholic beverages

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use
Add. 31

- Procedures regarding the removal of a passenger who appears to be intoxicated

- Procedures to handle passengers who may have brought their own alcoholic beverages onboard

**3-3547.    CARRY-ON BAGGAGE.** As a result of the September 11, 2001 terrorist attacks, the U.S. Congress passed The Aviation and Transportation Security Act. Section 122 of the Act, entitled "Sense of Congress," clearly states its desire for the FAA to maintain its current restriction on carry-on baggage of one bag and one personal item. The Transportation Security Administration (TSA) web site has information as to items that are permitted and prohibited in carry-on baggage as well as provides examples of what constitutes a personal item. The TSA web site is www.tsa.gov.

   **A.**   Title 14 CFR part 121 prohibits an air carrier from closing the passenger entry door in preparation for taxi or pushback, takeoff, or landing an airplane unless each article of carry-on baggage is stowed in a suitable baggage or storage compartment under a passenger seat.

   **B.**   An air carrier may not allow the following:

       1)   The boarding of carry-on baggage unless each passenger's baggage has been scanned to control the size and amount carried on board in accordance with an approved carry-on baggage program. Additionally, no passenger may board an airplane if his/her carry-on baggage exceeds the baggage allowance prescribed in the air carrier's approved program.

       2)   All passenger entry doors of an airplane to be closed in preparation for taxi or pushback unless at least one crewmember verifies that each article of carry-on baggage is properly stowed. Baggage is neither properly stowed nor restrained unless the over-head bin door is closed and latched. The same requirements apply for stowing carry-on baggage before takeoff and landing.

       3)   Stowage of carry-on baggage or cargo that could hinder the use of any emergency equipment. Air carriers should provide suitable storage space for all required emergency equipment.

   **C.**   When air carriers allow the stowage of cargo and baggage in passenger seats, they should include this information in their FAA-approved carry-on baggage program. The information about this practice should include:

- The types of cargo that may be restrained in the seat

- Location of the seat(s) where it may be stowed

   **D.**   Carry-on baggage may be stowed against a passenger class divider or bulkhead if both are stressed for inertia loads and the baggage is restrained from shifting by FAA-approved tiedown straps or cargo nets. A principal operations inspector (POI) must approve the stowage of carry-on baggage against the bulkhead or divider. The POI will coordinate this approval with the

2

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

8900.1 CHG 0                                                                                                          9/13/2007

Aircraft Evaluation Group (AEG) and other elements within the FAA, as needed. Carry-on baggage may be stowed in coat closets or other compartments that the FAA approves.

**E.** The operation of an airplane with carry-on baggage, cargo, or trash stowed in uncertified receptacles, such as lavatories, is contrary to 14 CFR part 121 and the certification basis of the aircraft. If a receptacle in the cabin of the airplane, including the lavatory, is intended for the stowage of carry-on baggage, cargo, or trash, it must be shown to meet the applicable requirements in the airplane certification basis. These requirements include:

- The structural requirements pertaining to the restraint of the receptacle's contents for flight, ground, and emergency landing load conditions

- Requirements pertaining to fire containment

NOTE: The certification requirements are contained in 14 CFR part 25.

**F.** Part 121, section (§) 121.589 stipulates that each air carrier must have a carry-on baggage program approved by the Federal Aviation Administration (FAA). Carry-on baggage programs must comply with existing regulations.

1)  A description of carry-on baggage articles must be in the program. This description shall provide information about the types of articles which could be exempt from the carry-on baggage count. This could include such things as child restraints, canes, assist devices for people who are physically challenged, articles of personal clothing, etc. Some air carriers believe that "exempted articles" do not have to be restrained. Therefore, information that all articles (including those exempt from the carry-on baggage count) must be properly restrained shall also be stipulated in the carry-on baggage program.

2)  Proper stowage of carry-on baggage is a major safety issue. Advisory Circular (AC) 121-29, as amended, asks the airlines to include in their carry-on baggage programs a definition of "properly stowed." Ensuring that baggage does not interfere with emergency equipment is an important part of the information about proper stowage. In addition, nothing can be stowed in the seat pockets except magazines and passenger information cards. It is not a good safety practice to stow meals, either brought onto the airplane by passengers or served by the air carrier, in seat back pockets. The FAA considers meals carried on by passengers to be carry-on baggage. Even though meals may be exempt by the air carrier from the number of bags permitted, they still must be stowed in accordance with the regulations pertaining to carry-on baggage. Nothing may be stowed in the lavatories, unless lavatories meet all the requirements for approved cargo stowage areas.

3)  The program should specify the crewmember position responsible for ensuring that carry-on baggage is properly stowed. While each crewmember should ensure carry-on baggage procedures are followed, it is important that a specific crewmember be identified to be responsible for insuring carry-on baggage is properly stowed for each cabin or each cabin area. Specific and clear crew assignments are an important part of safety.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

8900.1 CHG 0                                                                      9/13/2007

    4)   The air carriers shall provide information to passengers about their carry-on baggage programs. This information should include advice about the types of articles that should not be carry-on baggage. Many air carriers do this as part of their telephone announcements when reservations are made. In addition, some air carriers provide this information through public address announcements and signs at the airport. A variety of methods used by the air carrier are acceptable, but the public should be able to readily obtain the information.

    5)   Carry-on baggage programs should:

- Comply with existing regulations and applicable programs such as the FAA approved weight and balance program

- Provide information about preventing baggage, which cannot be stowed as carry-on baggage, from reaching the aircraft as carry-on baggage

- Ensure that carry-on baggage which is brought to the airplane, but not carried in the cabin, is assigned the same weight as other baggage carried in the cargo compartment

- Define carry-on baggage, including those items that might be exempt

- Provide information about size and number accepted

- Define properly stowed, to include overhead bin stowage and under seat stowage. For proper under seat stowage of carry-on baggage, there must be forward and side restraints to prevent bags from sliding into the aisle.

- Ensure that carry-on baggage does not interfere with emergency equipment, and that nothing is placed in front of or directly on tip of emergency equipment

- Address stowage of unusual articles such as musical instruments

- Prohibit the stowage of carry-on baggage and other items in the lavatories and seat back pockets (the only items allowed in seat back pockets should be magazines and passenger information cards)

- Provide specific crewmember assignments for the verification that carry-on baggage is properly stowed

- Address procedures in appropriate manuals

- Provide crewmember training on carry-on baggage, and

- Ensure that information is available to the public about the air carrier's carry-on baggage program

4

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

6)   Air carriers should use approved procedures to ensure compliance with their carry-on baggage program. These procedures should include the following items:

- Preboarding scanning to ensure that size and amount of passenger carry-on baggage is in accordance with the allowances prescribed in the approved carry-on baggage program

- Closing and latching each overhead bin before all passenger doors are closed in preparation for taxi or pushback and before takeoff and landing

- Closing, latching, or installing each restraint device for each cargo compartment located in the passenger cabin before all passenger doors are closed and before takeoff and landing

- Stowing each piece of "under seat" carry-on baggage

- Removing all carry-on baggage that cannot be stowed properly in the passenger cabin, before closing all passenger entry doors in preparation for taxi or pushback, and reloading it as checked luggage in a cargo compartment

7)   Each air carrier may decide if they will allow passengers to travel with their pets in the passenger cabin. If an airline does allow cabin pets, then the pet container is considered to be carry-on baggage and must conform to all carry-on baggage regulations.

- The pet container must be small enough to fit underneath the seat without blocking any person's path to the main aisle of the airplane

- The pet container must be stowed properly before the last passenger entry door to the airplane is closed in order for the airplane to leave the gate

- The pet container must remain properly stowed the entire time the airplane is moving on the airport surface, and for take off and landing

- Passengers must follow flight attendant instructions regarding the proper stowage of the pet container

- Additional information on traveling with pets in the passenger cabin can be found on the FAA Cabin Safety web site (www.faa.gov/safety/programs_initiatives/aircraft_aviation/cabin_safety/)

**3-3548.     STOWAGE OF NON-COLLAPSIBLE FLEXIBLE TRAVEL CANES.** The Department of Transportation (DOT) issued an Order of Dismissal to certain complainants against a U.S. air carrier dismissing the complainant's allegation that the air carrier violated 14 CFR part 382, which prohibits discrimination against qualified handicapped persons. The complainants, who are legally blind, alleged that the carrier's failure to allow them to stow their long white flexible canes at their seat constituted unlawful discrimination under DOT rules.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 35

    **A.** The current rules require air carriers to allow stowage of flexible canes near passengers in a manner consistent with FAA safety regulations.

    **B.** Part 121 requires all carry-on items, other than articles of loose clothing, to be stowed in a suitable closet, baggage or cargo stowage compartment, including an overhead rack having doors or restraints, or under a passenger seat that is fitted with a means to prevent stowed articles from sliding forward in the passenger compartment or sideward into the aisle. In addition, part 121 allows flexible travel canes to be stowed:

    1)  Laterally under two or more connected passenger seats in the same row, if the cane does not protrude into an aisle and is flat on the floor.

    2)  Longitudinally between a non-emergency exit window seat and the fuselage, if the cane is flat on the floor.

    3)  Longitudinally beneath any two non-emergency exit row window seats, if the cane is flat on the floor.

    4)  In accordance with any other method the Administrator approves.

    **C.** The thrust of part 121 is to ensure that all carry-on items are properly restrained in the event of an emergency. The FAA requires that passenger seats, under which baggage is allowed to be stowed, must be equipped with under-seat restraints sufficient to prevent articles of baggage, including flexible travel canes and other thin profile items of baggage, from sliding forward. Also, aisle seats, under which the FAA allows baggage to be stowed, must be equipped with under-seat restraints to prevent baggage from sliding forward. POIs and/or CSIs (as applicable) shall contact their assigned air carriers to:

- Inform them of these thin profile baggage restraint problems

- Require them to take action to ensure that the FAA-approved carry-on baggage program of each air carrier operating under part 121 has policies that ensure proper restraint of all carry-on baggage, including non-collapsible flexible travel canes

**3-3549.    STOWAGE OF GALLEY SERVICE ITEMS.** Part 121 section (§) 121.577, prohibits an air carrier from moving on the surface, taking off, or landing an airplane when any food, beverage, or tableware, furnished by the air carrier, is located at any passenger seat. In an emergency situation requiring evacuation, litter from food service of any kind (including coffee and rolls) can be hazardous due to poor footing. Accordingly, part 121 prohibits serving any food or beverage, regardless of the type of containers used, during movement on the surface, takeoff, and landing. In addition, any food item or container that the passenger carries on board the aircraft would be considered carry-on baggage and must be properly stowed, in accordance with part 121, for movement on the surface, takeoff, and landing.

**A.** Part 121 also states that, during movement on the surface, takeoff, and landing, the following items must be secured in their stored positions (i.e., correctly positioned and fastened in their storage compartment and restraint means, if any):

- Passenger food and beverage trays

- Serving carts

- Each movie screen that extends into an aisle

NOTE: If there is a question regarding the stowage of a particular item, and it must be stowed for takeoff and landing, then that item must also be stowed for movement on the surface.

**B.** Air carriers may arrange to provide limited beverage and food service to their passengers when the aircraft is no longer moving on the surface (e.g., while the aircraft is stationary on a taxiway in a long queue awaiting takeoff.) In such cases, the air carrier should have specific procedures for flight crewmembers and flight attendants to follow, including coordination and communication between the flight deck and the passenger cabin(s), to ensure that these requirements are met before aircraft movement on the surface resumes.

**C.** In addition, the FAA considers that galley supplies stowed outside the galley are cargo. These supplies must be stowed in accordance with part 121. If galley supplies or other cargo, weighing over 20 pounds, are placed under a seat, the FAA must approve the container or restraint usually, through a supplemental type certificate.

**3-3550.      RETENTION OF ITEMS OF MASS.** Part 121 refers to galley equipment, serving carts, and crew baggage. However, the FAA did not intend to list all items of mass. Crewmembers must restrain any item that can become a hazard by shifting under the load factors of an emergency landing.

**A.** Particular attention should be given to compliance with part 121 regarding restraints for any baggage carried on the flightdeck. Flightcrew flight-kits are not items of crew baggage. This policy also applies to aviation safety inspectors (ASI) and additional flight crewmembers. While it is logical that flight kits be placed so that movement is restricted, the FAA does not intend that they be restrained in a manner that would interfere with the needs and functions of the flightcrew.

NOTE: This is only applicable to flight kits.

**B.** It is recommended that air carriers include instructions to flight attendants that all serving carts, in addition to being stowed for takeoff and landing and when it is not in use, be properly restrained when in use but not being moved from one location to another. Air carriers should expand this policy to require restraint of all galley equipment (including supplies) that are not being used, so they will not become hazards during periods of inflight turbulence.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

8900.1 CHG 0                                                                                    9/13/2007

**3-3551.     POTENTIAL PROBLEMS ASSOCIATED WITH FOOD AND BEVERAGE
SERVICE.**

     **A.**  Reports are received regarding passengers and flight attendants burned by the spillage
of hot liquids. Air carriers should have procedures discontinuing service of hot liquids when
turbulent air is encountered that is not severe enough for the flight attendants to discontinue all
service. In addition, containers for hot liquids should have lids that can be securely closed.
Additional service items and areas of concern that could cause injuries are:

- Carts with sharp corners or projections that may cause injury

- Brakes on the carts that are hard to operate, inadequate, or nonexistent

     **B.**  When flight attendants carry food and beverage containers (bottles, glasses, trays, hot
water and coffee containers, etc.) loosely on the cart and in turbulence, they may become
dislodged and strike or scald passengers and crewmembers

     **C.**  Flight attendants should not leave carts unattended. Air carriers should have
procedures which ensure that flight attendants are no more than 10 feet (3 rows) away from the
carts left in the aisles. Flight attendants should not park carts out of their normal galley take
off/landing positions unless they can be properly restrained. Some aircraft are equipped with
restraint devices such as mushrooms, which will properly hold carts in other areas. When this is
the case, flight attendants may leave them unattended. However, most items should be cleared
from the top of the carts. During a sudden directional change of the aircraft, items left
unrestrained on the top of the carts can become dislodged and cause injuries.

     **D.**  Air carriers should have procedures for reporting cart and cart restraint deficiencies.
Flight attendant manuals should contain information about the procedure for cart stowage and
restraint.

**3-3552.     PROBLEMS WITH LOWER LOBE GALLEYS.**

     **A.**  The FAA requires air carriers to provide instruction to flight attendants on electrical
equipment and related circuit breakers located in the cabin area of aircraft, which includes all
galleys, service centers, and lifts. A good understanding of the function of these circuit breakers
could eliminate a problem before it becomes a safety hazard. Air carriers should assure that this
subject is adequately covered in flight attendant training for all aircraft so equipped.

     **B.**  The FAA received information concerning passengers having access to the lower lobe
galleys. They either let themselves down in the lifts or the flight attendant took them down.
There is no justifiable reason for passengers to be in the galley where they would interfere with
the flight attendant duties. In addition, there is no provision for oxygen masks and safety belts for
extra persons. Air carriers should incorporate into their manuals and training programs
prohibition against passengers being allowed in the lower lobe. Hence, they should placard each
lift.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 38

USCA Case #13-1316     Document #1491488     Filed: 05/05/2014     Page 41 of 126

**C.**   Some air carriers have conducted training and/or instructions in the lower lobe during flight with five or six flight attendant trainees. They have also allowed deadheading crewmembers to occupy or visit the lower lobe during flight. Due to the number of oxygen masks and seatbelts, only two flight attendants should be allowed in the lower lobe at any time during flight. One additional person may be allowed for instruction, evaluation, or inspection duties.

**D.**   It is very difficult to hear the public address (PA) system announcements in the lower galley because of aerodynamic noise and other noise emitting from nearby systems. The flight attendant working in the galley cannot hear the captain's warning of clear air turbulence or 10-minute warning of descent. In addition, there have been reports of numerous failures of the intercom systems. Sometimes, flight attendants in the galleys rely on the other flight attendants to pass the warning. Air carriers should incorporate flight attendant procedures to assure that all warnings are passed to and acknowledged by persons in lower galleys.

**E.**   En route inspections have revealed a nonconformity throughout the aviation industry in training and procedures for flight attendants who have to work in lower lobe galleys. Air carriers' emergency procedures pertaining to the lower lobe should include procedures and training on the location and use of emergency equipment. The emergency procedures should also include the removal of an injured flight attendant in the lower section.

**F.**   Minimum Equipment Lists (MEL) between different aircraft (DC-10, L-1011, and B-747) are not always compatible. In one instance, if the personnel lift is inoperable, the flight attendant will not perform food servicing during flight. In another instance, if the personnel lift is inoperable, the flight attendant may go down to the lower galley, but the service is limited to a number of carts that can be delivered and stowed in the passenger cabin. In addition, flight attendants have sustained serious injuries caused by certain lift malfunctions that occurred during flight. Air carriers should include procedures in their flight attendant manuals and training programs to assure that there are adequate instructions throughout their system on dispatching aircraft with inoperable personnel or cart lifts. Additionally, they should have procedures in the event these lifts become inoperable during flight. Further, assurance should be sought to determine that each air carrier is keeping flight attendants informed on conditions and procedures, which are set forth in the MELs that affect them.

**G.**   Some airlines do not have a sufficient number of mushrooms in the cabin in order for crewmembers to "tie down" each serving cart in the event of turbulence. These carts can weigh up to 250 pounds and should be anchored when not being transferred to or from the cart lifts. Air carriers' procedures and training should include instructions to the flight attendants that all carts must be properly stowed for:

- Movement on the surface

- Takeoff

- Landing

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 39

- Whenever they are not being moved from one location to another

**H.** The FAA has found some retractable mushrooms in lower galleys inoperable. They are either jammed in the down position or, when lifted to the up position, will fall back down when the cart is placed over it. The automatic brakes are insufficient to keep the carts from moving about during takeoff and landing. Air carriers should conduct inspections periodically in the lower lobe to see that the mushrooms are operable and that crewmembers adhere to procedures requiring each cart to be tied down or stowed. Air carrier maintenance programs should ensure that mushroom restraints and other types of floor tie downs are not worn down. The thickness and circular diameter must be maintained in order for the mushroom-type of restraints to properly secure the cart.

**3-3553.     PREDEPARTURE CABIN EQUIPMENT CHECKS BY FLIGHT ATTENDANTS.** Some air carriers assign flight attendant tasks for making a predeparture check of the normal and emergency equipment in the passenger cabin.

**A.** In reviewing this situation, we found that in most cases the flight attendants on the wide-body aircraft have predeparture equipment check assignments. On other aircraft, the flight crewmembers and flight attendants sometimes share the predeparture check of passenger cabin normal and emergency equipment. In each case, the POI and/or CSI (as applicable) indicated that the flight attendants received training on the equipment and the operations manual contained appropriate procedures.

**B.** When an air carrier elects to have the flight attendants accomplish a predeparture check of normal and emergency equipment in the cabin, the POI and/or CSI (as applicable) should be fully aware of the specific tasks assigned to the flight attendants. These tasks should be reviewed to ensure that they are not in the areas which require an airman certificate. Generally, the predeparture assignments of the flight attendants should be relative to the type of equipment used in connection with their regular and emergency duties. Appropriate initial and recurrent training is required to ensure the flight attendants are properly qualified. Air carriers must also include adequate procedures and instructions in their manuals so that the applicable personnel will be able to properly perform their assigned tasks.

**C.** The assignment of the flight attendants by an air carrier to conduct a predeparture check of the cabin does not relieve the air carrier from training flight crewmembers on normal and emergency equipment in the passenger cabin.

**3-3554.     PASSENGER BRIEFING ON FLOOR PROXIMITY LIGHTING.** Briefing airline passengers regarding the presence of floor proximity lighting is a good safety practice and should be encouraged. Part 121 requires the installation of floor proximity emergency escape path marking. The purpose of this lighting is to provide emergency evacuation guidance for passengers when all sources of illumination, more than four feet above the cabin aisle floor, are totally obscured.

**A.** Many airline passengers are not aware of this lighting. Therefore, many air carriers include a statement about the lighting in the passenger briefing required by part 121 and depict it on the passenger information cards.

**B.** Information that should be included in the passenger briefing includes the actual location of the lights, such as floor level or seat level. In addition, the briefing should include the change in pattern, such as color and/or design of the lights that indicate the location of emergency exits.

**3-3555.    CABIN DOOR OPERATING MECHANISMS.**

**A.** At times, passengers have consciously or inadvertently moved door operating mechanisms, even when the mechanisms are located under protective plastic covers. In at least one case, a passenger removed a plastic cover before the door operating handle was moved. A handle that is moved during flight could accidentally cause an aircraft door to open during landing. In one situation, when a door opened, the slide was deployed. This was unsafe and caused considerable expense to the air carrier.

**B.** POIs and/or CSIs (as applicable) should ensure that their assigned air carriers:

1)  Inform crewmembers of the potential problem of and the need to be alert to the possibility of passengers moving an exit mechanism.

2)  Have procedures for crew members to check the position of the door handles periodically during flight.

**3-3556.    FOKKER 28-4000 PASSENGER SAFETY INFORMATION CARDS.**

**A.** The National Transportation Safety Board (NTSB) believes that there may be a problem with the door operation depiction on some Fokker 28-4000 passenger information cards. The NTSB requested that the FAA review the Fokker 28-4000 passenger information cards to ensure the following:

- That the cards accurately show the procedure for operation of the two forward doors

- That the cards show the procedure for the removal of the overwing emergency exit handle cover

- That the cards contain a warning to passengers that the plastic cover should only be removed in emergency situations

**B.** Even though the passenger information cards are supplementary to the oral briefings required by part 121, POIs and/or CSIs (as applicable) assigned to air carriers operating the Fokker 28-4000 should review pertinent passenger safety information cards to ensure that they

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

show the correct information. In the event that the cards are deficient, the proper information should be displayed when the cards are replaced.

**3-3557.    MISCELLANEOUS OPERATIONAL AMENDMENTS, AIR CARRIER CABIN SAFETY OPERATIONS PROVISIONS.** In this rule, there are several amendments to parts 121 and 135 that affect the following areas of air carrier cabin safety operations:

- Safety belt security during movement on the surface

- Stowage of service items during movement on the surface

- Passenger information and passenger briefing provisions

- Passenger compliance with signs, placards, and crewmember instruction

- Emergency evacuation assisting means readiness

    **A.    Passenger Information.**

        1)  Parts 121 and 135 require passenger information signs to be illuminated during any movement on the surface. In addition, these regulations require passengers to obey the instructions of signs and placards and the instructions of crewmembers regarding these signs and placards.

        2)  Regulations require that:

- Passengers be briefed on prohibitions against smoking and

- A statement be added to the pretakeoff announcements stating that passengers must comply with the instructions conveyed by lighted passenger information signs and placards and of crewmembers regarding the signs and placards

    **B.    Arming Doors.** Part 121 requires that any time there are passengers on board, one door must be ready for evacuation. If the jetway or stairs are pulled back, then at least one door must be armed (for example, for certain door slide/raft installations, the girt bar must be in place).

    **C.    Movement on the Surface.**

        1)  Parts 121 and 135 require that all service items (including food, beverage, tableware, beverage trays, serving carts and movie screens) are in their stowed position for movement on the surface. If there is a question regarding the stowage of a particular item, and it must be stowed for takeoff and landing, then it must also be stowed for movement on the surface. It should be noted that air carriers may arrange to provide limited beverage and food service to its passengers when the aircraft is no longer moving on the surface (e.g., when the aircraft is stationary on a taxiway in a long queue awaiting takeoff or in the airport penalty box).

8900.1 CHG 0                                                                                            9/13/2007

In such cases, the air carrier should have specific procedures for flight crewmembers and flight attendants to follow, including coordination and communication between the flight deck and the passenger cabin. This will ensure that these new requirements are met before aircraft movement on the surface resumes.

NOTE: the Air Transportation Division, AFS-200, is reviewing the implications for operations of the requirement that air carriers delay taxiing on a flight to prevent aircraft movement while food and beverages are being stowed. AFS-200 is considering changes to this requirement. POIs and/or CSIs (if applicable) should inform their assigned air carriers that picking up food and beverages before movement on the surface will not be part of the compliance schedule at this time.

2)  Parts 121 and 135 now require all occupants of an aircraft to be seated with their safety belts fastened during movement on the surface.

**3-3558.     USE OF CHILD/INFANT RESTRAINT SYSTEMS IN AIRCRAFT.** This paragraph provides additional information on the use of child/infant restraint systems in aircraft. The FAA and the National Highway Traffic Safety Administration (NHTSA) have agreed upon a single government performance standard that will satisfy both aviation and highway safety requirements for child/infant restraint systems. Information regarding most CRS manufacturers is maintained at the NHTSA web site (http://www.nhtsa.dot.gov/CPS/CSSRating/Index.cfm).

**A.**  Part 121 requires that "during takeoff, landing, and movement on the surface of an airplane, each person on board shall occupy an approved seat or berth with a separate safety belt properly secured about him/her. However, a person who has not reached his/her second birthday may be held by an adult who is occupying a seat or berth."

**B.**  A person under the age of two may be held in an adult's lap or placed in a regular passenger seat for takeoff and landing. However, because of the safety benefits, the FAA encourages the use of approved child/infant restraints aboard aircraft (for more information, see: www.faa.gov/index.cfm/apa/1268).

**C.**  Air carriers are encouraged to allow the use of empty seats to accommodate CRSs. However, air carriers are under no obligation to allow unticketed children to occupy empty passenger seats, regardless of whether the child is to be placed in a CRS.

**D.**  Air carrier personnel, specifically flight attendants, should be aware of the following items pertaining to CRSs:

- The CRS should have a solid back and seat

- The CRS should have internal restraint straps installed to securely hold the child to the CRS

- The CRS should be labeled stating that it has been approved for aviation use, and

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 43

USCA Case #13-1316      Document #1491488        Filed: 05/05/2014      Page 46 of 126

- The CRS should have instructions on the label which must be followed; (labels for approval from other countries are allowed and therefore may vary)

**E.** Federal Motor Vehicle Safety Standard (FMVSS) 213 defines booster seats as seats *not* having backs. Based on this definition, the use of such automotive booster seats is not authorized in air carrier operation. Unfortunately, some manufacturers market and label their approved aviation child restraint seats as "booster seats," even though these seats have backs. Thus, aviation "booster seats" with backs and labeled "approved for aviation use" can be used for all phases of flight provided the label instructions are followed.

NOTE: Children who fit in an automotive booster seat usually can be properly restrained in an airline passenger seat without a CRS.

**F.** Belly belts and vest type devices are not approved for use during takeoff, landing, and movement on the surface. These devices usually attach the child to the accompanying adult and could contribute to injuries when the adult rotates over his/her seat belt during deceleration. Other such devices tie the child to the passenger seat and since a solid back is not provided, the child may be injured when the back of the aircraft seat back rotates forward. Although some foreign airlines have approved the use of "belly belts" and other devices that do not have solid backs and solid seats, they are not approved for takeoff, landing, or movement on the surface.

**G.** Child restraint systems must be installed in forward facing aircraft seats, and in accordance with instructions on the label. This includes placing the child restraint in either a forward or aft facing direction in the passenger seat. The CRS should not be installed in the same row of an emergency exit or in the row forward or aft of an emergency exit. A window seat is the preferred location; however, other locations may be acceptable, provided the CRS does not block any passenger's (including the parent or guardian of the child) egress to the aisle used to evacuate the aircraft. A responsible adult should occupy a seat next to the child.

**H.** Parts 121 and 135 require air carriers to accept approved CRSs when the parent/guardian/attendant has purchased a ticket for their use.

1) These regulations require air carriers to ensure that the child is properly secured in the CRS, the CRS is properly secured in a forward facing seat, the child does not exceed the weight limits of the CRS, and the CRS is approved and has the proper labels.

2) These regulations do not permit the use of safety belt extensions (commonly referred to as belly belts), the use of vest and harness type devices that attach to the parent or to the parent's restraint system or the use of booster-type child restraint systems (even though certain of these type devices bear appropriate labels showing that they meet applicable United Nations standards or are approved by a foreign government).

3) If the approved CRS is supplied by the parent or guardian, they are primarily responsible for ensuring that the CRS is approved, the child is the right size and weight for the CRS, and the CRS is properly installed in a forward facing passenger seat. In this case, flight attendant responsibility is limited to checking with the child's parent or guardian to ensure that

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 44

the above conditions have been met, that the child appears to be properly restrained in the CRS, and that the CRS appears to be properly installed in the passenger seat. Finally, it is the responsibility of the parent or guardian to ensure that the CRS is free of any obvious defects and that it functions properly.

      4)  In cases where the approved CRS is supplied by the air carrier, properly trained personnel should ensure that the CRS is free of any obvious defects and functions properly. The trained personnel should also ensure that the child does not exceed the weight limits of the CRS, is properly restrained in the CRS, and the CRS is properly installed in a forward facing passenger seat.

    **I.**  To improve emergency evacuation capabilities, the FAA recommends the following precautions:

- The air carrier's training program should cover the use of child restraint systems

- The CRS should be secured to a regular passenger seat at all times or, if not in use, stowed as carry-on baggage

- The CRS should not be located in an aisle seat or in a row of seats immediately forward of, aft of, or in the same row as an emergency exit

- During an emergency evacuation the CRS should remain attached to the passenger seat, and only the child should be removed from the aircraft

- No other passenger may occupy the same passenger seat with the CRS

- CRSs are not approved for use in sideward facing passenger seats

- The child should always be properly secured in the CRS whenever other passengers are required to have their safety belts fastened

    **J.**  In the event that a parent/guardian is traveling with more than one child in a CRS or is traveling with several small children, only one of whom is occupying a CRS, good judgment should be used regarding placement of the CRS. At a minimum:

- The CRS should be placed so that it does not block any passenger's (including the parent/guardian's) egress to the aisle used to evacuate the airplane

- The CRS should be placed so that the parent/guardian can reach the child in the CRS to release and evacuate with the child, should an emergency evacuation be necessary

NOTE: As long as the above conditions are met, this may result in the CRS being placed between a passenger (including the parent/guardian) and the aisle and/or the CRS being placed in a seat other than a window seat.

Add. 45

**K.** The majority of individuals who use CRSs on commercial aircraft are young children who typically weigh 40 pounds or less. However, there are some individuals who, because of physical challenges, need the support and security that a restraint system provides in order to travel safely on aircraft. The scope of the CRS regulations that are contained in 14 CFR parts 91, 121, 125, and 135 apply to any individual who is a child (i.e., under age 18) who does not exceed the specified weight limit for the CRS, is properly secured in the CRS, and is in a CRS that bears the proper labels. Air carriers should ensure that flight attendants are aware that larger children (who have not reached their eighteenth birthday) may use a properly approved CRS that is appropriate for that child's size and weight. In this case the air carrier may not prohibit the use of the CRS. There are several companies that manufacture CRSs approved for use on aircraft that are specifically designed for larger children who are physically challenged. Information regarding some of those manufacturers is posted on a list maintained by NHTSA http://www.nhtsa.dot.gov/CPS/CSSRating/Index.cfm

NOTE: No air carrier may prohibit the use of a CRS by any child under the age of 18 as long as the CRS is properly labeled, the child does not exceed the specified weight limit of the CRS, and the child is properly secured in the CRS.

**L.** In the case of an adult (i.e., 18 years old or older) who because of physical challenges needs the support and security that a restraint system provides in order to travel safely on aircraft, the individual or the air carrier (on the individual's behalf) may request an exemption to § 121.311(b). There are several companies that manufacture restraint systems that may be used by adults.

1) To find out how to submit a petition for exemption, go to http://www.faa.gov/regulations_policies/rulemaking/petition/.

2) Exemption information is available for your review on the FAA's Automated Exemption System web site. To review a previously granted exemption regarding this issue, go to http://aes.faa.gov and type

**M.** On July 16, 2002, the FAA published Technical Standard Order (TSO) C100b, Child Restraint Systems, which contains minimum performance standards that a child restraint system must meet in order to obtain approval and be identified with the applicable TSO marking. The TSO was published for review and comment prior to its adoption. This TSO can be accessed at http://www.airweb.faa.gov/Regulatory_and_Guidance_Library/rgTSO.nsf/MainFrame?OpenFrameSet.

**N.** Current operating rules in parts 91, 121, 125, and 135 require that child restraint systems used on aircraft bear two labels: "This child restraint system conforms to all applicable Federal motor vehicle safety standards" and "THIS RESTRAINT IS CERTIFIED FOR USE IN MOTOR VEHICLES AND AIRCRAFT," in red lettering, or must bear either a label showing approval of a foreign government or a label showing that the seat was manufactured under the standards of the United Nations. However, under current operating rules, a CRS that is specifically designed for use on aircraft under the performance standards of TSO-C100b, as

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 46

amended, and is not certified under the standards of FMVSS 213, will not have the labeling required by current regulations to be used on aircraft.

**O.** In order to use a CRS that has been marked in compliance with TSO-C100b, as amended, on any aircraft, the CRS must also bear the labeling required by current regulations. In order to use the CRS without the proper labeling, an exemption from the regulations would be required. The exemption process in discussed in subparagraph K above.

**3-3559.     USE OF NON-APPROVED CHILD/INFANT RESTRAINT SYSTEMS IN AIRCRAFT.** The regulations that are contained in § 121.311 prohibit the use of certain types of child restraint systems during ground movement, takeoff, and landing.

**A.** During the cruise portion of the flight, however, there is no regulatory prohibition regarding the use of any type of child restraint, including those that are prohibited from use during ground movement, takeoff, and landing.

**B.** There is also no regulatory requirement that an air carrier permit the use of "non-approved" CRS during the cruise portion of flight. If an air carrier decides to implement an operational policy that is not inconsistent with the regulations, they have the operational flexibility to do so.

**3-3560.     DOOR/SLIDE ARMING.** Crewmembers should be able to evacuate passengers from an aircraft whether it is moving on the surface or parked at the gate.

**A.** In accordance with existing regulations, air carriers must have procedures to ensure that immediately after the stairs or jetway are pulled back from the airplane, at least one floor level exit is armed. At least one air carrier has expressed concern that this practice could result in an evacuation where the slide would inflate and perhaps hit someone on the ground. If this concern is of primary importance to an air carrier, then the air carrier should have a policy that ensures that all ground vehicles are out of the possible "slide strike" area before the jetway or stairs are pulled back.

**B.** In the past, the requirement stipulated that the crewmembers must arm doors before the pilot taxied the aircraft. However, the present requirements mandate that crewmembers arm each floor level exit be armed before movement on the surface. The ideal time to arm the doors is immediately before the aircraft begins to move. Procedures to arm doors simultaneously with the start of pushback are also acceptable.

**3-3561.     PASSENGER SEATBELT DISCIPLINE.** Passengers unfastening their seatbelts when the seatbelt sign is illuminated concerns the FAA. The Regulations require air carriers to illuminate the seatbelt sign:

- Before movement on the surface

- During takeoff and landing

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 47

- At any other time when considered necessary by the pilot in command

**A.** Regulations also require all passengers to occupy their seat with their seatbelt fastened when the seatbelt sign is illuminated and to comply with crewmember instructions regarding the "Fasten Seat Belt" sign.

**B.** When the seatbelt sign is turned on, crewmembers should make an announcement. The announcement should emphasize that when the seatbelt sign is illuminated, regulations require passengers to fasten their seatbelts. In addition, as long as the sign is illuminated, crewmembers should periodically remind passengers that the seatbelt sign is lighted. Crewmembers should make additional and forceful announcements if passengers stand and the seatbelt sign is illuminated, especially during turbulent air operations.

**C.** Many passengers regard the illumination of the seatbelt sign prior to landing as a signal to prepare for landing by going to the lavatory, standing, or stowing baggage. This is not a safe practice. Some crewmembers have adopted the desirable practice of making an announcement before turning on the seatbelt sign for landing. They announce that:

- The flight will be landing shortly; now is the time to go to the lavatory or move about the cabin

- Once the seatbelt sign is illuminated, passengers should be in their seats with their belts fastened

**D.** Historically, most airlines ensured passengers were seated during movement on the surface. However, during the 1980s, at least one airline allowed its aircraft to be taxied with passengers standing. The FAA Administrator defined this practice as a careless and reckless operation. The FAA filed violations and the courts upheld them. Therefore, the FAA incorporated into 14 CFR the requirement that the seatbelt sign must be turned on prior to movement on the surface. This does not mean that pilots must stop an aircraft when a passenger stands. Pilots must weigh the safety alternatives before determining if it is appropriate to stop an airplane because a passenger stands up during taxi. Pilots may elect to stop the aircraft when it is pulling up to a gate and several passengers stand. However, there may be other times when stopping the aircraft could cause a more serious safety problem.

**E.** The regulations do not require all passengers to be seated before the passenger loading door is closed. Requiring passengers to be seated before the passenger loading door is closed is one way air carriers have chosen to obtain passenger compliance with the lighted seatbelt sign. This is a good practice, but not one that the FAA requires.

**F.** Crewmembers must give an announcement when the seatbelt sign is turned off in flight that passengers should keep their seatbelts fastened when seated. The POI and/or CSI (as applicable) should emphasize the requirement for this announcement. In addition, POIs and/or CSIs (as applicable) should encourage air carriers to establish additional procedures to emphasize the importance of passengers wearing their seatbelts at all times when seated. These procedures could include:

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 48

- Additional announcements

- Video presentations

- Articles in air carrier publications or pamphlets in seat pockets

**G.** POIs and/or CSIs (as applicable) should encourage air carriers to use announcement techniques that serve to forewarn passengers of pending situations that will require them to comply with the seatbelt sign when it is illuminated. Examples of these situations include expected turbulence and approaching destination. These techniques should be designed to preclude any passenger movement once the seatbelt sign is illuminated.

**H.** Standup bars on wide-bodied air carrier aircraft have caused considerable concern for the safety of passengers when turbulence is encountered. On occasion, both passengers and flight attendants have disregarded the seatbelt sign when it was turned on and continued to congregate near the bar. This results in a potentially hazardous situation, not only for those passengers standing, but also for others seated in the area adjacent to the bar. From a safety viewpoint, whenever the seatbelt signs are on, all passengers, including those in the vicinity of the standup bar, should be secured in their seats. Air carriers having standup bars installed in their aircraft should issue suitable instructions for the flight attendants regarding seatbelt discipline procedures.

**3-3562.    FLIGHT AND CABIN CREWMEMBER COORDINATION, COMMUNICATION, AND SAFETY DURING POTENTIALLY HAZARDOUS CONDITIONS OF FLIGHT.** A review of aircraft accidents/incidents and cabin en route inspections reports indicates that there is a need for better communication between flight and cabin crewmembers. Also, there is a need for better seatbelt discipline by passengers and flight attendants.

**A.** Due to the nature of their cabin duties, flight attendants are susceptible to turbulence-related injuries. Close coordination between cabin and flight crewmembers can facilitate the timely completion of cabin services and preclude the exposure of flight attendants to potential injury during known or anticipated encounters with turbulence.

**B.** During flight, the PIC is responsible for the safety of passengers and crewmembers. Therefore, the PIC should ensure that:

- The cabin crewmembers complete their safety duties as appropriate for each phase of flight.

- During takeoff and landing, the flight attendants are seated at their duty station with safety belts and shoulder harnesses fastened.

- During movement on the surface, unless performing safety-related duties, flight attendants must sit with safety belts and shoulder harnesses fastened.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 49

C.  During emergency conditions, the flightcrew is primarily responsible for maintaining control of the airplane. However, as conditions permit, the flightcrew should brief the flight attendants on the nature of the emergency, the approximate amount of time for cabin preparation, and the contemplated course of action. This will enable the flight attendants to more effectively carry out their duties.

D.  Air carriers should be reminded that it is advisable to make a public address announcement to remind passengers that Federal regulations require them to fasten their seatbelts when the seatbelt sign is turned on. Additionally, part 121, sections (§§) 121.415 and 121.417 specify that training programs must ensure that each crewmember remains adequately trained. The training program should include:

- Instruction on coordination among crewmembers in abnormal/emergency situations

- Review and discuss previous aircraft accidents and incidents pertaining to actual emergency situations

E.  Coordination and communication between the flight and cabin crewmembers during all phases of flight concerns the FAA. The FAA requests that POIs review their assigned air carrier's training program and operational manuals to ensure that the air carrier establishes a safe and effective means of coordination and communication between the flight and cabin crewmembers. POIs should address the operation, coordination, and communication procedures.

- Guidance to flight crewmembers on the importance of a predeparture briefing of the senior flight attendant, which includes forecast turbulence related weather conditions, scheduling of cabin services, clean up, securing of galley and cabin, carry-on baggage, and passengers

- Use of the public address system to alert flight attendants and passengers of anticipated inflight turbulence

- Guidance for notifying flight attendants when they are to cease inflight services, secure the galley, sit with their restraints fastened, and/or resume duties

- Standardization notification to the flightcrew from the cabin crew when the cabin crew completes all pretakeoff and prelanding duties and the cabin has been secured

- Standardized pretakeoff and prelanding signals from the flightcrew, which the flightcrew uses to allow sufficient time for flight attendants to be seated

**3-3563.    BRACE FOR IMPACT POSITIONS.**

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 50

**A.** The Aeromedical Research Branch of the Civil Aerospace Medical Institute (CAMI), Protection and Survival Laboratory, has conducted research and tests with respect to establishing "brace for impact" positions for passengers and flight attendants.

**B.** In order to establish a best brace for impact position for each person, it would be necessary to know the size and physical limitations of the individual, the seating configuration, the type of emergency, and many other factors.

**C.** There are two primary reasons for bracing for impact.

    1)  To reduce flailing. Having the occupant flex, bend, or lean forward over their legs can reduce flailing.

    2)  To reduce secondary impact. Repositioning the body (particularly the head) against the surface it would strike during impact can reduce secondary impact.

**D.** Today's aircraft may have seating arrangements that result in very small seat pitches (the space between seats) or a combination of small and large seat pitch spacing (i.e., an aircraft with a first class/coach seating arrangement). Also, amendments to part 121 have upgraded the airworthiness standards for flight attendant seats, including the requirement for shoulder harnesses. In view of this information, this provides the best possible information for most emergency situations.

**E.** Passengers should take a brace position in one of several ways. In all cases, the seatbelt should be worn, as tight and as low on the torso as possible.

    1)  In aircraft with low-density seating or seats spaced relatively far apart, passengers should, as depicted in Illustration A or B of figure 3-125, rest their head and chests against their legs. Passengers can reduce flailing by grasping their ankles or legs, as depicted in Illustration A, or if they are unable to do that, wrapping their arms under their legs, as depicted in Illustration B. Their heads should be face down in their laps, and not turned to one side.

**Figure 3 – 125, Brace Position in Aircraft With Low-Density Seating or Seats Spaced Relatively Far Apart**


Illustration A


Illustration B

    2)  In aircraft with high-density seating or in cases where passengers are physically limited and are unable to place their heads in their laps, they should position their heads and arms

against the seat (or bulkhead) in front of them, as depicted in figure 3-126.

**Figure 3 – 126, Brace Position in Aircraft With High-Density Seating or Where Passengers Are Physically Limited**



3)   Passengers in aft facing seats should rest their heads on the seat back (or bulkhead) behind them as depicted in figure 3-127. The passengers should not place their hands in back of their heads, as has been recommended in the past. Rather, passengers should either place their hands in their laps or grasp the side of their seats.

**Figure 3 – 127, Brace Position for Passengers in Aft Facing Seats**



4)   The passengers should place their feet flat on the floor and slightly in front of the edge of the seat.

5)   Passengers should not use pillows or blankets between their bodies and the object they are bracing against (either a seat back or their own body). Pillows and blankets provide little, if any, energy absorption and increase the possibility of secondary impact injury. Also, pillows and blankets could create additional clutter in the aisles which could be a detriment in an emergency evacuation.

6)   Children that occupy approved child restraint devices should be braced in accordance with the manufacturer's instructions. Children in passenger seats should utilize the same brace position as adults. Adults holding infants should provide uniform support to the infant's head, neck, and body and lean over the infant to minimize the possibility of injury due to flailing.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 52

8900.1 CHG 0                                                                                                    9/13/2007

    7)   Pregnant or handicapped passengers may or may not need the assistance of another person in taking a brace position, but should, in general, attempt to take the same brace position as the other passengers. If aft facing passenger seats are available, these passengers may benefit from being located to those seats.

    **F.**   The brace positions for flight attendants will depend on the direction their seats face and type of restraint system those seats are equipped with.

    1)   In forward facing seats equipped with an inertial reel shoulder harness, the flight attendants should sit back in the seat, as depicted in figure 3-127, and rest their chin on their sternum, as depicted in figure 3-128. If the seats are equipped with noninertial reel-type shoulder harnesses, the flight attendants should fasten their shoulder harnesses as tight as possible, lean against them, and rest their chins on their sternums as depicted in figure 3-128. The flight attendants should position their arms and hands in their laps or hold on to the side of their seats, but should not be holding onto their restraint systems.

**Figure 3 – 128, Brace Position With Chin on Sternum**



    2)   In rear facing flight attendant seats, the flight attendants should sit back in their seats, rest their heads against their seat backs or headrests, and have the restraint systems, inertial or noninertial type, as tight as possible, as depicted in figure 3-127. They should not clasp their hands behind their heads, but position them as in a forward facing seat.

    **G.**   Helicopter "brace for impact" positions are the same as those for airplanes. Flight attendants, if present, should utilize either the brace position for passengers or flight attendants depending on their seats and restraint systems.

    **H.**   In the case of an anticipated emergency landing, the passengers should be briefed on the above information. In the case of an unanticipated emergency, the flight attendants may only have enough time to give a short command, such as "lean over" or "grab your ankles." Experience has shown that in an attempt to take a brace position of some sort, the passengers will end up in a position that could result in less injury than if they make no attempt at all.

    **I.**   The air carrier's crewmember emergency training program should contain bracing information appropriate to the aircraft and seat spacing used by that air carrier.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 53

**3-3564.    EMPHASIS ON TIME MANAGEMENT AND CREW COORDINATION IN PREPARATION OF CABIN FOR IMPENDING EMERGENCY LANDING.**

   **A.**  On July 19, 1989, a DC-10-10 experienced a catastrophic failure of the number 2 tail-mounted engine during cruise flight. The separation, fragmentation, and forceful discharge of stage one fan rotor assembly parts from the number two engine led to the loss of the three hydraulic systems that powered the airplane's flight controls. The flightcrew experienced severe difficulties controlling the airplane, which subsequently crashed during an attempted landing at Sioux Gateway Airport, Iowa. There were 285 passengers and 11 crewmembers onboard. One flight attendant and 110 passengers were killed.

   **B.**  The NTSB investigation resulted in recommendations to the FAA. They included recommendation A-90-172: Issue an Air Carrier Operations Bulletin for all air carrier flightcrew training departments to review this accident scenario and reiterate the importance of time management in the preparation of the cabin for an impending emergency landing.

   **C.**  POIs and/or CSIs (if applicable) should ensure that their assigned air carrier's training department reviews the accident scenario of United Airlines, Inc., Flight 232. Emphasis should be on time management and crew coordination and/or communication in emergency cabin preparation. "Lessons learned" in this accident may be very useful for developing air carrier's training curriculums. In any case, each emergency training program should provide flight attendants, who may be required to act in rapidly changing emergency conditions, with knowledge of the air carrier's policies and procedures. CRM training, with practice and feedback sessions, is recommended for building communication, situational awareness, problem solving, and stress management skills.

**3-3565.    FLIGHT ATTENDANT RESTRAINT DURING A CRASH AND EMERGENCY EVACUATION SECOND CHOICE EXIT DETERMINATION.**

   **A.**  On February 1, 1991, a B-737-300 collided with a Fairchild Metroliner while the B-737 was landing. The Metroliner was positioned on the same runway awaiting clearance for takeoff. As a result of the collision, both airplanes were destroyed. All 10 passengers and 2 crewmembers aboard the Metroliner and 20 passengers and 2 crewmembers aboard the B-737 were killed.

   **B.**  The NTSB investigation resulted in recommendations to the FAA. They included recommendation A-91-117: Direct the emergency evacuation subcommittee of the Aviation Rulemaking Advisory Committee to examine flight attendant emergency procedures regarding the "2nd choice" exit assignments to ensure that such assignments provide for use of the nearest appropriate exit point. They also included recommendation A-91-118: Issue an Air Carrier Operations Bulletin directing principal operations inspectors to emphasize that during a crash sequence, flight attendants must remain properly restrained and seated in their crew seats until the airplane has come to a complete stop.

   **C.**  The NTSB believes that POIs and/or CSIs (as applicable) should ensure that air carriers emphasize the following:

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

1)   During flight attendant training, the air carriers that have a second choice exit assignment for flight attendants (e.g., overwing Type III exits) should emphasize the need to evaluate personal risk in a decision to use a closer escape path rather than using the assigned second choice exit. For example, another door or any opening in the fuselage may be more acceptable and more appropriate.

2)   That during a crash sequence, flight attendants must remain properly restrained and seated in their crew seats until the airplane has come to a complete stop.

**D.** Procedures in flight attendant manuals and training programs that provide for "second choice" exit assignments for aircraft emergency evacuation should be reviewed. This review should ensure that such assignments also provide for the use of the nearest available exit or fuselage opening when appropriate.

**E.** Air carrier training programs often emphasize the need for rapid evacuation following takeoff and landing accidents. On the other hand, it is often difficult for flight attendants involved in such accidents to determine when an aircraft comes to a complete stop. This lack of a combination of cues (motion, deceleration, etc.) can result in flight attendants releasing their seatbelts prematurely. If the aircraft experiences a sudden deceleration while a crewmember is unsecured, the result may be incapacitation to that crewmember and an increase of passenger evacuation time. Therefore, crewmember training should emphasize the importance of crewmembers remaining seated and properly restrained until the aircraft comes to a complete stop. It should also identify techniques to aid crewmembers in making that determination.

**F.** During training in a crash scenario, air carriers should emphasize the following to their flight attendants:

- The need for them to evaluate personal risk in a decision to go to a second choice exit

- The need for them to remain seated and properly secured until the aircraft comes to a complete stop

### 3-3566.   ACCIDENT NOTIFICATION AND MANIFEST ACCOUNTING PROCEDURES.

**A.** On September 20, 1989, a B-737-400 was an "extra section" passenger flight to replace the regularly scheduled but cancelled flight from New York City's LaGuardia Airport. As the first officer began the takeoff on runway 31, he felt the airplane drift left. The captain noticed the left drift also and used the nosewheel tiller to help steer. As the takeoff run progressed, the aircrew heard a "bang" and a continual rumbling noise. The captain then took over and rejected the takeoff but did not stop the airplane before running off the end of the runway into Bowery Bay. The accident occurred in darkness. Both pilots and the four cabin crewmembers had minor injuries. Two of the 57 passengers were killed and 15 had minor or serious injuries.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

**B.**  The NTSB investigation resulted in recommendations to the FAA. They included recommendation A-90-105: Require airlines to provide airport crash/fire rescue personnel accurate and timely numbers of all persons aboard an accident/incident aircraft, and to provide assistance in determining the disposition of persons who have been recovered from the scene of an accident.

**C.**  The problems associated with the recovery efforts involving an air carrier accident, in which a night take off was aborted and the airplane ended up running off the end of the runway and into a body of water, were compounded because rescue personnel did not know exactly how many persons were onboard the airplane. This situation was detrimental to the rescue effort because it created an uncertainty as to how many persons the rescuers had to account for during the rescue operation. The NTSB recommended that the FAA require air carriers:

- Provide airport rescue personnel accurate and timely numbers of all persons aboard an aircraft involved in an accident or incident

- Assist in determining the whereabouts of persons who have been recovered from the scene of an accident

**D.**  The FAA agrees with the NTSB that air carriers should be able to provide accurate and timely information to an appropriate and/or Government authority with respect to the total number of persons on an aircraft and that air carriers should assist the appropriate authorities in determining the whereabouts of persons who have been recovered from the scene of an accident. The sum of the persons on board an aircraft includes:

- Crewmembers

- Revenue passengers

- Non-revenue passengers

- Children being held in the lap of an adult

- Persons occupying cabin or flightdeck jump seats

**E.**  Part 121 requires that all air carriers prepare a load manifest that includes, at the time of takeoff, the names of passengers (unless the passenger names are maintained by some other means). Part 135 requires, for multiengine aircraft, a load manifest that includes, at the time of takeoff, the number of passengers. On December 30, 1988, the FAA issued Action Notice 8430.29, the primary purpose of which was to provide guidance concerning a recent legal interpretation of part 121 regarding the manifest accounting for all non-crewmembers and the recording of passenger names.

1)  Part 121 requires that air carriers include, as part of the load manifest, the names of passengers unless such information is maintained by other means by the air carrier. Other means could be ticket stubs or a computer source. The principal reason for this regulation is to

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 56

facilitate the rapid and accurate determination of how many passengers are on board an aircraft and who they are in the event of an emergency situation, such as an accident or hijacking. Not having an accurate record of all passengers could, for example, hamper the efforts of rescue workers during a post-accident rescue operation.

    2)   The word "passenger", as used throughout the Regulations, means any passenger regardless of age. That interpretation also states that the word passenger, as used in part 121, is not qualified and means "any passenger." A crewmember, as defined in 14 CFR part 1, means "a person assigned to perform duty in an aircraft during flight time."

    3)   Any person provided transportation on an air carrier aircraft, who is not a crewmember assigned by the air carrier to perform duties during flight time, must be recorded as a passenger and listed.

        a)   Crewmembers include:

- The pilot-in-command

- The second in-command (SIC)

- Other required flight crewmembers (such as flight engineers, navigators, relief pilots, required and non-required flight attendants (who are assigned duties by the air carrier))

- Any other persons (pursers, customer service agents, etc.) assigned duties during flight time

        b)   All other persons are passengers. The following are examples.

- Non-revenue passengers

- Children (regardless of their age and whether they occupy a seat)

- Deadheading crewmembers or other company employees not assigned duties during flight time

- FAA or NTSB safety inspectors

- Law enforcement officials

    **F.**   In addition to the load manifest required by these regulations, the air carrier should also have a procedure that ensures that the total number of persons on board any aircraft, including the total number of crewmembers, is available at the time of takeoff. The procedures should, as a part of the manual requirements of parts 121 and 135 (accident notification procedures) contain guidance, instructions, and procedures regarding the local authorities (e.g., airport police, management, and/or fire department), who the air carrier's personnel should

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 57

contact in the event of an accident or incident. The procedures should also include what information to give in the notification, including the total number of persons on board the aircraft. The air carrier should also have a procedure that provides assistance to those authorities in determining the whereabouts of persons that the air carrier knows have been recovered from the scene of an accident.

    **G.**  If an airport is certificated in accordance with 14 CFR part 139, it must have an airport emergency plan. Air carriers and commercial air carriers should review the plans of those certificate airports to which they operate to ensure that the procedures they develop, in accordance with the Regulations, are consistent with the airport emergency plan that the airport air carriers developed. FAA ACs in the 150 series (e.g., 150/5210-14, Airport Emergency Plans) contain additional information concerning airport emergency plans.

**3-3567.**    **POLICY FOR PASSENGER AND FLIGHT ATTENDANT USE OF SEATBELTS DURING TURBULENCE.** This paragraph provides guidance about passenger and crewmember use of seat belts during turbulence. Additionally, air carriers should include procedures regarding communication and coordination in all crewmember manuals and training programs.

    **A.**  Regulations require the air carrier to ensure the following:

- That each passenger has an approved safety belt properly fastened around him/her during movement on the surface, takeoff, and landing

- Passengers have their seatbelt fastened any time the seatbelt sign is illuminated

- Signs are installed so they are visible (usually on the back of passenger seat), advising each passengers to keep their seatbelts fastened when seated

    **B.**  In 1993, the FAA issued an air carrier operations bulletin emphasizing the importance of passenger seatbelt discipline and asking air carriers to establish special emphasis programs to highlight the importance of this issue. Many airlines cooperated by making innovative changes to announcements and placing articles in publications informing passengers of the dangers associated with sitting in a seat without their seatbelts fastened. In spite of all these efforts, passengers and flight attendants continue to sustain injuries in flight during turbulence, evasive maneuvers, or other inflight disturbances. Many of these injuries are serious and result in broken bones (especially ankle bones) and head injuries.

    **C.**  Part 121 requires that a crewmember give an announcement after each takeoff, immediately before or immediately after turning the seatbelt sign off, that passengers should keep their seatbelts fastened, while seated, even when the seatbelt sign is off. POIs and/or CSIs (as applicable) should emphasize the requirement for this announcement. POIs and/or CSIs (as applicable) should also remind air carriers that making a public address announcement to remind passengers that Federal regulations require them to fasten their seatbelts when the seatbelt sign is turned on is advisable. POIs and/or CSIs (as applicable) should encourage their assigned air carriers to establish additional procedures to emphasize the importance of passengers wearing

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 58

their seatbelts at all times while seated. These procedures could include additional announcements, video presentations, and articles in air carrier publications or pamphlets in seat pockets.

**D.** Coordination and communication between the flight crewmembers and the flight attendants during all phases of flight concerns the FAA. POIs should ensure that their assigned air carrier's training programs and operational manuals contain the safe and effective procedures for coordination and communication between all crewmembers. These procedures should address:

1)   Guidance to flight crewmembers on the importance of a predeparture briefing of the flight attendants, which includes:

- Forecast turbulence related weather conditions

- Securing the galley and cabin

- Carry-on baggage

- Passengers

- Scheduling of cabin service and pick up

2)   Use of the public address system or other signal to alert flight attendants and passengers of anticipated inflight turbulence.

3)   Guidance and specific signals to notify flight attendants when they are to cease inflight services, secure galley, sit with their restraints fastened, and/or resume duties.

4)   Guidance for flight attendants regarding flight attendant determination that turbulence is too severe for the continuing of service and taking their seats with their restraints fastened and that they are to notify the flight crewmembers regarding this action.

5)   Standardized notification to the flightcrew from the flight attendants when they complete all pretakeoff and prelanding duties and have secured the cabin.

6)   Standardized signals from the flightdeck crew before takeoff and before landing, which they use to allow sufficient time for the flight attendants to be seated.

**3-3568.     GALLEY SECURITY.** Reported incidents of galley carts not properly secured or galley service items not properly managed have caused concern that there is a need to have additional guidance regarding galley carts and galley supplies. Notwithstanding the "Miscellaneous Operational Amendments" final rule, effective on October 15, 1992, the compliance schedule for enforcing § 121.577 regarding the pick up of paper cups and plastic glasses prior to movement of the aircraft, has not been established at this time. Inspectors have reported finding that proper restraints were no longer available for galley equipment and that

29
UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

galley components could not be restrained by the existing latches. Inspectors have also reported finding latching devices that did not work properly for stowage compartments or drawers. The only latches available or the latches that were identified as the primary latches were not long enough to keep the doors properly closed. Certificated air carriers should have procedures to address the following areas:

**A. Responsibility for Galley Restraint.** A specified crewmember should be responsible for each galley. However, all crewmembers are responsible for ensuring galley security. Crewmembers have been known to enter a secured galley and open a compartment and inadvertently forget to resecure the galley. Therefore, crewmembers should:

1)  Ensure that the galley and restraints are available and function properly.

2)  Report malfunctioning galley equipment and restraints by following the specific procedures; and

3)  Check the proper stowage of "items of mass," as referenced in § 121.576, and equipment in the galley.

**B. Availability of Proper Restraint.**

1)  The primary restraint should be identified.

2)  The primary restraint should be in good working order and available for use during each takeoff and landing.

3)  Air carriers should have procedures to ensure that the primary restraint performs the function for which it was intended.

NOTE: Not all latches required to be in the locked position provide the primary restraint.

**C. Malfunction in Galley Equipment.** The air carrier should have specific procedures for reporting galley equipment and restraints that have malfunctions. These procedures should include a method identifying the person (or position) who will receive the report. The procedures should be a part of the required flight attendant manual.

**D. Checking Galley Restraints.** The responsible flight attendant should check the galley and galley components to ensure proper restraints, including:

- Actions such as pulling vigorously on carts, oven doors, drawers, and other components. This is a good method of ensuring that they are secured.

- Ensuring the safe and correct parking of carts on mushrooms.

- Ensuring that brakes are operational on carts that use brakes.

30
UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

- If keys are applicable to the container, then ensuring that the key is in the locked position should be part of the actual checking procedures;

- Galley curtains are secured open for takeoff and landing; and

- Visual checking of galley, galley components, and galley cart security when possible.

**E. Phases of Flight.** The procedures should include, at least, the following information for each phase of flight.

1) Prior to movement on the surface. Prior to movement on the surface the responsible flight attendant should ensure that all primary galley restraints are available and are in working order.

2) Movement on the surface.

a) All galley items with the exception of paper cups and plastic glasses should be picked up and properly stowed prior to movement on the surface. Extension of the compliance schedule for the pick up of paper cups and plastic glasses should not result in the safety problem of having galley components unrestrained. When an air carrier wishes to serve food or beverages while the airplane is stationary, the air carrier should ensure that this service will not affect galley security.

b) The air carrier should either serve beverages in containers which can be thrown in a garbage receptacle or ensure that all items which are not disposable are picked up prior to movement on the surface. Pick up of service items is considered safety related and therefore all flight attendants assigned duties on that flight may pick up galley service items during movement on the surface.

3) Prior to Takeoff. Flight attendants should ensure that the galley and galley components are properly stowed and restrained.

4) Procedures for Galley Security Inflight. Procedures for galley security inflight include the following:

a) Carts are not to be left unattended.

b) Air carriers should have procedures which ensure that flight attendants are no more than 10 feet away (approximately three rows) from the carts left in the aisles.

c) Flight attendants should not park carts out of their normal galley takeoff/landing positions unless they can be properly restrained. Some aircraft are equipped with restraint devices such as mushrooms which will properly hold carts in other areas. When this is the case, they may be left unattended; however, most items should be cleared from the top of the carts. If left unrestrained, items on the top of the carts can become dislodged and cause injuries

31

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

should there be a sudden directional change of the aircraft. It is recommended that all cart restocking should be done in the galley as this is a good safety practice.

d)   During service, other than when the cart is being moved, the brake (if applicable) must be engaged. If the cart is parked out of the galley during the flight, then it should be on the mushroom.

e)   Galley carts and the galley itself should be maintained in an orderly fashion because of the possibility of turbulence or evasive actions. This means that as many supplies as possible should be stowed or left in their containers. It is recommended that the top of the carts be kept as clear as possible. During light turbulence, when service can continue, it is still advisable to discontinue the service of hot liquids and these liquids should be removed from the tip of the cart.

5)   Prelanding. Flight attendants should ensure that all galleys are properly restrained and that galley components are properly stowed and secured.

6)   Postlanding. Flight attendants should ensure that all reports of malfunctioning galley restraints, galley components, and galley carts are properly recorded and/or reported.

## 3-3569.   ENSURING THAT CHILDREN WHO HAVE REACHED THEIR SECOND BIRTHDAY ARE PROPERLY RESTRAINED.

**A.**  On June 8, 1995, a DC-9-32 was operated as a scheduled, domestic passenger flight under the provisions of part 121. The flight was cleared for takeoff on runway 27R. Five crewmembers and 57 passengers were on board.

**B.**  As the airplane began its takeoff roll, the airplane occupants and air traffic control heard a "loud bang." The right engine fire warning light illuminated, the flightcrew of the following airplane reported to the crew that the right engine was on fire, and the takeoff was rejected. Shrapnel from the right engine penetrated the fuselage and the right engine main fuel line, and a cabin fire erupted. The airplane was stopped on the runway, and the captain ordered the evacuation of the airplane.

**C.**  The flight attendant seated in the aft flight attendant jump seat received puncture wounds from shrapnel and thermal injuries. Another flight attendant and five passengers received minor injuries. The pilots, the third flight attendant, and 52 passengers were not injured. The airplane's fuselage was destroyed.

**D.**  The NTSB investigation of this accident resulted in recommendations to the FAA. These recommendations included A-96-84: Provide guidance on how to implement the requirement that occupants who are more than 24 months old are restrained during takeoffs, landings, and during turbulence.

**E.**  During this NTSB investigation, it was determined that one child who had reached its second birthday was listed as a lap child, despite regulations that require all passengers who have

32

reached their second birthday to be restrained during takeoffs and landings. The Safety Board has long been concerned about the inadequacy and enforcement of this regulation, and in the last several years, has identified at least six accidents and one enforcement action, in which children who had reached their second birthday, were unrestrained because they were held in someone's lap. The ages of these children ranged from 26 months to 5 years.

F.   Present regulations allow parents/guardians of children who have not reached their second birthday the option of holding these children in their laps. Children who have reached their second birthday must be restrained in an approved restraint system. As pointed out in the background to the NTSB recommendation, the problem appears to be that some parents/guardians want to hold children who have reached their second birthday in their lap. This is not an acceptable procedure.

G.   In order to preclude this occurrence, many air carriers ask the age of the lap-held child when the child is presented to be placed on the load manifest. In addition, many air carriers instruct crewmembers to ask parents the age of lap-held children. These procedures complement each other and are recommended.

## 3-3570.     FLIGHT ATTENDANT APPAREL WHILE PERFORMING DUTIES ASSOCIATED WITH FLIGHT.

A.   On June 8, 1995, a DC-9-32 was operated as a scheduled, domestic passenger flight under the provisions of part 121. The flight was cleared for takeoff on runway 27R. Five crewmembers and 57 passengers were on board.

B.   As the airplane began its takeoff roll, the airplane occupants and air traffic control heard a "loud bang." The right engine fire warning light illuminated, the flightcrew of the following airplane reported to the crew that the right engine was on fire, and the takeoff was rejected. Shrapnel from the right engine penetrated the fuselage and the right engine main fuel line, and a cabin fire erupted. The airplane was stopped on the runway, and the captain ordered the evacuation of the airplane.

C.   The flight attendant seated in the aft flight attendant jump seat received puncture wounds from shrapnel and thermal injuries. Another flight attendant and five passengers received minor injuries. The pilots, the third flight attendant, and 52 passengers were not injured. The airplane's fuselage was destroyed.

D.   The NTSB investigation of this accident resulted in recommendations to the FAA. These recommendations included A-96-88: Issue an operations bulletin recommending that POIs advise their air carriers to disseminate FAA safety guidance on airline passenger attire to their flight attendants.

E.   The NTSB investigation of this accident disclosed that the flight attendant who received the most serious injuries was wearing shorts and a short-sleeved shirt. Safety experts agree that in order to decrease the chance of sustaining burns, it is better to wear long sleeves and pants than it is to wear short sleeves and short pants. In addition, fabrics such as wool and cotton

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

USCA Case #13-1316     Document #1491488        Filed: 05/05/2014       Page 66 of 126

are better than synthetic fabrics. Also, it is better to have low heeled shoes which are enclosed. Straps or laces are encouraged while sandals are discouraged.

**F.** Air carriers should ensure that those charged with developing the criteria for the attire crewmembers wear while performing duties associated with flight are aware of these safety considerations.

**G.** Air carriers should ensure that crewmembers are aware of the information regarding the safety considerations for the apparel they wear during flights.

**3-3571.     ADOPTION OF FLIGHT CREWMEMBER FLIGHT TIME LIMITATION RULES TO ESTABLISH FLIGHT ATTENDANT DUTY, FLIGHT TIME LIMITATIONS, AND REST RESTRICTIONS.** The flight attendant duty period limitations and rest requirements final rule allows air carriers to adopt the flight crewmember rules for their flight attendants. This rule provides additional scheduling flexibility and eliminates the need for an air carrier to have two sets of scheduling requirements for its flight crewmembers and flight attendants. This provision also will permit flight attendants on such operations to be scheduled with the same limitations as the flight crewmembers. This option appears in 14 CFR §§ 121.467(c) and 135.273(c) of the final rule.

**A.** In order to adopt the flight crewmember's flight, duty, and rest requirements for its flight attendants, the air carrier must establish written procedures which are approved by the Administrator and referenced in the air carrier's operations specifications. The procedure as written must comply with the following guidelines and contain at least the following information:

1)     Air carriers wishing to apply the flight crewmember flight, duty, and rest requirements to flight attendants may obtain approval by submitting their procedures for preliminary review and approval to the principal operations inspectors assigned to them at the FAA FSDO that is charged with the overall inspection of their operations. The approval process is similar to those used for exit seating and passenger carry-on baggage required to ensure that flight crewmember rules are adequately applied to flight attendants.

2)     The written procedures must apply to all flight attendants used in the air carrier's operation.

3)     The written procedures must be applied to the air carrier's entire operations.

4)     The written procedures must show that the flight crewmember rules are adequately applied to the flight attendants. They must clearly show that when the flight crewmembers are following the rules for an operation, for example, domestic, the flight attendants will also be following those rules. Another example would be if the flight crewmembers are using the Flag rules, then the flight attendants must also be following these rules and the written procedures would clearly show this is the case.

5)     The written procedures for establishing duty period limitations and rest

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

requirements for air carriers certificated under part 135 must include the limitations contained in subpart F except for provisions for on-board rest facilities, as appropriate to the operation being conducted.

    6)  The written procedures must provide information about augmenting the flight attendant crew complement. Part 121 and 135 air carriers are required to provide flight attendants on aircraft with certain passenger seating configurations in accordance with §§ 121.391, 135.107, or the air carrier's operations specifications, as appropriate. The number of flight attendants required on an aircraft to meet the provisions of §§ 121.391, 135.107, or the air carrier's operations specifications, whichever is greater, is referred to as the minimum flight attendant crew complement.

    NOTE: Any air carrier that elects the options to apply flight crewmember flight, duty, and rest requirements of flight attendants and has established written procedures for augmenting the minimum flight crewmember complement must establish procedures for augmenting the minimum flight attendant complement. The augmenting procedures must be based on the number of flight crewmembers assigned to the flight that is in addition to the minimum flight crewmember complement as specified in the aircraft type certificate data sheet. For example, if the minimum flight crewmember complement on a Boeing 747-200 is three, as specified in the aircraft type certificate data sheet, an air carrier that schedules four flight crewmembers for an extended long-range flight will be required to schedule one flight attendant in addition to the minimum flight attendant crew complement that is required by §§ 121.391, 135.107, or the air carrier's operations specifications. For example, if the operations specifications for a certain airplane requires eight flight attendants, and if the air carrier adds one flight crewmember, that air carrier would be required to add one additional flight attendant, for a total of nine flight attendants.

    7)  In addition, in the written procedures each air carrier must show how they will ensure that the definition of "rest period" in the final rule is applied to flight attendants. (See the detailed discussion on "Rest Period Requirements" and "Reserve Status, Stand-by Status, or Similar Assignments" in the final rule.)

    8)  Under the provisions for applying flight crewmember flight, duty, and rest requirements to flight attendants, if the Administrator finds that revisions to the written procedures are necessary for the continued adequacy of the procedures for applying flight crewmember flight, duty, and rest requirements to flight attendants, the Administrator will require the air carrier to make necessary changes within 30 days after being notified by the Administrator. In addition, an air carrier may petition the Administrator to reconsider the notice to change the procedures.

    NOTE: This procedure for requiring changes is consistent with the current regulatory language for aircraft inspection programs and pilot training programs contained in §§ 91.415 and 121.405, respectively, as well as a number of other regulations.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

USCA Case #13-1316    Document #1491488       Filed: 05/05/2014      Page 68 of 126

9)   Any air carrier that establishes written procedures to apply the flight crewmember flight, duty, and rest requirements to flight attendants and that subsequently wishes to revise this practice and schedule flight attendants according to the duty period limitations and rest requirements in § 121.467 or 135.273 must amend their operations specifications in accordance with §§ 121.79(c) and 135.17(b). These sections require an air carrier to file an application for an amendment of operations specifications at least 15 days before the effective date proposed by the applicant for the amendment, unless a shorter filing period is approved by the FSDO charged with the overall inspection of the air carrier. See chapter 18, section 3 of this volume, for information regarding the issuance of OpSpec A032, Adoption of flight crewmember flight time limitation rules to establish flight attendant duty and flight time limitations and rest restrictions.

**3-3572.    EXIT SEATING PROGRAM.** The applicable air carriers must comply with the appropriate parts of 14 CFR pertaining to exit seating: §§ 121.585 and/or 135.129. The following information provides guidance and clarification on the development of the exit seating program and defines the applicability.

**A.  Applicability.**

1)   Exit row regulations apply to the following air carriers:

a)   Part 121 certificated air carriers. This includes air carriers who carry passengers pursuant to § 121.583, because § 121.585 is not on the list of part 121 regulations from which those air carriers are exempt.

b)   Part 135 on-demand air carriers with aircraft having more than 19 passenger seats.

2)   The exclusion of part 135 on-demand aircraft having 19 or fewer passengers seats and part 135 commuter aircraft having 9 or fewer seats was based on typical passenger seating configurations and exit availability of these aircraft.

**B.  Exit Seat.** An exit seat is defined as each seat in a row of seats through which passengers would have to pass to gain access to an exit from the first seat inboard of the exit to the first aisle inboard of the exit. A passenger seat having direct access means a seat from which a passenger can proceed directly to the exit without having to enter an aisle or pass around an obstruction (such as a bulkhead, lavatory, closet, galley, etc.).

1)   The air carrier's manual procedures must contain a listing of designated exit seats for each type of passenger seating configuration in its fleet.

2)   "Exit seat" is a more accurate term than "exit row." In some configurations involving a row of two seats at an exit, only one seat is behind a partition. (For example, the forward most row on the left side of the Dash-8.) The window seat, obstructed by the partition, is not considered an exit seat because the passenger does not have direct access to the forward left exit. However, the passenger seated next to that seat on the aisle has direct access because that passenger does not have to pass around the bulkhead to reach the exit. This is one of the rare

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

exceptions whereby the entire row is not an exit row.

### C. Selection Criteria.

1)   As applicable to the exit seating rule, the required selection criteria for an occupant of an exit seat are listed in §§ 121.585(b) and 135.129(b). The selection criteria is a listing of capabilities and conditions to be applied to determine the suitability of persons to occupy an exit seat.

2)   The selection criteria should be contained in its entirety in the air carrier's manuals, including the flight attendant manual, and the exit seating passenger information card. The selection criteria must also be available for inspection by the public at all passenger loading gates. Air carriers should avoid paraphrasing the selection criteria, as it may change the meaning of the neutral selection criteria and result in unwarranted discrimination. An example of such paraphrasing whereby the meaning of the criteria is changed would be if an air carrier misrepresented § 121.585(b)(4) as follows:

a)   "The person lacks sufficient visual capacity to perform one or more of the applicable functions."

b)   The omission of "without the assistance of visual aids beyond contact lenses or eyeglasses" (as stated in the regulation) significantly changes the meaning of the criteria and could result in unwarranted removal of passengers with eyeglasses seated at exit seats. However, in some instances the regulatory language could be changed for simplification purposes without changing the meaning of the criteria. For example, "to exit expeditiously" could be restated as "to exit quickly."

3)   The airline employee, designated to determine who may be assigned to an exit seat, must make this assessment in a nondiscriminatory manner by consistent application of the neutral criteria.

a)   If, for example, a passenger is being evaluated for assignment to an exit seat, age (with the exception of those younger than 15 years of age) or the size of a person alone should not be the determining factors. The airline employee must evaluate the individual's physical and mental capabilities, and other conditions, as clearly outlined in the selection criteria. If that individual meets all the selection criteria, then age or size alone should not be a disqualifying factor.

b)   However, if that individual has difficulty walking and lifting his/her own carry-on luggage, then the application of the neutral criteria would exclude this individual from being assigned an exit seat because it would appear by observation that the individual would not be able to move expeditiously and perform the tasks involved in the emergency evacuation.

### D. Functions.
As applicable to the exit seating rule, §§ 121.585(d) and 135.129(d) list the functions which a passenger, seated at an exit seat, must be willing and able to perform in the event of an emergency. The functions must appear on the exit seating passenger information

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

card, but can be in written form or graphically displayed. The functions must also be contained in the written airport information available at the passenger loading gates and in the air carrier's manual procedures.

**E.  Seat Selection/Assessment/Verification Process.** Each air carrier, using the selection criteria, is required to determine the suitability of each person who occupies an exit seat. Regulations require that persons responsible for making this determination be identified in the air carrier's manual. The air carrier is further responsible for developing procedures concerning this passenger selection process. The procedures should address:

- Who is responsible for making these determinations (prior to boarding and the final verification on board the aircraft)

- How they will make this determination

- When the process will be performed

- Where the process will be performed

- Identification of each designated exit seat (for each passenger seating configuration in its fleet)

1)  Advanced Seating.

a)  To the maximum extent feasible, exit seats should be assigned prior to boarding the aircraft. This would reduce the confusion or requests for reseating and possible delays after the aircraft is boarded. This does not preclude an air carrier from having an open seating policy, advance seat selection, self check-in kiosks, or other type of computer/ internet technologies which allows advance seating selection and check-in at airports where passengers may be permitted to select and be assigned an exit seat at check-in without screening by air carrier personnel. However, when these types of check-ins are in place, additional procedures should be developed and implemented for screening, verifying, and reseating passengers onboard the aircraft to ensure compliance with exit seat assignment requirements.

b)  For example, menu prompts which appear at the point of exit seat selection could assist in preliminary verification of passenger eligibility. When a passenger has chosen an exit seat by means of a self check-in kiosk, the ground agent at the ticket lift point could make determinations and assessments at the time of the required verification of positive ID to meet TSA security requirements. In order to safeguard the screening process, other carriers may select a "see agent" prompt at the point of passenger selection of exit seating via self check-in. POIs and/or CSIs (if applicable) should ensure that when air carriers offer these methods of advanced seat selection, check-in, and open seating that approved exit seating programs provide ample information detailing the methods of screening and procedural safeguards in place to ensure compliance with exit seat assignment requirements.

2)  The air carrier is responsible for identifying those persons who will make the

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

determination as to the suitability of the person assigned to an exit seat. The responsibility can be assigned to a customer service agent, a crewmember, or other persons specified by the air carrier in its company's manual procedures.

    3) Should air carriers choose to use electronic media that allows passengers to select exit seats and print out a boarding pass without going through an employee of the company, they must have procedures in place for screening those passengers. The individuals and the procedures used to accomplish this should be identified in the appropriate air carrier manuals.

    4) While the regulation specifically defines the criteria for persons occupying an exit seat, the method by which the airline employee assesses the person assigned to an exit seat should be defined by the air carrier in its company's manual. This process generally requires a physical observation of the person and should require additional processes such as conversation with the person, to determine if he or she meets the selection criteria (ability to hear, understand, impart information, not distracted by other responsibilities such as caring for small children or other traveling companions, etc.).

    5) Sections 121.585(g) and 135.129(g) state that the air carrier may not taxi or pushback unless at least one required crewmember has verified that no exit seat is occupied by a person the crewmember determines is likely to be unable to perform the emergency functions. The required crewmember and the method used to make this determination must be specified in the company's manual.

### F. Individual Exit Seat Briefings.

    1) The NTSB recently examined 46 passenger aircraft evacuations that occurred between September 1997 and June 1999. The report, titled National Transportation Safety Board, Emergency Evacuation of Commercial Airplanes, Safety Study NTSB/SS-00/01 (Washington, DC: NTSB, 2000), resulted in recommendations to the FAA. They include recommendation A-00-77: Require air carriers to provide all passengers seated in exit rows in which a qualified crewmember is not seated a preflight personal briefing on what to do in the event the exit may be needed. To read the entire report, go to: www.ntsb.gov/Recs/letters/letters.htm.

    2) During the study, the NTSB examined passenger performance in exit rows for the six cases for which the Board received information on the overwing exit operation. In several evacuations, the passengers had trouble using the exits correctly and the Board determined that one reason for these difficulties was passenger inattention to the safety materials provided. The Board found that in one case, exit seats were occupied by two passengers older than age 70, one of whom was unable to open the exit. In addition, three passengers seated in exit rows did not speak the language in which briefings and oral commands were given by the crew.

    a) Of the six study cases, several of the air carriers had procedures in place to individually brief passengers on exit row tasks. Passengers who received an individual briefing were more likely to read the safety card than those who did not receive an individual briefing.

b)  The Board found that 44.5 percent of the passengers who were individually briefed reported examining their safety cards and 16 percent of the passengers who did not receive an individual briefing reported examining their safety cards.

c)  In addition, those who received individual briefings performed better during actual evacuations and were better prepared to operate the overwing exits.

3)  Many air carriers have procedures which designate certain crewmembers to conduct additional structured personal conversations or briefings, beyond the oral briefing required by §§ 121.585(h) and (i) and 135.129(h) and (i), to ensure that the passengers in exit seats can hear, understand, and speak the language of the air carrier. (However, fluency in the language of the air carrier is not required as long as the exit seat passengers can understand crew instructions, commands, the graphic illustrations related to exit seat functions, and are able to adequately impart information related to emergency functions.)

4)  Individual briefings that are given to passengers who occupy exit seats have a positive effect on the outcome of an aircraft evacuation. Individual briefings also assist flight attendants in assessing the suitability of passengers who occupy those seats. An individual briefing reminds passengers of their exit seat responsibilities, gives them the encouragement to review their safety information card and also gives passengers the opportunity to ask the flight attendant any questions they may have about exit operation or procedures. This briefing also presents an opportunity for the flight attendant to assess the passengers' ability to understand oral crew commands.

5)  POIs and/or CSIs (if applicable) should strongly encourage their assigned air carriers to consider the safety benefits that are accomplished by individual exit seat briefings and to include such briefings in their predeparture procedures. In the absence of procedures that require individual briefings, POIs and/or CSIs (if applicable) should ensure that each air carrier has a method in place to ensure compliance with § 121.585(g), which requires verification by a required crewmember that the passengers can perform all required functions, which includes the ability to follow oral directions.

G.  **Assessment/Verification Prior to Landing.** Air carriers should also have procedures in place to ensure that exit seats are not occupied by persons who do not meet the exit seat criteria. Crewmembers should continue to monitor exit seat occupancy during flight, in the course of their normal duties, to ensure that persons who do not meet the criteria do not move into exit seats. In addition, crewmembers should recheck the exit seats before landing to make certain that passengers who met the criteria and occupied exit seats prior to takeoff still meet the exit seat criteria for landing (e.g., intoxication during flight, panic attacks, passenger illness or injury).

H.  **Exit Seating Passenger Information Card.** Sections 121.585(d) and 135.129(d) provide the requirement for the contents of the exit seating passenger information card. This exit seating passenger information card may be in addition to the standard passenger information card, which is required by §§ 121.571(b) and 135.117(e) or it can be incorporated into the standard passenger information card. The exit seating passenger information card is required to

40

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 70

be located at each designated exit seat. The exit seating passenger information card is to be presented in the primary language in which briefings and oral commands are given by the crew. It must contain the following information:

    1) The selection criteria, as found in §§ 121.585(b) and 135.129(b);

NOTE: The selection criteria are mobility, strength and dexterity standards that do not specify where exits should be deposited. Exits should be deposited in accordance with the airplane manufacturer's instructions. Air carriers must depict on their passenger information card the actual weight of the exit so that each potential exit seat passenger can make an assessment as to whether or not they meet the selection criteria. Therefore, air carriers must include the selection criteria on their passenger information card. However, there is no need to repeat the information verbatim from the regulation.

    2) The emergency function, as found in §§ 121.585(d) and 135.129(d);

NOTE: The functions must be listed (as in the rule) and/or graphically displayed on the passenger information card. Either or both methods are acceptable. If a function can not be graphically depicted on the card (such as "Follow oral directions and hand signals given by a crewmember."), then it should be written on the exit seating information card.

    3) The contents (to follow) found in §§ 121.585(e) and 135.129(e):

        a) A request that passengers identify themselves for reseating if they cannot meet the selection criteria; have non discernible conditions that will prevent them from performing the applicable functions listed on the card; may suffer bodily harm as a result of performing one or more of the functions; and do not wish to perform the functions

        b) A request that passengers identify themselves to allow reseating if they lack the ability to read, speak, or understand the specified language in which crew commands will be given in an emergency. (This request is to be written in each language used by the air carrier for the passenger information card. If the card, for example, contains some safety instructions in several languages, then this request should be in each of those languages.)

    **I. Oral Briefing.** Sections 121.585(h) and (i) and 135.129(h) and (i) provide the specific requirements for the oral briefing. The content of the required oral briefing must be part of the air carrier's manual procedures. As per the rule, the oral briefing shall:

    1) Reference the exit seating passenger information card, along with the criteria and the functions. (The required oral briefing only requires a reference, not a reading of the contents of the criteria and functions.)

    2) In addition, the briefing must have a statement that requests the passenger to identify himself or herself for reseating if he or she:

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

- cannot meet the selection criteria

- has a non discernible condition that will prevent him or her from performing the applicable (emergency) functions

- may suffer bodily harm as the result of performing one or more of the functions

- does not wish to perform the functions

3)   This briefing should be conducted after all the passengers have boarded. If the required briefing is conducted several minutes before the entry door is closed and then several late passengers board after the briefing is completed, the briefing should be repeated in case one or more of the late passengers occupies an exit seat.

4)   It is beneficial when the air carrier incorporates into the required oral briefing the exit seat locations for that aircraft configuration so the passengers seated at the exit seats clearly understand that the briefing requirements are directed toward them. Some air carriers further identify exit seat locations to passengers and crew with placards in the cabin, or with an indication on the passenger boarding pass.

   **J.   Reseating/Full Booking.**

1)   Sections 121.585(k) and 135.129(k) require that in the event that a passenger assigned to an exit seat would be unable to perform the evacuation functions, or requests a non-exit seat, the air carrier shall expeditiously relocate the passenger to a non-exit seat. The air carrier's manual procedures should clearly outline how the reseating would be accomplished.

   NOTE: The air carrier, by regulation, shall not require the passenger to disclose his or her reason for needing reseating.

2)   Sections 121.585(l) and 135.129(l) require that in the event a passenger assigned to an exit seat wishes to be relocated to a non-exit seat and all of the non-exit seat are booked full, the air carrier must move a passenger from a non-exit seat to the exit seat who is willing and able to assume the evacuation functions. The air carrier's manual procedures should clearly outline how the reseating with a full load would be accomplished.

   NOTE: If a passenger is assigned to an exit seat but later has second thoughts about being seated at an exit seat, the passenger should be relocated prior to pushback. However, if taxiing has begun or takeoff is already underway, the rule does not require that the passenger be moved. This would create dangers as great as or greater than allowing the person to remain in place until the aircraft is airborne. The cabin crew has been alerted to the location of a potential problem in the event of an evacuation and can wait until airborne when it would be safe to relocate the passenger. This is not an excuse for a crewmember to be complacent in performing the required verification.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 72

**K. Denial of Transportation.**

1)  Sections 121.585(m) and 135.129(m) state that an air carrier may deny transportation to any passenger under this section only because:

- The passenger refused to comply with instructions given by a crewmember or other authorized employee of the air carrier concerning the implementation of the approved exit seating procedures; and

- The only seat that will physically accommodate the person's disability is an exit seat.

2)  The air carrier's manual procedures must describe the reasons for denial of transportation. It should also describe how it will be handled and who is designated to handle the situation.

**L. Disputes.** Sections 121.585(n)(iv) and 135.129(n)(iv) require that the air carrier include procedures which address how to resolve disputes arising from the implementation of this rule, and identify the employee on the airport to whom complaints would be addressed for resolution. This person is commonly referred to as the Complaint Resolution Official or CRO.

**M. Airport Information.** Sections 121.585(f) and 135.129(f) require that each air carrier shall make available for inspection by the public at all passenger loading gates and ticket counters at each airport where it conducts business, written procedures established for making determinations in regard to exit seating. The method of presentation of the airport information may vary, such as: a flyer, a card, a ticket jacket, a computer printout, a posted sign, etc. The air carrier's exit seating program should state the method in which this information will be presented to anyone who requests this information. This written airport information should contain:

- The selection criteria, as found in §§ 121.585(b) and 135.129(b);

- The emergency functions, as found in §§ 121.585(d) and 135.129(d);

- The requests for reseating, as found in §§ 121.585(e) and 135.129(e);

- The reasons for denial of transportation, as found in §§ 121.585(m) and 135.129(m);

**N. Program Content for Submission.** The air carrier should submit the following documents to the POI and/or CSI (if applicable):

1)  Manual Excerpts.

a)  Manual excerpts should be submitted from the operations, flight attendant, and passenger/customer service portions of the air carrier's manuals, with procedures appropriate for the air carrier's employees to adequately perform their exit seating duties and responsibilities.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

USCA Case #13-1316     Document #1491488          Filed: 05/05/2014      Page 76 of 126

b)   The procedures should contain: the selection criteria, the emergency functions, location of designated exit seats, requirements for exit seating passenger information cards, crewmember verification of appropriate seating in exit seats, passenger oral briefings, seat assignments, requirements for written airport information, reseating, full bookings, assignment of exit seats, denial of transportation, resolving disputes arising from exit seating, and identification of the air carrier employee on the airport to whom complaints should be addressed for resolution.

2)   Configuration Diagrams. These should be submitted (for evaluation) and should display each passenger seating configuration in the air carrier's fleet. The diagram should highlight all exit seats, all passenger exits, any obstruction, such as: bulkheads, lavatories, closets, galleys, etc.

3)   Exit Seating Passenger Information Cards. Must be submitted for each type, make/model, and series aircraft. These cards may be submitted in draft form, pending final approval.

4)   Airport Information. The air carrier should identify the manner in which the written airport information is presented and submit a draft copy pending final approval.

**O.   Approval Process.** The intent of the exit seating review and approval process is to ensure consistent application of the regulation, particularly when the rule was new and policy was being developed. (See figure 3-129, Exit Seating Program Job Aid.) During the original approval process, the exit seating programs were sent for review first to the POI, and then forwarded for a second review by the Exit Seating Coordinator at the Regional Office who approved the programs on behalf of the Director, Flight Standards Service (AFS-1). The POI no longer needs to forward exit seating programs to the Exit Seating Coordinator at the Regional Office for approval. The POI is now considered to be the representative of AFS-1 in terms of compliance with §§ 121.585(p) and 135.129(p).

1)   Once the air carrier has completed their exit seating program package, a copy of the program should be forwarded in draft format to their POI and/or CSI (if applicable). During the review process, the POI and/or CSI (if applicable) should use this guidance and complete the Exit Seating Program Job Aid (checklist), figure 3-129. If the POI and/or CSI (if applicable) is not satisfied with the package, the inspector will return it to the air carrier with an explanation of the changes/additions needed for the program. If the POI and/or CSI (if applicable) finds the program to be complete and satisfactory, the POI will then give the final approval to the air carrier and issue operations specification A022.

2)   Any subsequent revisions to the approved exit seating program, such as a change in procedures, an addition of new aircraft, a change in the passenger seating configurations, a change to the exit seating passenger information card, etc., must be sent to the POI and/or CSI (if applicable). The certificate holding office should maintain a copy of an up-to-date version of their air carrier's exit seating program.

**P.   Special Approvals.** There may be situations whereby an air carrier may conduct some operations entirely in a foreign country. Such a situation could occur during a wet lease

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 74

operation. The entire airplane may be full of passengers who all speak one foreign language. The intent of the rule was not to exclude foreign speaking passengers from the exit seat, provided these passengers understand the commands given by the crewmembers in the event of an emergency, all the information on the approved exit seating passenger information card, and the required oral briefings. This may be accomplished in a number of ways. The crewmembers may be bilingual and trained in two languages, one of which is the language of the foreign passengers. The briefings may be conducted in two languages, the language of the foreign speaking passengers and the primary language of the air carrier. The exit seating passenger information cards should also be in the two languages. An amendment to the existing exit seating program would be needed which details the manner in which the air carrier would address this type of operation.

    1) If the situation is such that the operation is conducted domestically and a large group of foreign speaking passengers board the aircraft speaking one particular foreign language, and board in such numbers that the only seats remaining for them are the exit seats, then the air carrier would need to develop special procedures for FAA review and approval which would address this type of operation in order to comply with the rule.

    2) If the air carrier cannot find any passengers who speak the language of the air carrier, then the air carrier should attempt to find those passengers who have some understanding of the language used by the air carrier in the domestic operations. In this situation it would appear that an interpreter would have to be used who is fluent in both the air carrier's primary language and the language of the foreign speaking passengers. An exit seating passenger information card would have to be developed in that foreign language and the interpreter would have to thoroughly brief the foreign speaking passengers on the contents of that specially approved exit seating passenger information card. The interpreter would also have to provide the required exit seating oral briefing in the foreign language to ensure that the exit seating passengers are willing and able to perform the emergency functions. The interpreter would have to review the commands, which would be given by the crewmember in an emergency evacuation, in both the primary language of the air carrier and in the foreign language.

    3) A designated crewmember should oversee this special briefing and make the determination that those passengers understand their responsibilities, meet the criteria, and are willing and able to perform the emergency functions, if called upon to do so. This procedure requires more time to implement prior to departure and the necessary time must be allotted for this special briefing.

    4) In these and other similar situations, the air carrier would need to develop, in advance of the operation, and submit for approval specific procedures, special exit seating passenger information cards in the foreign language to be used, and crewmember training for that specific operation. The procedures must detail how the exit seating requirements would be met and who would be responsible for implementing the procedures and making the final determination as to the suitability of these passengers. The amended procedures must be sent to the POI and/or CSI (if applicable) for review. If the procedures satisfactorily meet the requirements, the exit seating program amendment for foreign speaking passengers can be approved by the POI.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

**3-3573.    EMERGENCY EVACUATION WITH INFANTS.** Researchers from the FAA Aerospace Medical Institute (CAMI), AAM-600, have completed two studies designed to determine the most favorable methods for the emergency evacuation of infants from aircraft (All CAMI publications may be accessed at: http://www.faa.gov/library/reports/medical/oamtechreports/index.cfm The following information is intended for use in developing passenger information materials and/or briefing.

   **A.**  The purpose of the first study, published in 2001, was to determine the most favorable methods for the evacuation of infants via an inflatable emergency evacuation slide. The results of this study strongly suggest that jumping onto the slide should be the favored boarding manner, as opposed to sitting down and sliding which slows the progress of the evacuation. The carrying position that provides the most protection for the child would include cradling the child's head and neck with the hand (for a vertical position) or in the arm (for horizontal positions), keeping the child's arms, legs, and feet enfolded as much as possible by the adult's arms. Both positions emphasize the importance of cradling the infant to protect its head, arms, and legs.

   **B.**  The purpose of the second study, to be published in 2004, was to determine the most favorable methods for evacuation of infants through a Type III overwing exit. The results of this study suggest that carrying the infant vertically, cradling the infant to protect its head, arms, and legs, should be the favored egress maneuver through the Type III exit, as opposed to carrying the child horizontally or passing the child to another passenger on the outside of the Type III exit.

**3-3574.    USE OF PORTABLE ELECTRONIC DEVICES.** POIs and principal avionics inspectors (PAI) should review the provisions contained in 14 CFR part 91, § 91.21, part 121, § 121.380, and AC 91.21-1, Use of Portable Electronic Devices Aboard Aircraft, with their assigned operators. POIs and PAIs shall ensure that their operators have adequate procedures in place to determine whether or not portable electronic devices are acceptable for passenger use on-board their aircraft. POIs shall ensure that their operators specify in their operations manuals those portable electronic devices that may not be operated on-board their aircraft. Although 14 CFR § 121.571, part 125, § 125.327, and § 135.117 do not require the following briefing information to be given, POIs should encourage their assigned operators to include information regarding the operation of portable electronic devices in their operators' pre-takeoff passenger safety briefings. These briefings should include any specific restrictions that apply to passenger use of portable electronic devices. An example briefing might be the following: "Some portable electronic devices may interfere with the aircraft's communications and navigation systems. Please refrain from using any electronic device other than portable voice recorders, hearing aids, and [the operator should add to this list of portable electronic devices, the generic identification of any device that it determines will not cause interference.] For your safety and the safety of others, please stow all carry-on portable electronic devices during taxi, takeoff, and landing."

**3-3575.    BRIEFINGS ON INDIVIDUAL FLOTATION DEVICES.** Individual flotation devices, for use by passengers, are not always identical on some aircraft. The differences in the equipment can be insignificant. For example, flotation cushions may have straps on the sides or straps across the bottom of the cushion. In either case, the instructions for use would be the same, "Insert your arms through the straps and hold the cushion to your chest." The straps are not in the same place, but the same instructions would work regardless of the location of the straps.

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 76

However, there are cases when the differences in the flotation cushions or the life preservers are significant.

**A. Significant differences in life preservers are:**

- Some are donned by placing one part over the head,

- Others are worn like a coat, and

- Some have inflation handles that work differently.

**B. Operators use various methods to inform passengers of using dissimilar flotation equipment, such as:**

- Briefing passengers on the different types of flotation devices;

- Displaying the differences on passenger cards and alluding to them in the briefing;

- Using a combination of briefing and passenger cards; and

- Briefing passengers (in rare cases) on only one design.

**C. Policy.** When a passenger is informed about more than one type of flotation cushion or life preserver it can be confusing. One method for informing passengers is to give each passenger information about the piece of individual flotation equipment that is located at that individual passenger's seat. In some cases, this may mean different cards at different seats and individual briefings at certain seats. When two sections on the same aircraft are equipped differently, each section would need a different passenger briefing. Another method for informing passengers is to advise them during the oral briefing that there are different types of flotation cushions on the airplane and therefore, it is important that they study the card carefully and be aware of the differences in the flotation equipment. The different methods of donning and/or operating the individual flotation device should be depicted on the card and given in the oral briefing or demonstration (if extended over-water flight).

**RESERVED.** Paragraphs 3-3576 through 3-3590.

**Figure 3 – 129, Exit Seating Program Job Aid**

| This preapplication phase job aid provides guidance for determining air carrier compliance with §§ 121.585 and 135.129, Exit Seating. |
| --- |
| Certificate Holder Name: |
| Doing Business As (DBA): |
| |
| Address: |

| | |
|---|---|
| | |
| Certificate Holder Certificate No.: | |
| POI Name: | |
| Office and Phone Number: | |
| Review Completed | |
| Signature and Date: | |
| Date Program Approved: | |
| | |
| Date AFS-500 Notified: | |
| | |
| Comments: | |
| | |
| | |
| | |
| REQUIRED ATTACHMENTS: Detailed on attached pages - Complete the lines with Y (for Yes) or N (for No): | |
| Exit Seating Procedures | |
| Airport Information | |
| Passenger Seating Cards | |
| Aircraft Floor Plans | |

EXIT SEATING PROCEDURES. Procedures should be submitted as manual section/training program sections/bulletins, etc. as appropriate to the individual carrier. Attach all applicable sections pertinent to exit seating only.

 NOTE: The POI should check for applicability and manual format and ensure that all applicable publications are revised. THE PROCEDURES MUST ADDRESS THE FOLLOWING REGULATORY REQUIREMENTS, AND MUST ADDRESS WHEN, HOW, AND BY WHOM THE ITEMS WILL BE ADDRESSED.

| SELECTION CRITERIA: Reference §§ 121.585(b) and 135.129(b). | |
|---|---|
| Do carrier procedures address when, how, and by whom the screening and/or selection will be accomplished? | |
| Do carrier procedures address the following selection criteria? | |
| 1. Does a person lack sufficient strength, dexterity, or mobility in both arms and hands, and both legs to perform the following functions? | |
| a. Reach upward, sideways, and downward to the location of emergency exit and exit slide operating mechanisms. | |
|  b. Grasp and push, pull, turn, or otherwise manipulate those mechanisms. | |

48

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 78

8900.1 CHG 0                                                                 9/13/2007

| | |
|---|---|
| c. Push, shove, pull, or otherwise open emergency exits. | |
| d. Lift out, hold, deposit on nearby seats, or maneuver over the seat backs to the next row objects the size and weight of overwing exit doors. | |
| e. Remove obstructions similar in size and weight of overwing exit doors. | |
| f. Reach the emergency exit expeditiously. | |
| g. Maintain balance while removing obstructions. | |
| h. Exit expeditiously. | |
| i. Stabilize an escape slide after deployment. | |
| j. Assist others in getting off an escape slide. | |
| 2. Is the person less than 15 years of age or does the person lack the capacity to perform one or more of the functions listed in §§ 121.585(d) and 135.129(d) without the assistance of an adult companion, parent, or other relative? | |
| 3. Does the person lack the ability to read and understand instructions related to emergency evacuation pro vided by the certificate holder in printed or graphic form or the ability to understand oral crew commands in the language used by the carrier? | |
| 4. Does the person lack a sufficient visual capacity to perform one or more of the functions listed in §§ 121.585(d) and 135.129(d) without the assistance of visual aids beyond contact lens or eyeglasses? | |
| 5. Does the person lack a sufficient aural capacity to hear and understand instructions shouted by crew members without assistance beyond a hearing aid? | |
| 6. Does the person lack the ability to adequately impart information orally to other passengers? | |
| 7. Does the person have either of the following? | |
| a. A condition or responsibility, such as caring for small children, that would prevent the person from performing one or more of the functions listed in §§ 121.585(d) and 135.129(d). | |
| b. A condition that might cause the person harm if he or she performs one or more of the listed functions. | |
| SEATING ASSIGNMENTS/VERIFICATION PROCEDURES | |
| Are exit seats identified for seat assignment purposes? | |
| Reference §§ 121.585(g) and 135.129(g). Does the certificate holder have a procedure that taxi or pushback will not be allowed until at least one required crewmember has verified that no exit seat is occupied by a person the crewmember determines is likely to be unable to perform the functions listed in §§ 121.585(d) and 135.129(d)? | |
| Are verifying crewmembers specifically identified? | |
| Reference §§ 121.585(j)(k) and 135.129(j)(k). Does the certificate holder have procedures to honor a passenger's request to be relocated and the procedures for relocation? | |
| Does the procedure note that a person does not need to disclose his or her reason for the request? | |
| Reference §§ 121.585(l) and 135.129(l). Does the certificate holder have procedures to move a passenger to accommodate a relocated passenger, in the event of full booking of | |

49

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 79

| | |
|---|---|
| non-exit seats? | |
| DENIAL OF TRANSPORTATION/RESOLVING DISPUTES | |
| Reference §§ 121.585(m) and 135.129(m). Does the certificate holder have procedures to deny transportation because of either or both of the following? | |
| 1. The passenger refuses to comply with instructions. | |
| 2. The only seat that will physically accommodate the person's handicap is an exit seat. | |
| Reference §§ 121.585(n) and 135.129(n). Does the certificate holder have procedures for resolving disputes, including identification of the employee at the airport to whom complaints should be addressed for resolution? | |
| ORAL BRIEFING PROCEDURES | |
| Reference §§ 121.585(i) and 135.129(i). Does the oral briefing reference the following? | |
| 1. Passenger information cards. | |
| 2. The selection criteria in §§ 121.585(b) or 135.129(b). | |
| 3. The functions to be performed under §§ 121.585(d) or135.129(d). | |
| 4. A request for reseating if any of the following conditions are met: | |
| a. Cannot meet the selection criteria. | |
| b. Has a nondiscernible condition that would prevent him or her from performing the listed functions. | |
| c. May suffer bodily harm as a result of performing one or more of those functions. | |
| d. Does not wish to perform those functions. | |
| AIRPORT INFORMATION | |
| Reference §§ 121.585(f) and 135.129(f). Does the certificate holder have written procedures for making determinations regarding exit seating available for inspection by the public at all passenger loading gates and ticket counters at each airport where it conducts passenger operations? | |
| Is a copy of the information attached? | |
| Is the content complete and the method of inspection identified, such as flyers, signs, and so forth? | |
| PASSENGER INFORMATION CARDS | |
| Are copies of applicable cards attached? | |
| Are cards appropriate to carrier's aircraft and configurations? | |
| Do procedures address the use and location of cards? | |
| Reference §§ 121.585(d) and 135.129(d). Do the briefing cards contain the following functions? | |
| 1. Locate the emergency exit. | |
| 2. Recognize the emergency exit opening mechanism. | |
| 3. Comprehend the instructions for opening the emergency exit. | |
| 4. Operate the emergency exit. | |
| 5. Assess whether opening the emergency exit will increase the hazards to passengers being exposed. | |

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

| | |
|---|---|
| 6. Follow oral directions and hand signals given by a crewmember. | |
| 7. Stow or secure the emergency exit door so that it will not impede the use of the exit. | |
| 8. Assess the condition of the escape slide, activate the slide, and stabilize the slide after deployment to assist others in getting off the slide (where applicable to aircraft type). | |
| 9. Explain how to pass expeditiously through the emergency exit. | |
| 10. Explain how to assess, select, and follow a safe path away from the emergency exit. | |
| Does the briefing card contain the selection criteria listed in §§ 121.585(b) and 135.129(b)? | |
| Does the briefing card contain a request that a passenger identify himself or herself to allow reseating if he or she meets one of the following criteria? | |
| 1. Cannot meet the selection criteria. | |
| 2. Has a nondiscernible condition that would prevent him or her from performing the listed functions. | |
| 3. May suffer bodily harm as a result of performing one or more of those functions. | |
| 4. Does not wish to perform those functions. | |
| 5. Lacks the ability to read, speak, or understand the language, or the graphic form specified by the carrier, or lacks the ability to understand oral crew commands (in every language used by the certificate holder for the card). | |
| AIRCRAFT FLOOR PLANS | |
| Are the aircraft passenger seating floor plans submitted for each aircraft make, model, and series, and for each passenger seating configuration used by the certificate holder? | |
| Are exits and exit seats identified? | |

| List aircraft operated: Aircraft Make/Model/Series | Configurations (same or show each configuration) | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

UNCONTROLLED COPY WHEN DOWNLOADED
Check FSIMS to verify this version is current prior to use

Add. 81

A Report from the PED ARC to the FAA



September 25, 2013

## Portable Electronic Device (PED) Aviation Rulemaking Committee

## PED Stowage Policy Assessment and Considerations

| Summary |
| --- |
| The PED ARC has determined the need for a Portable Electronic Device (PED) stowage policy assessment on aircraft used in commercial passenger air transportation. The ARC tasked a working group to present considerations to assist commercial aircraft operators in developing a PED stowage policy that would work in concert with an expanded PED use policy. This paper summarizes FAA relevant regulations and guidance, evaluates current industry PED policies, and provides considerations to standardize industry best practices for stowage of PEDs as appropriate. |

Add. 82

## Portable Electronic Device Aviation Rulemaking Committee
## PED Stowage Policy Assessment and Considerations

### Contents

1.      Background ...................................................................................................... G-5

1.1.    Purpose ........................................................................................................... G-5

1.2.    Applicability & Scope ....................................................................................... G-5

1.3.    Charter ............................................................................................................ G-5

1.4.    Definitions ....................................................................................................... G-6

2.      Current FAA Regulations and Guidance .......................................................... G-7

2.1.    Regulations ..................................................................................................... G-7

2.1.1.  Portable Electronic Devices (14 CFR § 121.306) ........................................... G-7

2.1.2.  Carry-on Baggage (14 CFR § 121.589) ......................................................... G-8

2.1.3.  Stowage Compartments (14 CFR § 25.787) ................................................... G-9

2.1.4.  Part 25, Subpart C – Structure, General (14 CFR § 25.561) ........................ G-10

2.2.    Guidance ....................................................................................................... G-10

2.2.1.  Carry-On Baggage (AC 121-29B) ................................................................ G-10

2.2.2.  Use of Portable Electronic Devices Aboard Aircraft (AC 91-21.1B) ............. G-12

2.2.3.  Passenger Safety Information Briefing and Briefing Cards (AC 121-24C) ...... G-13

2.2.4.  Stowage of Items in Seat Pockets (InFO 09018) .......................................... G-15

2.2.5.  Transport Airplane Cabin Interiors Crashworthiness Handbook) .................. G-16

2.2.6.  Corded Electrical Devices Used in the Passenger Cabin (ANM–02–115–20) ...... G-16

3.      Survey of Current Industry Stowage Policies ................................................ G-17

3.1.    Background .................................................................................................... G-17

3.2.    Survey Questions and Summary of Responses ............................................ G-17

3.3.    Discussion of Survey Results ....................................................................... G-18

4.      PED Stowage Considerations ....................................................................... G-19

4.1.    Key Issues to Consider ................................................................................ G-19

4.2.    Key Questions .............................................................................................. G-21

4.3.    Minimize Variability of Stowage Policies ...................................................... G-23

4.4.    Develop a Public Messaging Strategy .......................................................... G-23

Appendix 1: PED Stowage Survey Responses .......................................................... G-25

Appendix 2: AAM-630 Memorandum, Recommendations for PED Usage Onboard Airliners .............. G-31

# 1. Background

## 1.1. Purpose

The Federal Aviation Administration (FAA) Portable Electronic Devices Aviation Rulemaking Committee (PED ARC) is tasked to make suggestions to further clarify and provide guidance on allowing additional PED use by passengers in the cabin without compromising the continued safe operation of the aircraft. The PED ARC stowage policy working group was established to evaluate PED policies in use today by Title 14, Code of Federal Regulations (14 CFR) Part 119 certificate holders. Since a migration to "PED tolerant" airplanes will allow passengers' devices to remain powered on throughout flight, the team was also asked to consider expanding the windows of time that passengers may use their electronic devices, without adversely affecting cabin safety.

## 1.2. Applicability & Scope

This document, PED Stowage Policy Assessment and Considerations is a product of the Portable Electronic Device Aviation Rulemaking Committee based on the evaluation conducted by the PED Stowage working group. This report serves as suggested guidance for those 14 CFR 119 certificate holders that desire to allow passengers to utilize PEDs in any phase of flight on their aircraft. The air carrier is ultimately responsible for passenger safety. Procedures may vary due to differences in air carrier operations and aircraft. The scope of this document is limited to passenger PED stowage as related to carry-on baggage policies. The use of the terms "aircraft operator(s)" and "operator" throughout this document is applicable to operations conducted under 14 CFR parts 91k, 121, 125 and 135.

The working group's efforts included contacting and working with the FAA Office of Aerospace Medicine (AAM-600) and Cabin Safety Inspectors (CSI), Airlines for America (A4A), the Association of Flight Attendants-CWA (AFA), the National Business Aviation Association (NBAA), the National Air Transportation Association (NATA), the Association of Professional Flight Attendants (APFA), the Regional Airline Association (RAA), and other interested stakeholders.

## 1.3. Charter

The PED ARC Stowage Working Group will recommend guidance to enable operators to develop a PED stowage policy that would work in concert with an expanded PED usage policy.

Add. 84

A Report from the PED ARC to the FAA

## 1.4.  Definitions

A **Portable Electronic Device (PED)** is any piece of lightweight, electrically-powered equipment.  These devices are typically consumer electronic devices functionally capable of communications, data processing and/or utility.

To stow an item, according to one dictionary definition, is "to put (something that is not being used) in a place where it is available, where it can be kept safely, etc."[52] **Stowage**, therefore, is simply a "space especially on a ship or airplane for stowing things."[53] For purposes of this report, a stowage location on an airplane is generally one that is approved for stowage by the operator, and placarded with a maximum weight restriction. If an item is located in a place that lacks formal operator approval or a maximum weight placard, but where it is considered, in the judgment of the operator, that in a survivable incident (e.g., severe turbulence during a critical phase of flight) the item is unlikely to threaten any occupant's safety (e.g., restricting egress from a seat during an emergency evacuation) or lead to one or more injuries, this report refers to that item's condition as "**secure**". Some factors that help determine the relative safety of a secure location include the size, shape, and weight of the passenger's item, as well as the holding properties of the location itself.

---

[52] Hyperlink:  Merriam-Webster online dictionary [http://www.merriam-webster.com/dictionary/stow] Accessed September 19, 2013.
[53] Hyperlink:  Merriam-Webster online dictionary [http://www.merriam-webster.com/dictionary/stowage] Accessed September 19, 2013.

Add. 85

## 2. Current FAA Regulations and Guidance

The following sections summarize and discuss current FAA regulatory, policy, and guidance documents relevant to stowage of passenger items in the cabin.

### 2.1. Regulations

Pertinent parts of the applicable regulations have been excerpted here for this discussion.  Footnotes have been provided to link to the full regulatory language.

#### 2.1.1. Portable Electronic Devices (14 CFR § 121.306)

Portable electronic devices regulation 121.306 gives operators the authority to determine whether particular devices may be used on board their aircraft:[54]

*§ 121.306   Portable electronic devices.*

*(a) Except as provided in paragraph (b) of this section, no person may operate, nor may any operator or pilot in command of an aircraft allow the operation of, any portable electronic device on any U.S.-registered civil aircraft operating under this part.*

*(b) Paragraph (a) of this section does not apply to—*

*(1) Portable voice recorders;*

*(2) Hearing aids;*

*(3) Heart pacemakers;*

*(4) Electric shavers; or*

*(5) Any other portable electronic device that the part 119 certificate holder has determined will not cause interference with the navigation or communication system of the aircraft on which it is to be used.*

*(c) The determination required by paragraph (b)(5) of this section shall be made by that part 119 certificate holder operating the particular device to be used.*

---

[54] Hyperlink: §121.306 Portable electronic devices  [http://www.ecfr.gov]; Accessed September 19, 2013.

A Report from the PED ARC to the FAA

## 2.1.2. Carry-on Baggage (14 CFR § 121.589)

14 CFR § 121.589 paragraphs (b) - (f) specify requirements for ensuring that cabin items are properly secured during takeoff and landing operations:[55]

*§ 121.589   Carry-on baggage.*

*\* \* \* \**

*(b) No certificate holder may allow all passenger entry doors of an airplane to be closed in preparation for taxi or pushback unless at least one required crewmember has verified that each article of baggage is stowed in accordance with this section and § 121.285 (c) and (d).*

*(c) No certificate holder may allow an airplane to take off or land unless each article of baggage is stowed:*

*(1) In a suitable closet or baggage or cargo stowage compartment placarded for its maximum weight and providing proper restraint for all baggage or cargo stowed within, and in a manner that does not hinder the possible use of any emergency equipment; or*

*(2) As provided in § 121.285 (c) and (d); or*

*(3) Under a passenger seat.*

*(d) Baggage, other than articles of loose clothing, may not be placed in an overhead rack unless that rack is equipped with approved restraining devices or doors.*

*(e) Each passenger must comply with instructions given by crewmembers regarding compliance with paragraphs (a), (b), (c), (d), and (g) of this section.*

*(f) Each passenger seat under which baggage is allowed to be stowed shall be fitted with a means to prevent articles of baggage stowed under it from sliding forward. In addition, each aisle seat shall be fitted with a means to prevent articles of baggage stowed under it from sliding sideward into the aisle under crash impacts severe enough to induce the ultimate inertia forces specified in the emergency landing condition regulations under which the airplane was type certificated.*

*\* \* \* \**

---

[55] Hyperlink: §121.589 Carry-on baggage  [http://www.ecfr.gov]: Accessed September 19, 2013.

Add. 87

### 2.1.3. Stowage Compartments (14 CFR § 25.787)

14 CFR § 25.787 paragraphs (a) and (b) specify the design requirements for approved stowage compartments:[56]

§25.787   Stowage compartments

*(a) Each compartment for the stowage of cargo, baggage, carry-on articles, and equipment (such as life rafts), and any other stowage compartment must be designed for its placarded maximum weight of contents and for the critical load distribution at the appropriate maximum load factors corresponding to the specified flight and ground load conditions, and to the emergency landing conditions of § 25.561(b), except that the forces specified in the emergency landing conditions need not be applied to compartments located below, or forward, of all occupants in the airplane. If the airplane has a passenger seating configuration, excluding pilots seats, of 10 seats or more, each stowage compartment in the passenger cabin, except for underseat and overhead compartments for passenger convenience, must be completely enclosed.*

*(b) There must be a means to prevent the contents in the compartments from becoming a hazard by shifting, under the loads specified in paragraph (a) of this section. For stowage compartments in the passenger and crew cabin, if the means used is a latched door, the design must take into consideration the wear and deterioration expected in service.*

\* \* \* \*

---

[56] Hyperlink: §25.787  Stowage compartments [http://www.ecfr.gov]; Accessed September 19, 2013.

### 2.1.4. Part 25, Subpart C – Structure, General (14 CFR § 25.561)

14 CFR § 25.561 paragraph (b) lists specific inertia forces experienced during emergency landing conditions on land or water:[57]

*§ 25.561   General.*

*\* \* \* \**

*(b) The structure must be designed to give each occupant every reasonable chance of escaping serious injury in a minor crash landing when—*

*(1) Proper use is made of seats, belts, and all other safety design provisions;*

*(2) The wheels are retracted (where applicable); and*

*(3) The occupant experiences the following ultimate inertia forces acting separately relative to the surrounding structure:*

*(i) Upward, 3.0g*

*(ii) Forward, 9.0g*

*(iii) Sideward, 3.0g on the airframe; and 4.0g on the seats and their attachments.*

*(iv) Downward, 6.0g*

*(v) Rearward, 1.5g*

*\* \* \* \**

## 2.2.  Guidance

This section lists several FAA policy and guidance documents that expand on and clarify existing regulations and generally provide one means, although not the only means, for complying with those regulations. Relevant portions of these documents are excerpted in the following sections:

### 2.2.1. Carry-On Baggage (AC 121-29B)

Advisory Circular (AC) 121-29B "provides information about features that the … FAA … recommends be included in air carriers' carry-on baggage programs [and] provides clarification to air carriers about how to comply with FAA's carry-on baggage regulations."[58]The following portions of the AC address issues relevant to stowage of PEDs:

---

[57] Hyperlink:  §25.561  Structures, General [http://www.ecfr.gov];  Accessed September 19, 2013.
[58] Hyperlink:  FAA AC 121-29B Carry-On Baggage [http://rgl.faa.gov];  Accessed September 19, 2013.

Add. 89

*Excerpt - FAA Advisory Circular 121-29B:*

*4. What should your FAA-approved carry-on baggage program address?*

*…*

*d. Explain how you intend to stow carry-on baggage properly. This part of the program depends on the type of aircraft covered by the program, including cabin configuration and other space factors. Your stowage program should ensure that:*

*(1) Carry-on baggage does not obstruct passenger movement to, from, or across the aisle;*

*…*

*e. Describe your procedures to verify that each article of baggage is properly stowed in an approved compartment or other specifically approved area before flight attendants close the passenger entry doors on each flight. The FAA recommends that you task a specific crewmember, such as the lead flight attendant, with verifying proper stowage. Your description should include:*

*(1) Methods to ensure carry-on baggage and cargo do not exceed the FAA-approved weight limitations or load limits for the specific place they are stowed, including the restraints used to secure them. …*

*i. Establish procedures for informing travelers and travel agents about the specific carry-on requirements of your flights. You may accommodate travelers with special baggage problems, provided you can stow the baggage safely. …*

*j. Include information about your carry-on baggage program in the appropriate parts of the crewmembers' manual. You should cover all of the elements listed above, especially crewmember responsibility for verifying that baggage is stowed properly and will not hinder the availability and use of emergency equipment; and other pertinent information that the principal operations inspector determines should be in the crewmembers' manual.*

*k. Provide training to appropriate ground personnel and to all crewmembers regarding your approved carry-on baggage program. The training should include at least carry-on baggage limitations; baggage scanning; processing of carry-on baggage that you cannot accommodate in any of the passenger compartments; proper stowing of carry-on baggage, cargo and unusual items in the cabin; crew coordination; applicable passenger information; types of limitations on stowage provisions; verification that carry-on baggage is stowed so it does not interfere with emergency equipment; and how to handle carry-on baggage during an emergency.*

### 2.2.2. Use of Portable Electronic Devices Aboard Aircraft (AC 91-21.1B)

Advisory Circular 91-21.1B provides aircraft operators with information and guidance that are one means, but not the only means, for complying with 14 CFR § 91.21. [59]

*Excerpt - FAA Advisory Circular 91-21.1B:*

*6. RECOMMENDED PROCEDURES FOR THE OPERATION OF PEDs ABOARD AIRCRAFT. If an operator allows the use of PEDs aboard its aircraft, procedures should be established and spelled out clearly to control their use during passenger-carrying operations. The procedures, when used in conjunction with an operator's program, should provide the following:*

*a. Methods to inform passengers of permissible times, conditions, and limitations when various PEDs may be used. This may be accomplished through the departure briefing, passenger information cards, captain's announcement, and other methods deemed appropriate by the operator. For air carrier operations conducted under 14 CFR part 121 or part 135, the limitations, as a minimum, should state that use of all such devices (except certain inaccessible medical electronic devices, for example, heart pacemakers) are prohibited during any phase of operation when their use could interfere with the communication or navigation equipment on board the aircraft or the ability of the flightcrew to give necessary instructions in the event of an emergency.*

*…*

*f. Prohibiting the operation of any PEDs during the takeoff and landing phases of flight. It must be recognized that the potential for personal injury to passengers is a paramount consideration, as well as is the possibility of missing significant safety announcements during important phases of flight. This prohibition is in addition to lessening the possible interference that may arise during sterile cockpit operations (below 10,000 feet).*

---

[59] Hyperlink: FAA AC 91-21.1B Use of Portable Electronic Devices Aboard Aircraft [http://www.faa.gov]; Accessed September 19, 2013.

### 2.2.3. Passenger Safety Information Briefing and Briefing Cards (AC 121-24C)

Advisory Circular 121-24C provides aircraft operators with "information regarding the items that are required to be, or should be, covered in oral passenger briefings and on passenger briefing cards." [60]

*Excerpt - FAA Advisory Circular 121-24C:*

*1. ORAL BRIEFINGS. The pretakeoff oral briefing should be given so that each passenger can clearly hear it and easily see required demonstrations. …*

*…*

*a. Pretakeoff. Before each takeoff, the operator must ensure that all passengers are orally briefed on each of the following:*

*…*

*(9) Portable Electronic Devices. Except as provided in § 91.21, no part 119 certificate holder or pilot in command may operate or allow the operation of portable electronic devices on any U.S.-registered aircraft operated by the certificate holder. Passengers should be informed of permissible times, conditions, and limitations when various portable electronic devices may be used.*

*c. Prelanding. A prelanding briefing is recommended and should include the following: seatbelts must be securely fastened; smoking materials must be extinguished; tray tables must be secured in their stowed position; seat backs must be in a fully upright position; food, beverages, or tableware must be picked up; and carry-on baggage and movie/video screens must be properly stowed for landing.*

*…*

*e. Crewmember Procedures. Each oral briefing provided by a carrier or commercial operator for its passengers must be explained and described in appropriate manuals. The manuals should also contain a description of flight attendant tasks and coordination procedures to ensure passenger compliance with information signs and flight attendants' safety instructions. This description should include the stipulation that flight attendants should notify the pilot in command anytime a passenger is not complying with safety instructions. Flight attendants should neither be assigned nor perform nonsafety-related duties during the safety briefings if those duties could obstruct the view of the passengers or distract them from listening.*

---

[60] Hyperlink: FAA AC 121-24C  Passenger Safety Information Briefing and Briefing Cards [http://rgl.faa.gov/]; Accessed September 19, 2013.

*2. PASSENGER SAFETY BRIEFING CARDS. Oral briefings must be supplemented with briefing cards, which must be pertinent only to that type and model of aircraft and consistent with the airline's procedures. The information on the cards should be consistent with the information contained in the air carrier's manuals. When aircraft equipment is substantially different, even within the same model of aircraft, the air carrier should provide information cards specific to that aircraft. …*

*…*

*c. Content. Safety briefing cards that provide information to passengers should include:*

*…*

*(14) Portable Electronic Devices. The cards should inform passengers of permissible times, conditions, and limitations when various portable electronic devices may be used.*

*(15) Supplemental Information. The cards may contain supplemental instructions. For example, for takeoff and landing, carry-on baggage and tray tables must be properly stowed, galley service items must be collected from passengers and stowed, and seat backs must be placed in their fully upright position.*

### 2.2.4. Stowage of Items in Seat Pockets (InFO 09018)

Information for Operators (InFO) 09018, Stowage of Items in Seat Pockets, dated November 12, 2009, provides clarifying guidance for air carriers about the stowage of items in seat pockets.[61]

> The intent of the carry-on baggage regulation, Title 14 of the Code of Federal Regulations (14 CFR part 121, section 121.589, is to prevent carry-on items from slowing an emergency evacuation and to prevent injury to passengers by ensuring items are properly restrained. Seat pockets have been designed to restrain approximately 3 pounds of weight and not the weight of additional carry-on items. Seat pockets are not listed in the regulation as an approved stowage location for carry-on items. If a seat pocket fails to restrain its contents, the contents of the seat pocket may impede emergency evacuation or may strike and injure a passenger.

> If small, lightweight items, such as eyeglasses or a cell phone can be placed in the seat pocket without exceeding the total designed weight limitation of the seat pocket or so that the seat pocket does not block anyone from evacuating the row of seats; it may be safe to do so.

> The requirements of the carry-on baggage regulation are applicable to take-off and landing. Nothing in the carry-on baggage regulation prohibits a passenger from taking out small personal items from an approved stowage location and placing them in the seat pocket after takeoff and stowing them in approved locations prior to landing. Crewmembers may still direct a passenger to stow carry-on items in an approved stowage location, during flight should they pose a hazard, such as in the case of turbulence.

Existing FAA policy in Order 8900.1, Volume 3, Chapter 33, Section 6, Operations—Cabin Safety,[62] states that carry-on baggage programs should:

- *Prohibit the stowage of carry-on baggage and other items in the lavatories and seat pockets (the only items allowed in seat pockets should be magazines and passenger information cards)*

- *Provide specific crewmember assignments for the verification that carry-on baggage is properly stowed*

- *Address procedures in appropriate manuals*

- *Provide crewmember training on carry-on baggage, and*

- *Ensure that information is available to the public about the air carrier's carry-on baggage program*

---

[61] Hyperlink:  FAA InFO 09018 [http://www.faa.gov] Accessed September 19, 2013.
[62] Hyperlink:  Order 8900.1, Volume 3, Chapter 33, Section 6, Operations, Cabin Safety [http://fsims.faa.gov] Accessed September 19, 2013.

### 2.2.5. Transport Airplane Cabin Interiors Crashworthiness Handbook (AC 25-17A)

Passenger PEDs that are sufficiently thin may slide out from under-seat stowage locations into aisles,[63] creating tripping hazards and/or obscuring emergency path lighting, given the gap allowed beneath under-seat restraints as noted on page 156 of AC 25-17A: [64]

> (G) The bottom of the restraint system should be no more than 2 1/2-inches above the floor level of the airplane. The top of the system should be no less than 3-inches above the floor level of the airplane. (Amendment 25-32).

### 2.2.6. Corded Electrical Devices Used in the Passenger Cabin (ANM–02–115–20)

FAA Policy Statement No. ANM–02–115–20, dated November 21, 2002, consolidates and clarifies "certification policy for addressing potential hazards associated with the installation of corded electrical devices used in the passenger cabin."[65] Specific sections of 14 CFR Part 25 design regulations are cited that require passageways leading from main aisles to various types of exit doors, between individual passenger areas, and cross aisles between main aisles, be unobstructed.

---

[63] Excerpt and Hyperlink: From FAA Order 8900.1, Volume 3, Chapter 33, Section 6, Operations—Cabin Safety, 3-3548. STOWAGE OF NON-COLLAPSIBLE FLEXIBLE TRAVEL CANES: "The FAA requires that passenger seats, under which baggage is allowed to be stowed, must be equipped with under-seat restraints sufficient to prevent articles of baggage, including flexible travel canes and other thin profile items of baggage, from sliding forward." Accessed September 19, 2013.

[64] Hyperlink: FAA AC 25-17A Transport Airplane Cabin Interiors Crashworthiness Handbook [http://www.faa.gov]; Accessed September 19, 2013.

[65] Hyperlink: FAA Policy Statement No. ANM–02–115–20 Corded Electrical Devices Used in the Passenger Cabin [http://www.airweb.faa.gov]; Accessed September 19, 2013.

# 3. Survey of Current Industry Stowage Policies

## 3.1. Background

The PED stowage working group developed a survey to request information from various aviation industry stakeholders about current operator policies related to stowage of PEDs. Surveys were emailed to, and completed by, FAA Certificate Management Office (CMO) staff, Part 121 operators, flight attendants, and one aircraft manufacturer. In all, 41 completed surveys were returned.

## 3.2. Survey Questions and Summary of Responses

The table below includes the full text of all survey questions, as well as numbers of responses in each category. Respondents were asked to answer Yes or No to each question, and to leave items blank if unsure. However, many of the participants did not always follow this guidance. For purposes of the summary table, in most cases, alternate responses were converted to Yes, No, or blank following inspection, although a small number were categorized as "OTHER" when the other three options could not be applied.  Detailed results are provided in Appendix 1.

| # | Question | Response | | | |
|---|---|---|---|---|---|
| | | Yes | No | Blank | Other |
| 1 | Does your aircraft operation have a policy requiring stowage of some or all passenger PEDs at any point during a flight? If Yes, please answer questions 1a-h, and attach text of policy, if possible. | 38 | 3 | 0 | 0 |
| 1a | Does the policy require stowage of passenger PEDs under some flight conditions and/or phases of | 36 | 4 | 1 | 0 |
| 1b | Does the policy treat different sizes and/or weights of passenger PEDs differently? | 21 | 17 | 2 | 1 |
| 1c | Does the policy allow passenger PEDs to be stowed in seat pockets? | 25 | 15 | 1 | 0 |
| 1d | Does the policy limit the weight of items, including passenger PEDs, stowed in seat? | 28 | 6 | 6 | 1 |
| 1e | Does the policy limit seat pocket stowage to ensure that passengers can egress safely during an emergency? | 34 | 4 | 3 | 0 |
| 1f | Does the policy specifically restrict the use/stowage of wired headsets? | 7 | 30 | 3 | 1 |
| 1g | Does the policy specifically restrict the use/stowage of wireless headsets? | 10 | 25 | 5 | 1 |
| 1h | Does your aircraft operation have crewmember reports of incidents involving passenger Non-compliance with PED stowage requirements? If Yes, please attach examples, if | 19 | 7 | 15 | 0 |
| 2 | Do any of your aircraft have seat power plugs installed for passenger use? If Yes, please answer questions 2a-b. | 15 | 24 | 2 | 0 |
| 2a | Can passenger PEDs be connected to seat power during all phases of flight? | 4 | 12 | 25 | 0 |
| 2b | Can cabin crewmembers disable seat power? If Yes, please answer questions 2c-d. | 11 | 4 | 25 | 1 |
| 2c | At individual seats? | 2 | 12 | 26 | 1 |
| 2d | In separate sections of the airplane? | 8 | 6 | 26 | 1 |
| 3 | Are crewmembers (pilots and/or flight attendants) required to make announcement(s) to passengers related to stowage of PEDs? If Yes, please attach text of announcement(s), if possible. | 33 | 8 | 0 | 0 |
| 4 | Does your aircraft operation require crewmembers (pilots and/or flight attendants) follow specific procedures to enforce its passenger PED stowage policies? If Yes, please attach details, if possible. | 25 | 13 | 3 | 0 |
| 5 | Does your aircraft operation have reports of passenger PEDs thrown about the cabin due to turbulence, hard landing, or sudden stop acceleration/deceleration? If Yes, please attach redacted copies or summaries of incident reports, if possible. | 1 | 26 | 14 | 0 |

## 3.3.  Discussion of Survey Results

The stowage policies survey results tabulated above provide responses of operator policies across domestic passenger air transport operations. Participants were drawn from FAA Certificate Management Office personnel, Part 121 operators both directly and anonymously through the trade association Airlines for America (A4A), Association of Flight Attendants-CWA (AFA) safety committee chairpersons, one other air carrier union, and one aircraft manufacturer.

Some general perspectives on current stowage policies and practices may be observed. First, it is clear from responses to questions 1 and 1a, in which 93% and 88% of all participants, respectively, answered yes, that most operators appear to require that passenger PEDs be stowed at some point during a flight, which conforms to the guidance in InFO 09018. The responses to 1b suggest that only about half of operators (51% Yes) have policies that distinguish between different sizes/weights of PEDs. The responses to 1c and 1d suggest that about two-thirds of operators allow the use of seat pockets as stowage for PEDs and/or restrict the weight of items stowed in seat pockets (61% and 68% Yes, respectively). The responses to 1e suggest that most operators (83% Yes) consider safe egress during an emergency in their seat pocket stowage policies, although the responses to 1f suggest that most do not consider wireless headsets to be an egress issue (73% No). Responses to 1g suggest that most operators do not place restrictions on use or stowage of wireless headsets (61% No). Responses to 1h suggest that about half of operators receive reports of passenger non-compliance with PED stowage policies (46% Yes).

Question 2 asked about seat power plugs; responses suggest that most operators (37% Yes, 59% No) at this time do not have this option available to passengers. Responses to 2a suggest that most operators today who have power plugs do not allow unrestricted use of them during all phases of flight (10% Yes). Responses to 2b suggest that cabin crew can generally disable seat power if necessary (27% Yes); responses to 2c suggest that very few of these systems can be disabled at individual seats (5% Yes), although responses to 2d suggest that power can often be disabled in individual sections of the cabin (20% Yes).

The remaining survey questions asked about crew announcements, stowage policy enforcement, and reports of injury incidents involving PEDs. The responses to question 3 indicate that operators, in general, require crewmembers to make announcements that relate to stowage of PEDs (80% Yes), while the responses to question 4 suggest that somewhat fewer operators (61% Yes) require that crewmembers follow specific procedures to enforce stowage policy restrictions on PEDs. Responses to question 5 suggest that few operators have reports of passengers being struck by PEDs during inflight incidents; only one responder definitively answered yes to this question, while 34% were unsure.

## 4. PED Stowage Considerations

The ARC report recommends that FAA and industry stakeholders develop standard content and timing for cabin and flight deck crewmember instructions to passengers on use and stowage of PEDs.

The ARC report further recommends to support standardized industry best practices for stowage related to PEDs, the FAA update stowage policy and guidance documents to incorporate expanded use of PEDs as necessary. The information in this section provides ideas for operators to consider when reviewing their stowage policies.

### 4.1. Key Issues to Consider

The Stowage Policy working group debated various issues related to stowage and securing of loose items in order to develop specific recommendations to the FAA for future research and development of guidance to operators. The issue that received the greatest attention: How to balance the desire of many passengers to use their PEDs during the critical takeoff and landing phases of flight while maintaining or even elevating existing levels of operational and occupant safety. Other issues explored included the effect of PED use on passenger attention to crewmember instructions during the pre-takeoff and pre-landing phases as well as emergency incidents; options for designating seat pockets as approved stowage locations without damaging their structural integrity, adversely affecting egress, and increasing projectile risks; safe use and stowage of corded devices (e.g., headphones, power adapters); management of under-seat stowage to prevent PEDs from becoming tripping or projectile hazards or obscuring emergency path markings; content and timing of crew announcements in combination with appropriate procedures and training to encourage passenger compliance with stowage policies and adequate management of loose item risks; and content, formats and media options for disseminating information to travelers that explain operator stowage policies in ways that maximize understanding and acceptance of restrictions.

Roughly in parallel with these internal Stowage Policy working group discussions, research scientists in the FAA Office of Aerospace Medicine, Civil Aerospace Medical Institute (CAMI), Protection and Survival Research Laboratory (AAM-630) also assessed options for expanded PED usage policies. The AAM-630 Memorandum in Appendix 2 of this document considers the relationship of PED usage to post-crash emergency evacuation; reviews literature on the adverse effects of distractions on passenger safety awareness and National Transportation Safety Board (NTSB) recommendations to counter historic declines in passenger attention to safety information; reviews accident data showing that take-off and landing are critical phases of flight for accidents and fatalities; praises the benefits of mandatory evacuation drills for all passengers on cruise ships; and supports the need for a clean cabin environment during pre-flight briefings and critical phases of flight.

The AAM-630 memorandum also considers the issues of projectile injury risks from unsecured items of mass, items in seat pockets, and items held in a cabin occupant's hand. AAM-630 research scientists state in the memorandum that it is the unexpected nature of events such as turbulence and emergency landings that makes it unlikely a passenger would be able to hold onto an object during an incident, even if it is small and light. The memorandum also comments on the lack of evidence for any increased occupant injury risk posed by PEDs when compared to "any other object (e.g., a hard cover book) of similar weight, size and stiffness." (p. 4 of Appendix 2)

The AAM-630 memorandum concludes with a discussion of dynamic testing of airplane seats with 3 lbs of paper, approximately 1.25 inches thick, stowed in a seat pocket during the seat qualification process. The memorandum response suggests that "dynamic tests show that the seat can carry the additional weight of the literature without structural failure, but do not ensure that the literature is retained throughout the entire dynamic event" (reference Appendix 2, pages 4-5).

This last observation referenced in the AAM-630 memorandum, which concerns the lack of testing to ensure that contents in seat pockets are retained, is supported by a summary of one aircraft manufacturer's policy related to dynamic seat testing obtained by a member of the Stowage Policy working group. This testing policy, which conforms to applicable sections of SAE Aerospace Standard 8049B (referenced in footnote 29 of the AAM-630 memorandum) may be summarized as follows:

- Dynamic Testing of the passenger seats is to validate that the seat can take the weight of its occupant plus the weight of a 3 lb. object stored in the seat pocket.
- Dynamic Testing does not prove that the 3 lb. object stays in the seat pocket, there are no requirements for this.
- There is no requirement that defines the size of the object to be used during the testing....just that it weigh 3 lbs.
- Prior to the testing, the seat pocket is "taped" shut so the 3 lb. object remains in the pocket during the test.

A Report from the PED ARC to the FAA

## 4.2. Key Questions

The Stowage Policy working group reviewed the regulatory and guidance material in Section 2 and the policy survey responses in Section 3, along with the Appendix 2 memorandum prepared by AAM-630. As a result of this review, the following questions arose:

- What are the impact injury risks, assessed qualitatively and quantitatively, from typical PEDs of less than 3 pounds, in the event of a survivable impact on takeoff or landing?[66] Are PEDs any different than books or magazines, in terms of occupant injury risks, considering such factors that could include, but are not limited to, weight, form factor, hardness, and quantity?

- Is there an acceptable size/weight limitation for PEDs that could allow stowage in seat pockets during critical phases of flight? Is 3 lbs an acceptable weight constraint? Should the allowable weight account for an operator's existing seat pocket contents (i.e., magazines, safety briefing cards, and airsickness bags)? Figure 1 shows one possible concept for a seat pocket PED sizing card – would such a concept be useful in tandem with an operator's stowage policy?

- How can operators further improve cabin safety policies so that the expansion of PED use during all phases of flight does not adversely affect the safety of the travelling public?

- Would the allowed use of PEDs through all phases of flight impact cabin safety? (Refer to Figure 2 below) If safety were affected, how should operators update policy to mitigate any reduction of safety?

- How can the use of seat power receptacles be managed with an expansion of PED usage?  Can a PED adversely restrict egress in an emergency evacuation if plugged into aircraft power receptacles?

- Can a PED adversely restrict egress in an emergency evacuation if stowed in a seat pocket – assuming all items in seat pocket do not exceed 3 lbs.? If so, is there an acceptable maximum device size?

- Can a PED with thin form factors (e.g., tablets, laptops) adversely restrict egress in an emergency evacuation if stowed under a seat outside of a bag?

- In the event of tarmac delays or runway holds when the airplane is not moving, should flight deck crewmembers authorize that passenger PEDs (including larger devices such as laptops) be used?

---

[66] Static inertial forces as specified by 14 CFR § 25.561(b)(3).
  Hyperlink:  §25.561  Structures, General [http://www.ecfr.gov/];  Accessed September 19, 2013.

**Figure 1.  Stowage Policy Example for a PED Size Check Box**

Sample dimensions and PED weight limits are one way (but not the only way) for passengers to quickly determine if their device is permitted by an operator's policy. Aircraft operators would determine appropriate values based on their fleet composition and best judgment.

- Specific dimensions and stowage policy *(e.g., FAA approved carry-on baggage program which includes personal items, and/or personal items policy for those carriers that do not have an FAA approved carry-on baggage program)* to be developed by the aircraft operator and approved by the geographic responsible FAA certificate oversight office.

- The aircraft operator is ultimately responsible for the specifics of what is displayed on the PED gate sizing box.  There will be some variance based on the uniqueness of the air carrier's operations and aircraft.

    **NOTE:**  FAA InFO 09018 – *Stowage of Items in Seat Pockets*, explains seat pockets have been designed to restrain approximately 3 pounds of weight and not the weight of additional carry-on items.  The PED weight limit should take into consideration aircraft conformity items in the seat pocket e.g. briefing card, air sickness bag, inflight magazine *(which contains safety and compliance information for passengers)*, headset that plugs into the armrest.



**Figure 2.  Phases of Flight**



A Report from the PED ARC to the FAA

## 4.3.  Minimize Variability of Stowage Policies

The variability of PED stowage policies between operators should be minimized, in order to maximize passenger understanding and acceptance of the rules, as well as compliance with crewmember instructions.

## 4.4.  Develop a Public Messaging Strategy

The information to the traveling public on cabin stowage policies should be easy to understand, concise, and be widely disseminated through various forms of media.

Add. 102

## Appendix 2:
## AAM-630 Memorandum, Recommendations for PED Usage Onboard Airliners



**Federal Aviation Administration**

# Memorandum

Date:        September 18, 2013

To:          Portable Electronic Device (PED) Aviation Rulemaking Committee (ARC)

From:        Manager, Protection and Survival Research Laboratory, AAM-630

Subject:     Recommendations for PED Usage Onboard Airliners

Cabin Safety research scientists in the FAA Office of Aerospace Medicine, Civil Aerospace Medical Institute (CAMI, AAM-630) have assessed the options for an expanded portable electronic device usage policy being considered by the Portable Electronic Device (PED) Aviation Rulemaking Committee (ARC) and its Stowage Policy Working Group, using data from aviation accident investigations, aviation human factors research, and the general literature for context. Of particular importance is the relationship of PED usage to post-crash emergency evacuation.

When an emergency evacuation is required, passengers must engage in rapid and appropriate behaviors under stressful conditions. In what has become the seminal analysis of airplane accident survival factors, Snow, Carroll and Allgood[1] concluded:

> Within a few seconds, [a passenger] must make a perilous journey from seat to sanctuary through fire, smoke and a maze of physical and human barriers... [survival] depends largely upon the number and location of exits, which of these are blocked by flame or impact damage, the human help he receives along the way and the intensity of the fire and smoke within the cabin. *But in addition to these extrinsic factors, his chance of survival is also influenced by physical and mental attributes of his own that may enable, or prevent, his effective exploitation of the short time he has remaining* (emphasis added).

Their study implicates informative preflight briefings, combined with positive direct crew assistance throughout the evacuation, as important to post-crash passenger survival. Since providing detailed information and specific instructions to people before and during an emergency has been shown to prompt action, reduce stress, and support the problem solving process, it is clear that passenger knowledge and awareness are key factors in determining how they will respond in the event of an accident (Baddeley[2], Chertkoff & Kushigian[3], Fritz & Marks[4], Quarantelli[5]).

---

[1] Snow, CC, Carroll, JJ, & Allgood, MA (1970). *Survival in emergency escape from passenger aircraft* (AM 70-16). Washington, DC: Office of Aerospace Medicine.

[2] Baddeley, AD (2001). Selective attention and performance in dangerous environments. *Human Performance in Extreme Environments, 5,* 86-91.

[3] Chertkoff, JM & Kurshigian, RH (1999). *Don't Panic: The Psychology of Emergency Egress and Ingress.* Wesport, CT: Praeger.

[4] Fritz, CD & Marks, ES (1954). The NORC studies of human behavior in a disaster. *Journal of Social Issues, 10,* 26-41.

[5] Quarantelli, EL (1954) The nature and conditions of panic. *American Journal of Sociology, 60,* 267-275.

2

The airplane passenger who has paid attention to the safety information available, and has developed a plan for what she or he would do to get out of an airplane in a hurry, is better able to handle an emergency situation without becoming confused or panicked (Hodson[6], Johnson[7,8,9], Leach[10], Pronko & Leith[11]).

In a three-part study of passenger safety awareness from 2000 to 2006 by Corbett and McLean[12], 60% of the participants reported that they did not attend to preflight safety information. Although the other 40% of the study participants claimed to engage preflight safety information, they did not know any more than the non-attenders, suggesting that while passengers may say they attend to safety information, in actuality they may not be learning or remembering it later. Multiple distractions are likely to be a large part of that shortcoming.

In a follow-up to the passenger safety awareness study, Corbett[13] analyzed the NTSB questionnaire and interview responses from the passengers of US Airways Flight 1549, which made a water landing in the Hudson River in January, 2009. Seventy percent of those passengers reported that they took more than 6 flights per year; 50% reported that they watched NONE of the preflight safety presentation; 89% did not read the safety information card at all; and using the same criteria from the previous study to classify them as attenders/non-attenders, *94% of the passengers were categorized as NON-attenders*. Thirty-six percent reported that they were reading, sleeping, listening to music, or distracted by other people during the briefing. It should not be surprising, then, that the passengers did not know what "brace for impact" meant, nor did they retrieve their flotation seat cushions or life preservers, nor could they properly don a life preserver they were given, nor did they realize that the overwing exits were not so-called "ditching" exits, nor did they realize that the evacuation slides aft of the wings were not "boats". The NTSB survival factors report makes clear that the passengers were mostly uninformed and unprepared to function effectively in that emergency situation[14].

In its safety studies and accident investigations, the NTSB continues to find that passenger attention to safety information is declining, and recommends that the FAA require operators to implement creative and effective methods of overcoming passenger inattention, and to conduct research to explore creative and effective methods that use state-of-the-art technology to convey safety information to passengers (A-74-113[15], A-85-101[16], A-00-86[17], A-10-86[18]). In response, the FAA has suggested that "One way to increase passenger motivation [to focus on the safety information] is to make the safety briefings and cards as interesting and attractive as possible," encouraging "operators to be innovative in their approach in imparting such information" (AC 121-24C; 2003[19]).

Safety procedures on modern day cruise ships should be exemplars for safety training for passengers[20]. At the start of each cruise, ALL passengers must become familiar with the procedure for evacuation of the ship in the event of a fire or collision. The International Convention for Safety of Life at Sea (SOLAS Regulation III/19) requires that all passengers on commercial vessels, no matter the number of times they have cruised, simulate an on-board emergency, retrieve life jackets, and proceed to life boats and/or muster stations in a training exercise known as a

---

[6] Hodson, M (2000, August 13). How to survive an air crash. The London Sunday Times, p. Travel 10.

[7] Johnson, DA (1979). *An investigation of factors affecting aircraft passenger attention to safety information presentations*. Washington, DC: DOT. (NTIS No. AD A082358)

[8] Johnson, DA (1984). *Just in Case: A Passenger's Guide to Airplane Safety and Survival*. New York: Plenum.

[9] Johnson, DA (1997). How people behave in aircraft accidents. *Human Performance in Extreme Environments, 2*, 71-80.

[10] Leach, J (1994). *Survival Psychology*. Washington Square, NY: New York University Press.

[11] Pronko, NH & Leith, WR (1956). Behavior under stress: A study of its disintegration. *Psychological Reports, 2*, 205-222.

[12] http://www.fire.tc.faa.gov/2007Conference/files/Evacuation/WedAM/CorbettPassSafetyAware/CorbettPassSafetyAwarePres.pdf

[13] http://www.fire.tc.faa.gov/2010Conference/files/Cabin_Safety_I/CorbettAwareness1549/CorbettAwareness1549Pres.pdf

[14] http://dms.ntsb.gov/pubdms/search/hitlist.cfm?docketID=47230&CFID=81828&CFTOKEN=71811991

[15] http://www.ntsb.gov/doclib/recletters/1974/A74_105_114.pdf

[16] http://www.ntsb.gov/doclib/recletters/1985/A85_93_104.pdf

[17] http://www.ntsb.gov/doclib/recletters/2000/A00_72_91.pdf

[18] http://www.ntsb.gov/doclib/recletters/2010/A-10-062-086.pdf

[19] http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgAdvisoryCircular.nsf/list/AC%20121-24C/$FILE/AC121-24C.pdf

[20] http://seniortravel.about.com/od/cruises/a/What-To-Expect-At-The-Lifeboat-Drill.htm

3

passenger boat drill. Further, a passenger's role is not simply to "do as you are told," but often to help organize the other passengers for a fast and efficient evacuation. Passengers are also instructed to be familiar with at least 2 evacuation routes from cabin to life boat.

CAMI Cabin Safety researchers recognize the attraction of "PED-tolerant" airplanes, including the allure of allowing these devices to operate during all phases of flight. However, in addition to the aforementioned scientific data and analysis pertinent to maintaining a "clean cabin environment," accident data show that takeoff/initial-climb and final-approach/landing are critical phases of flight for accidents and fatalities. The Boeing Company has published reports, e.g., *Statistical Summary of Commercial Jet Aircraft Accidents*, which show that 17% of accidents occurred during takeoff and initial climb and 54% occurred during final approach and landing for the period of 1992 through 2001[21], and for fatal accidents in the period of 2003 through 2012[22], the accident/fatality numbers are 16% and 41%, respectively. Combined, the research and accident statistics indicate that added distractions (e.g., usage of PEDs) during critical phases of flight would unnecessarily increase risk, discount passenger safety, and disregard the many serious efforts to rectify the shortcomings related to passenger safety awareness.

In particular, use of PEDs should continue to respect the clean cabin environment during the pre-flight briefing and critical phases of flight, since the focused attention of passengers to PEDs creates competition for passenger mental capacity. People can selectively attend to only one thing at a time. This limitation on attention is the reason states have cited to outlaw cell phone usage while driving[23], and while the results of passenger inattention to safety information on airliners would typically not be as dramatic, except in an emergency, it seems inexplicable to promote PED usage during the very times when passengers might need to engage that safety information the most. One might argue that other modes of public transportation do not demand such passenger engagement, but as cited above, the public transportation mode with the most comparable risk profile – cruise ships – does in fact mandate hands-on safety equipment briefings and emergency escape planning when all passengers have first come on board.

Whatever minimal loss in PED usage time caused by requiring a clean cabin environment during preflight briefings and the critical phases of flight can be mitigated effectively by immediately accessible (e.g., seatback pocket) PED stowage provisions. Such provisions would allow timely access when appropriate and mitigate evacuation delays or trip hazards caused by errant power cables and related accessories. Perhaps just as importantly, the message is sent that safety is an important concern that passengers need to embrace.

The circumstances surrounding the cabin safety aspects of PED usage onboard airliners have previously been made clear, and there is little additional information in this regard that needs to be garnered via laboratory research.

Biodynamics research scientists in the FAA Office of Aerospace Medicine, Civil Aerospace Medical Institute (CAMI, AAM-630) have assessed the options for an expanded portable electronic device usage policy being considered by the Portable Electronic Device (PED) Aviation Rulemaking Committee (ARC) and its Stowage Policy Working Group. The issues addressed are related to the injury risk from unsecured objects, and stowage of items in the seat back pocket.

Items of mass can become projectiles in the event of a sudden deceleration as could be experienced during a maximum performance landing, rejected takeoff, turbulence, or a severe but survivable crash landing. FAA regulations require that seats and restraint systems installed in newly manufactured airliners provide the occupants protection from serious head injuries during emergency landing conditions[24]. The impact scenarios used to verify this protection are a horizontal deceleration, as could result from a landing overrun, and a combined horizontal/vertical deceleration as could occur during a landing undershoot.

---

[21] http://www.oaviao.com/oaviao_novo/diretorio_aero/seguranca_voo/Boeingaccidentstatsum59-01.pdf, page 17

[22] http://www.skybrary.aero/bookshelf/books/2418.pdf, page 20

[23] http://www.distraction.gov/download/811737.pdf

[24] http://www.ecfr.gov/cgi-bin/retrieveECFR?gp=&SiD=19b36f76bf3e2ea97a7613c5435a19b8&r=SECTION&n=14y1.0.1.3.11.3.169.63

4

While hanging onto a small object exposed to the inertial forces that could be imposed during turbulence or an emergency landing is possible, it is the unexpected nature of these events that make it more likely that a passenger would lose control of even a light object. During a turbulence event, the most likely initial trajectory of a loose item is vertical. During an emergency landing, the initial trajectory will depend on the impact direction, with the forward and downward directions being the most likely. The relative velocity that a loose item can attain is related to the inertial force applied and the distance it travels. The presence of nearby seatbacks and walls in a typical aircraft cabin tends to limit the distance that an object can travel, thereby limiting its velocity. The impact risk to passengers posed by a loose object is related to its mass (weight), size, stiffness, and its velocity. There is no evidence that PEDs pose any more risk of injury to occupants than any other object (e.g., a hard cover book) of similar weight, size and stiffness.

One means to control the risk of impacts from loose objects is to store them during phases of flight where the risk of unexpected deceleration is most likely i.e. takeoff, turbulence, and landing. Since the seat back pocket is readily accessible, using it as a stowage compartment to store small items during critical phases of flight is one way proposed to ensure safety on a "PED tolerant" aircraft.

The amount of mass placed in literature pockets during aircraft seat dynamic tests and interpretation of the results of those tests are defined in multiple FAA documents, and industry standards. FAA regulations require that seats and restraint systems installed in newly manufactured airliners successfully complete dynamic tests and FAA guidance concerning conduct of those tests calls for the mass of baggage, life vests, and literature pocket contents be installed at each seat place[25]. An FAA Information Bulletin further states that "Seat pockets have been designed to restrain approximately 3 pounds of weight and not the weight of additional carry-on items[26]". An SAE Aerospace Recommended Practice qualifies the 3 lb. specified by reducing the mass in proportion to the literature pocket width relative to the overall seat back width.[27] FAA regulations also require that cargo in the passenger compartment be positioned so that if it breaks loose it will be unlikely to cause direct injury to occupants[28]. The latest version of the SAE performance standard for aircraft seats provides additional detail concerning retention of literature pocket contents during dynamic tests.[29] This standard states in Section 5.3.5.1 that "Items 0.15 kg (0.33 lb) or greater carried by the seat that do not affect the dynamic performance of the seat may be representative masses, but the production means of attachment must be on the test article." It also states in Section 5.3.9.15 that "Detachment of an item should be assessed to determine the effect on the seat or egress. The time when the item became detached relative to the time when the seat achieved peak reaction loads should be determined. If the item in question was retained until after the seat achieved peak reaction loads, the seat structure carried the total seat weight through the peak dynamic load and no retest of the structure or reduction of the tested seat weight is required due to the loss of the item. If the item detached prior to the seat achieving peak reaction loads, any item (or all items if more than one detached) exceeding 3% of the empty weight of the seat (i.e., without occupants, baggage, life vests, literature, etc.) will require a retest or a reduction in the tested seat weight. In both cases, the means of restraint should be improved and substantiated."

Meeting these requirements can be demonstrated by placing a 3 lb. item, simulating literature pocket contents in each seat back pocket during the dynamic qualification tests. If the pocket is narrower than the seat back, then a proportionally lighter item may be used. Since the primary purpose of including the literature weight in the dynamic tests was to substantiate overall seat strength, the SAE standard permits detachment of items after the time of peak loading. This means the dynamic tests show that the seat can carry the additional weight of the literature without structural failure, but do not ensure that the literature is retained throughout the entire

---

[25] http://www.airweb.faa.gov/Regulatory_and_Guidance_Library/rgAdvisoryCircular.nsf/0/808324BF7790FDA3862571010075BCBF?OpenDocument

[26] http://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/info/all_infos/media/2009/InFO09018.pdf

[27] SAE Aerospace Recommended Practice 5526C, Aircraft Seat Design Guidance and Clarifications, 2011-05, http://www.sae.org

[28] http://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&SID=130c1ff8c8c03c27d83459ecdd19494c&rgn=div8&view=text&node=14:1.0.1.3.11.3.169.62&idno=14

[29] SAE Aerospace Standard 8049B, Performance Standard for Seats in Civil Rotorcraft, Transport Aircraft, and General Aviation Aircraft, 2005-01, http://www.sae.org

A Report from the PED ARC to the FAA

5

dynamic event. For full width seat pockets, if the operationally required content of the literature pocket weighs only 1 lb., then an item weighing 2 lb. could be placed in the pocket and not exceed the weight for which the seat has been qualified.  The exact size of the simulated contents is not specified in the guidance material, but they are typically made up of 3 lb. of 8.5 x 11 inch paper (which is a stack about 1.25 inches tall).



**InFO**

Information for Operators

U.S. Department
of Transportation

InFO 09018
DATE: 11/12/09

**Federal Aviation
Administration**

Flight Standards Service
Washington, DC

http://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/info

*An InFO contains valuable information for operators that should help them meet certain administrative, regulatory, or
operational requirements with relatively low urgency or impact on safety.*

**Subject:** Stowage of Items in Seat Pockets

**Purpose:** To clarify guidance for air carriers about the stowage of items in seat pockets.

**Discussion:** Existing Federal Aviation Administration (FAA)  policy in FAA Order 8900.1, Volume 3,
Chapter 33, Section 6, Operations—Cabin Safety, states that carry-on baggage programs should
…"Prohibit the stowage of carry-on baggage and other items in the lavatories and seat back pockets (the
only items allowed in seat back pockets should  be magazines and passenger information cards)…"

The intent of the carry-on baggage regulation, Title 14 of the Code of Federal Regulations
(14 CFR) part 121, § 121.589, is to prevent carry-on items from slowing an emergency evacuation and to
prevent injury to passengers by ensuring items are properly restrained. Seat pockets have been designed to
restrain approximately 3 pounds of weight and not the weight of additional carry-on items. Seat pockets are not
listed in the regulation as an approved stowage location for carry-on baggage. If a seat pocket fails to restrain its
contents, the contents of the seat pocket may impede emergency evacuation or may strike and injure a
passenger.

If small, lightweight items, such as eyeglasses or a cell phone, can be placed in the seat pocket without
exceeding the total designed weight limitation of the seat pocket or so that the seat pocket does not block anyone
from evacuating the row of seats, it may be safe to do so.

The requirements of the carry-on baggage regulation are applicable to take-off and landing. Nothing in the
carry-on baggage regulation prohibits a passenger from taking out small personal items from an approved
stowage location and placing them in the seat pocket after takeoff and stowing them in approved locations prior
to landing. Crewmembers may still direct a passenger to stow carry-on items in an approved stowage location,
during flight should they pose a hazard, such as in the case of turbulence.

**Recommended Action:** Directors of safety and directors of operations should review their approved programs
to ensure they consider the hazard presented by stowing items in seat pockets and the programs appropriately
mitigate the associated risks. Training managers and crewmembers should be aware of the risk mitigations
developed by the air carrier. An air carrier has the responsibility to identify proper risk mitigations and train its
personnel appropriately; and the authority to enforce the risk mitigations it develops.

**Point of Contact:** Any questions regarding this InFO should be directed to the Part 121 Air Carrier Operations
Branch, AFS-220 at (202) 267-8166.

---

Distributed by:  AFS-200                                                                    OPR:  AFS-220

> This document is a supplement to InFO 13010.
>
> Information for Operators (InFOs) may be found at the following link:
> http://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/info/all_infos/



Effective Date:
February 24, 2014

**SUBJ:**  FAA Aid to Operators for the Expanded Use of Passenger PEDS

**Purpose**
This document is intended to be an aid for operators which outline issues that should be addressed when implementing a policy that allows an expanded use of passenger supplied portable electronic devices (PEDs) throughout various phases of flight.

**Applicability and Scope**
This aid to operators is applicable to Title 14 of the Code of Federal Regulations (14 CFR) part 119 certificate holders and 91 subpart K (91K) program managers. When followed, it provides an acceptable method of compliance for 14 CFR part 91 section (§) 91.21, part 121 § 121.306, part 125 § 125.204, or part 135 § 135.144, as applicable, when allowing expanded use of PEDs various phases of flight. The use of the terms "aircraft operator(s)" and "operator" throughout this document is applicable to operations conducted under 14 CFR parts 91K, 121, 125 and 135.

**Instructions**
Each aircraft make and model must be evaluated when expanding PED use. An operator may document a single evaluation that addresses their entire fleet (may be multiple aircraft make and models) or may use separate evaluations for each make and model. When significant differences or variations exist, separate assessment should be done. First, the assessment goes through a technical evaluation of the aircraft to determine eligible PED usage and then provides a checklist to ensure the necessary changes to an operator's policies, manuals, crew training and/or authorizations have been addressed.

**Process Overview:**



**Contact**
Flight Standards has designated a group of experts from the Air Transportation Division, AFS-200 and the Aircraft Maintenance Division, AFS-300; who are familiar with the work of the PED ARC, to assist with implementation of PEDs throughout various phases of flight. FAA Certificate Holding District Office and Regional Offices will be able to consult with this group during the review and approval process.

# 1. AIRCRAFT PED IMMUNITY:

## 1.1. Back Door Interference Assessment

**Describe HIRF certification basis and/or subsequent PED immunity demonstration. Check if YES. See appendix B for detailed process.**

| | | | |
|---|---|---|---|
| **PED Tolerance Qualification** | ☐ | 1. Aircraft that meet RTCA/DO-307 Section 3<br>*Aircraft system tolerant to Intentionally transmitting PEDs, Back Door Coupling* | No further back-door analysis required. |
| | ☐ | 2. PED tolerance demonstration per standard Transport Directorate Issue Paper associated with the installation of a wireless local area network - or - similar capability.<br><br>• At installation, other systems may have received additional testing beyond that of a Hazard Classification of Catastrophic, but the documentation was not required for certification.<br>• Back-door interference tolerance is provided for the frequency ranges tested. Significantly different frequency ranges require additional testing. | No further back-door analysis required. |
| | ☐ | 3. PED tolerance demonstration testing and analysis done using other acceptable methods. Test must be comprehensive and operator must have data to support the testing.<br><br>• PED testing in support of previous PED use allowance determination, such as WiFi system or cell phone testing done to support inflight use, may be acceptable. Must be supported by assessment of critical systems in the expanded phase of flight to ensure the previous testing covered these systems.<br>• Back-door interference tolerance is provided for the frequency ranges tested. Significantly different frequency ranges require additional testing. | No further back-door analysis required. |
| **HIRF Qualification** | ☐ | 4. Aircraft Type Certificated or system installed that meet FAA or EASA HIRF Regulations. (Follow decision flow chart in Appendix B)<br>*Meeting HIRF specifications, Special Conditions (e.g., 25-302-SC), or regulations*<br><br>• *Catastrophic* systems have been tested at a minimum.<br>• *Operational Required* equipment has not been tested.<br>• At certification, other systems may have received additional testing but the documentation was not required. | No further back-door analysis required. |
| | ☐ | 5. Aircraft Type Certificated or system installed prior to HIRF Regulatory Specifications in effect in 1987.<br>*Aircraft certified prior to 1987 do not have verified RF immunity.*<br><br>• *Compliance to DO-307 has not been met.*<br>• *At certification, other systems may have received additional testing but the documentation was not required.* | Back door tolerance not demonstrated.<br><br>Additional assessment or test required |

## 1.2.   Front Door Interference Assessment

The ARC report, Appendix F - Functional Hazard Risk Assessment (FHRA), contains a safety risk assessment for operators to assess the avionics configuration of their fleet, and the failure modes associated with different types of communications and navigation equipment with respect to electromagnetic interference. The assessment outlines mitigations and controls that the operator needs to adopt to expand PED use into various phases of flight.

| | | |
|---|---|---|
| ☐ | 1. Aircraft that Meet FAA RTCA/DO-307 Section 4<br>*Aircraft systems tolerant to unintentional emissions from PEDs, Front Door Coupling* | No further front-door analysis required. |
| ☐ | 2. Aircraft system function with Catastrophic, Hazardous or Major failure condition (see risk assessment, "Hazard Class" column) documented to meet the interference path loss requirements of DO-307/DO-294.<br><br>*Documented system tolerance to unintentional emissions from PEDs, Front Door Coupling* | No further front-door analysis required. |
| ☐ | 3. Aircraft system function with Catastrophic, Hazardous or Major failure condition (see risk assessment) **NOT** documented to meet the interference path loss requirements of DO-307/DO-294. | Must mitigate and apply controls. Risk assessment actions for required catastrophic. |

## 2. ANALYSIS AND MITIGATION

*The table below applies the results of the assessment of both front door and back door PED tolerance and determines the phases of flight where PEDs can remain on and be used.*

| STEP 1: Back-Door Tolerance | | STEP 2: Front Door Tolerance | | STEP 3. Acceptable Phases of Flight |  |
|---|---|---|---|---|---|
| Which rows in Section 1.1, Back Door Interference, are checked Yes? | | Which rows in Section 1.2, Front Door Interference, are checked Yes? | | Tally the results. A 'YES' in STEP 1 and a "YES" in STEP 2means that this phase of operations is permitted. See notes if your aircraft results in either a 'NO' or 'LIMITED'. **Check permitted phases below:** | |
| A 'YES' to any of the Questions 1 – 6 results in a YES, below for all phases of operation: | A 'Yes' to ONLY Question 7 will require additional assessment or testing for certain phases of operation: | A 'YES' to Questions 1 or 2 results in a YES, below: | A 'Yes' to ONLY Question 3 will require risk assessment, and mitigations / controls. | | |
| Yes | Yes | Yes | Yes | **Parked:** Passenger boarding and seating to door close. | 1 |
| Yes | Yes | Yes | Yes | **Taxi Out:** Push back, taxi from gate to (but not including on) the runway. | 2 |
| Yes | NO [1] | Yes | Yes | **Take-off & Departure**. Take-off transition to climb altitude/or gear-up | 3 |
| Yes | Yes | Yes | Yes | **Climb:** From 'transition to climb altitude' and/or gear retraction to through 10,000 ft AGL and onto cruise altitude. | 4 |
| Yes | Yes | Yes | Yes | **Cruise:** (currently authorized) | 5 |
| Yes | Yes | Yes | LIMITED [2] | **Descent:** From top of descent through 10,000 ft AGL to IAF and or/flaps | 6 |
| Yes | NO [1] | Yes | LIMITED [2] | **Approach:** From IAF to visual reference or landing. | 7 |
| Yes | Yes | Yes | Yes | **Landing & Taxi to Gate:** Begins at airplane touchdown, and concludes when airplane is parked for passenger unloading. | 8 |

[1] **NO**:

Additional analysis and/or testing of avionics or electrical systems that have major, hazardous or catastrophic failure effects as certified must be done to address back-door PED tolerance.

[2] **LIMITED**:

Examine the ARC report, Appendix F, specifically the tables starting on page F-37.
1. Reference the 'Phase of Flight' column and look for a '6' or '7', 'Descent' or 'Approach' respectively.
2. Identify the Avionics Systems, the failure modes that have been presented with respect to EMI. Apply the necessary mitigations and controls as indicated, at a minimum for those items with a "Hazard Class" at certification of 'Catastrophic', 'Hazardous' or 'Major'.
3. For operations (such as CAT II or CAT III), where the Hazard Classification is 'Catastrophic', the listed Mitigations and Controls are mandatory.

**PHASE OF FLIGHT DIAGRAM**



## 3. ESTABLISH EXPANDED PED USE

### 3.1.   Document Permitted PED Use

1.   Phases of operation (from section 2.) List the phases of flight where PED use is **permitted**:

_____

_____

### 3.2.   Document Prohibited PED Use

*The following, as compiled from sections 1 and 2, provides a list of key elements that should be present in an operator's policy and procedures in order to safely implement expanded use of PEDs.*

1.   Phases of flight: (from section 2.) List the phases of flight where PED use is **prohibited**:

_____

_____

2.   List any specific flight operations where PED use is **prohibited**:

_____

_____

3.   Current FCC regulations prohibit the use of cellular services in flight. Cellular services must be turned off (Airplane mode) while in flight but other wireless services, such as WiFi or blue tooth may be used if system is installed in aircraft to provide that service. List phases of flight where other (non-cellular) wireless services may be used.

_____

_____

_____

## 4. OPERATIONAL POLICY AND PROCEDURES

*This checklist provides a list of key elements that, if not currently covered, should be present in an operator's policy and procedures in order to safely implement the expanded use of PEDs. These elements should address the PED use expansion details provided in section 3.*

*It is acceptable to provide a temporary revision, insert or other methods of communication that an operator normally uses to convey urgent information as an interim method until the documents can be revised. These could include inserts, temporary document changes, stickers, etc.*

| 1. | EXPANDED PASSENGER PED USE IN U.S. AND INTERNATIONAL AIRSPACE<br>Operator has addressed in their policy expanded passenger PED use within U.S. airspace and outside U.S. airspace. Operators may expand the passenger use of portable electronic devices on domestic and international flights while within U.S. airspace (which includes the airspace over the CONUS, Alaska, Hawaii, U.S. territories and possessions, and U.S. territorial waters) and international airspace (over the high seas). Each operator may allow the expanded use of portable electronic devices when in the airspace of another country if doing so is consistent with the operating rules of that country. If a foreign country has adopted a more restrictive rule on PED use, the operator is bound by that regulation while in that country's airspace. | ☐ Complete |
|---|---|---|
| 2. | CREW COMMUNICATIONS: (See also Appendix A)<br>Operator has updated procedural and communications checklists as required for Normal, Abnormal and Emergency operations. This should include guidance for when PEDs can be used, and when they must be turned off or when and what type of wireless services can be used. | ☐ Complete |
| 3. | Pre-departure safety briefing. Operator has addressed the expanded use of PEDs by Passengers during the safety briefing. There should be adequate emphasis that the pre-departure briefing is important to safe operations and to minimize PED distractions during the safety briefing. | ☐ Complete |
| 4. | Operator has updated procedural and communications checklists as appropriate for any changes associated with expanded passenger PED use. | ☐ Complete |
| 5. | PED SECURING AND STOWAGE (See also Appendix C)<br>During take-off, landing and other critical phases of flight as appropriate, the operator has policy and procedure to ensure PEDs are properly secured and stowed. | ☐ Complete |
| 6. | RISK MITIGATION:  Suspected or Confirmed EMI event<br>Operational procedures exist for a crew to recognize, respond and report transient or intermittent problem, suspected or confirmed EMI events.<br><br>Note:  At minimum, record the time, effect on aircraft, aircraft location and phase of flight, suspected PED make, model, location, actions taken, and effect of action taken. | ☐ Complete |
| 7. | SAFETY PROGRAM DATA COLLECTION AND REPORTING<br>Operator has policy and procedure related to the reporting of events or anomalies associated with passenger PED use. Reportable items include but are not limited to passenger disruption, suspected or confirmed electromagnetic interference, and PED unit or battery failure that produced smoke or fire.<br><br>Note:  Standard practices ensure that these reports will also benefit the industry:<br>This may be performed through the operator's existing FAA approved ASAP program or via a standard NASA form. | ☐ Complete |

# 5. PILOT AND FLIGHT ATTENDANT TRAINING PROGRAM CHECKLIST

*This checklist provides a list of key elements, if not currently covered, that should be present in an operator's training program in order to safely implement the expanded use of PEDs.*

*It is acceptable to provide written or verbal briefings or other methods of communication that an operator normally uses to convey urgent information as an interim method until the training programs can be revised.*

| 1. | SUSPECTED OR CONFIRMED EMI EVENT:<br>Brief crew to ensure aircraft problems, including transient or intermittent problems should be reported. | ☐ Complete |
|---|---|---|
| 2. | CREW COORDINATION AND COMMUNICATION:<br>Explain how the crew will coordinate to manage passenger PED use as explained in Section 3. See also Appendix A for additional information<br>* Ensure instructions are provided to place passenger PEDs in "Airplane mode" to disable cellular service while airborne.<br><br>Note: When 10,000 feet is referenced in bulletins, manuals and other publications, "above ground level" (AGL) should be appended as referenced in the PED ARC report. | ☐ Complete |
| 3. | PASSENGER CARE AND RESPONSE:<br>Describe the communications methods used to teach the passengers about the new policy. | ☐ Complete |
| 4. | PASSENGER CARE AND RESPONSE:<br>Explain how the passengers will be informed about when it is OK to use PEDs and when/how they should secure or stow them appropriately. | ☐ Complete |
| 5. | PASSENGER CARE AND RESPONSE:<br>Describe techniques that may be used to deal with passengers that are using their PEDs in a disruptive or unsafe way (use of PED speakers instead of headphones, loud voice communications, etc.) | ☐ Complete |
| 6. | NON-ROUTINE, ABNORMAL OR EMERGENCY PROCEDURES:<br>Describe how to manage scenarios such as suspected or confirmed electromagnetic interference (see above), PED unit or battery smoke or fire, or other scenarios. | ☐ Complete |

## Appendix A:  Crew Communications & Passenger PEDs

This appendix is intended to aid an operator that has opted to allow the expanded use of passenger supplied and operated PEDs. This policy change introduces a need to assess and amend crew coordination and communications procedures as outlined below.

### Variables in Communications Methods and Policy

Passenger PED communication needs and methods vary. Communications for routine and normal operations may differ for an abnormal or enforcement situation, often depending upon the perceived severity of the situation and its risk.

- Routine or low risk communications needs translate to minimal or no communication/enforcement. Lower workload communication methods may be more appropriate (such as simple published procedures per passenger briefing cards, in-flight magazine/materials or cabin visual/aural annunciations).

- Non-Routine or higher risk situations require a greater degree of communication, management, and/or enforcement. An oral brief by the crew or personal interaction with a particular passenger may be required.

What situations or variables are ideal, lower risk and require less communication and management and represent minimal crew workload?

- Generally aircraft demonstrated to be 'PED tolerant' will have less restrictions to certain phases of flight, and require less crew supervision and communication. Ideally, these aircraft will be able to participate in a gate to gate 'PEDs OK' environment, leaving only traditional passenger care considerations.

What situations or variables are either non-routine or higher risk, subsequently requiring more communications and management and potentially drive a crew workload increase?

- Generally, older aircraft built to pre-HIRF standards that have not been demonstrated to be PED tolerant will continue to have limitations in certain phases of flight, and require appropriate crew management/communication.

- It's reasonable to expect that until the use of DO-307 and other related 'PED tolerant' testing/shielding methods mature, that there will be some variation between operators/aircraft fleets. This, in itself will drive a need to communicate and educate the flying public due to the variations of policy among operators.

- If PED use restrictions apply, narrowing the window of PED restriction to only certain minimum phases of flight may make PEDs-off compliance more challenging the closer it is to take off and landing; for example, it may not be a viable practice to walk up and down the aisle to enforce policy during steeper angles of climb and descent. A reasonable alternative may be to establish the expectation that the passengers comply with a verbal instruction from the crew to turn PEDs OFF.

- On an extremely rare basis, the flight crew may require the flight attendants to coordinate and check for compliance to ensure that all devices are turned off (e.g. potentially harmful interference noted with flight instruments). Operators should have written procedures in place to address this scenario. A suggested announcement would be:  The Captain has detected potential interference from a portable electronic device.  He has asked the flight attendant to instruct all passengers to turn off their portable electronic devices.  Safety is everyone's responsibility.

## Appendix B:  Background – Aircraft PED Tolerance to Back-door Interference

Transmitting PEDs (T-PEDs) are widespread among passengers and crewmembers, take many forms, and have many functions. In many cases the transmitting radio is embedded in a T-PED so that the operation of the radio transmitter is not apparent to the T-PED user. These T-PEDs operate in many frequency bands and with a wide range of transmitted RF power. Common T-PEDs and transmitted RF power include:

**Table 1: Common T-PEDs and Associated Power**

| COMMON T-PEDS AND ASSOCIATED POWER | |
|---|---|
| **Device** | **Transmitted RF Power** |
| Handheld mobile phones | 500 mW to 2 W |
| Wireless RF network transceivers | 10 mW to 1 W |
| Consumer handheld walkie-talkies | 500 mW to 5 W |
| Wireless personal digital assistants | 500 mW to 2 W |
| Handheld amateur radio transmitters | 500 mW to 7 W |
| Automobile keyless entry controllers | 50 mW or less |
| Airline operations handheld radios | 1 W to 6 W |

The aircraft RF environment produced by T-PEDs differs from the aircraft RF environment associated with High Intensity Radiated Fields (HIRF). The major differences are:

- Transmitting PEDs may operate very close to airplane systems and wiring, within the aircraft cockpit, cabin, and baggage areas, while HIRF transmitters operate some distance outside the aircraft.

- Airplanes fly through the maximum HIRF RF levels in a few seconds, while the T-PEDs operate within the airplane over a relatively long time frame.

HIRF transmitters are typically very high power transmitters in specific geographic locations outside the aircraft, while T-PEDs may be operated in many locations within the aircraft, including the cabin, cockpit and baggage or cargo compartments.

**What methods that can be applied to address HIRF, PED and T-PED threats?**

- The existing FAA regulations for high intensity radiated fields (HIRF), 14 25 CFR 23.1308, 25.1317, 27.1317 and 29.1317 were released in 2007. Current HIRF rules, apply to systems that have potential failure conditions of Major, Hazardous and Catastrophic.

- The HIRF requirement is based on transmitters located outside the airplane. Previous HIRF special conditions only applied to systems whose failure or malfunction would prevent continued safe flight and landing of the aircraft. It should be noted, however, that the majority of aircraft certified since 1989, also were certified to the JAA/EASA special conditions, which required compliance to Major, Hazardous and Catastrophic failure conditions, in similar fashion to the existing rule.

- For the past several years, the FAA has provided TC/STC applicants with an Issue Paper that is intended to address the Radio Frequency Susceptibility Requirements for airplane systems exposed to Transmitting Portable Electronic Devices (T-PEDs). These issue papers have been transferred into a draft policy letter PS-ANM-25-13.

- "DO-307: Aircraft Design and Certification for Portable Electronic Device (PED) Tolerance" has been released by the RTCA and has been accepted by the FAA for usage in the certification of PED tolerance and is referenced by AC 20-164 "Designing and Demonstrating Aircraft Tolerance to Portable Electronic Devices".

Demonstrated aircraft systems PED tolerance to back door effects show that the installed electrical/electronic systems that perform Required, Major, Hazardous and/or Catastrophic functions are able to perform their intended functions in the presence of RF environment created by T-PEDs, during all non-critical phases of flight. This would allow for operators to treat T-PEDs the same as they would treat non-transmitting PEDs, in accordance with AC 91-21-1B.

**Assessment of Aircraft PED Tolerance to Back-door Interference:**

RTCA DO-307 provides guidance that if the aircraft electrical and electronic systems and wiring are separated from potential locations of T-PEDs by 1 meter or more, then RF susceptibility tests on the equipment or systems performed in accordance with RTCA/DO-160E Section 20 Category R, are considered acceptable procedures and test levels for this demonstration. If the aircraft electrical and electronic systems and wiring are separated from potential locations of T-PEDs by less than 1 meter, then RF susceptibility tests on the equipment or systems performed in accordance with RTCA/DO-160E Section 20 Category W, are considered acceptable procedures and test levels for this demonstration. The tests may exclude test frequencies above 8 GHz.

The following table is taken directly from DO-307, Section 3, and provides the Back Door effects test requirements, based upon system criticality.

**Table 2: DO-307 Section 3 Aircraft System RF Radiated Susceptibility Test Recommendations**

| Classification of system | Distance between T-PED and system LRU > 20 cm | Distance between T-PED and system LRU < 20 cm |
|---|---|---|
| Catastrophic | ED-14E / DO-160E, Section 20, Cat. R | ED-14E/DO-160E Section 20, Cat. W, limited to 8 GHz |
| Hazardous | ED-14E / DO-160E, Section 20, Cat. R | ED-14E / DO-160E, Section 20, Cat. R |
| Major | ED-14E / DO-160E, Section 20, Cat. R | ED-14E / DO-160E, Section 20, Cat. R |
| Required by regulation | ED-14E / DO-160E, Section 20, Cat. R | ED-14E / DO-160E, Section 20, Cat. R |

Section 3 of DO-307 discusses the relationship between HIRF protection requirements and PED Tolerance to Back Door interference effects. PED tolerance is accomplished by ensuring that all equipment that performs functions that are listed in the "Classification of system" column of the above table have been qualified by test/analysis to the requirements, given in second and third column. Both DO-160 and the HIRF User's Guide[1] provide procedures that can be utilized for these types of tests.

---

[1] HIRF User's Guide, "Guide to Certification of Aircraft in a High-Intensity Radiated Field (HIRF) Environment" is available in SAE ARP 5583a. http://www.sae.org/technical/standards/ARP5583A

Add. 118

**How do I find out what level of HIRF protection has been applied to my aircraft?**



**OVERVIEW**

1. **Find the** type certificate data sheet (TCDS)[2] **for the make and model aircraft being assessed.**

2. Check the Type Certification basis for your aircraft make and model. **Does it include Amendment Nos. 23–57, 25–122, 27–42, or 29–49** (by aircraft certification part as applicable)?  Is the associated amendment number captured in a "through" statement? (e.g., 25-109 through 25-124) *(See example 1, next page)*

   a. **YES** - The aircraft has incorporated the necessary HIRF certification levels. No further review necessary. **Done.**

   b. **NO** – Proceed to **step 3**

   *Tip – Use the search function in Adobe to help locate the necessary requirements. We suggest that you look for key words such as "basis" or (25-122) to locate the text in the document. Once located, check the section's applicability to ensure the associated aircraft is addressed.*

3. **Search the TCDS for HIRF special conditions.** Is there one listed for your make and model? *(See example 2, next page)*

   a. **YES** – Record the special condition number. **Done, verify.** Look-up the special condition[3]. Review the special condition to ensure it covers electrical and electronic systems. **If not**, go to **step 5**.

   b. **NO** – Proceed to **step 4**.

   *Tip – Use the search function in Adobe to help locate the necessary requirements. We suggest that you look for key words such as "high" or "lightning" to locate the text in the document. Once located, check the section to ensure the associated aircraft is addressed.*

   *Tip - Special conditions that cover these systems have also been called "Protection From Lightning and Unwanted Effects of Radio Frequency (RF) Energy" If a HIRF search fails, try this approach*

4. Is there a HIRF Special Condition applicable to aircraft electrical and electronic systems for your make and model aircraft?  (use same search tips)

   a. **YES** - Record the special condition number and return to the TCDS for your make and model. Search the TCDS to **verify** that the special condition is listed for your aircraft.

   b. **NO** – Proceed to **step 5**.

**Flowchart (OVERVIEW):**

1. Locate the aircraft TCDS.

2. Is HIRF cert documented as part of standard aircraft certification?

3. Was HIRF cert documented as a 'Special Condition'?

4. Another place to look: Special Conditions Library. Under A/C make & model?

5. Found under specific electrical or electronic system(s) for your aircraft?

6. Are critical systems classified as Catastrophic covered by the Special Condition?

7. If HIRF cert for critical systems cannot be determined, testing or analysis must be performed.

---

[2] TCDS Link: http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgMakeModel.nsf/MainFrame?OpenFrameSet
[3] Special Conditions Link:  http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgSC.nsf/MainFrame?OpenFrameSet

InFO13010SUP                                                              PED Aid to Operators

5.  Is there a HIRF Special Condition applicable to specific critical electrical or electronic systems on your make and model aircraft?  (use same search tips)

    a. **YES** – record special condition number(s) and the system(s) covered. Proceed to **step 6**.

    b. **NO** – Proceed to **step 7**

6.  Review your critical aircraft systems to determine if any electrical or electronic systems were certified with a Hazard Class (failure condition) of 'catastrophic'.
    Does a special condition cover your critical system(s)?

    a. **YES** – The critical systems are adequately covered for PED tolerance to back-door interference. **Done.**

    b. **No** – Proceed to **step 7**.

    *Tip – Some special conditions are applicable for a change to the type certificate when it is revised to include another model incorporating the same novel or unusual design feature. If your TCDS lists a special condition and the language of the special condition does not specify your model, look for language in the special condition that applies it to future changes. (See example 3, page 13)*

7.  The critical systems for your aircraft cannot be determined to be PED tolerant to back door interference based on HIRF certification. Testing and analysis for critical systems (those certified with a catastrophic failure effect) to ensure PED tolerance to back-door interference must be (or have been) accomplished.

**Aircraft Make/Model Examples:**

**Example 1:**  HIRF as part of standard aircraft certification basis:
TDCS Excerpt, Gulfstream VI. Link[4]

| Certification Basis: | 14 CFR part 25, Airworthiness Standards:  Transport Category Airplanes, effective February 1, 1965, including Amendments 25-1 through 25-120 and 25-122, 25-124, and 25-132 |
|---|---|

**Example 2:**  HIRF addressed as a Special Condition:
TCDS Excerpt, certain Boeing 737 series aircraft:

Special Conditions:
Special Conditions were proposed, in accordance with §21.16.  The Special Conditions for the following subjects were issued in Renton, Washington, September 17, 1997.  Their effectivity was the same day as issuance:
• High Intensity Radiated Fields
• Limit Engine Torque Loads for Sudden Engine Stoppage
Special Conditions No. 25-358-SC, published in the Federal Register on June 29, 2007 addressed 737-600/-700/-700C/- 800/-900 and 900ER series airplanes regarding seats with non-traditional, large, non-metallic panels
Special Conditions No. 25-386-SC, published in the Federal Register on August 7, 2009, addressed 737-600/-700/-700C/-800/ and 900ER series airplanes with inflatable lapbelts installed

Link to Docket No. NM359; Special Conditions No. 25-358-SC[5]:

---

[4] http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgMakeModel.nsf/0/92fadb614112af7686257bcf0057bccd/$FILE/T00015AT_Rev_4.pdf
[5]  Link to example Special Condition:
http://rgl.faa.gov/Regulatory_and_Guidance_Library/rgSC.nsf/0/5163A169F74E9140862573150051A998?OpenDocument&Highlight=25-358-sc

Excerpt: *"Model 737-600, -700, -700C, -800, and -900 as of the effective date of these special conditions."*

**Example 3:** HIRF addressed as a Special Condition:

TCDS excerpt from 25-ANM-109 that shows it applicable to future changes:

As discussed above, these special conditions would be applicable initially to the Model CL-600-2B16 (CL-604 Variant). Should Canadair apply at a later date for a change to the type certificate to include another model incorporating the same novel or unusual design feature, these special conditions would apply to that model as well, under the provisions of Sec. 21.101(a)(1).

## Appendix C:  Securing and Stowing Passenger PEDs

**1.  PED - Stowed vs. Secured:**

There is an important distinction that needs to be made between "stowing" and "securing" PEDs. If a PED is "stowed", it must be placed into an approved carry-on stowage location. These locations have been designed and certified to comply with the requirements for retention of articles of mass during emergency landings. Approved carry-on stowage locations have specific weight and size limitations. When a PED is "secured", it is restrained by a method which may not have been certified for retention of articles of mass to the emergency landing load limits. The following elements from the PED ARC stowage policy subcommittee identify several considerations for inclusion in an operator's policy for stowing and securing PEDs (including any M-PEDs air carriers have included in their carry-on baggage programs and/or personal items policies).

**a.** Large PEDs (such as full-size laptops) must be safely stowed in an approved carry-on stowage location, and not present an undue hazard in the event of severe turbulence, crash forces or emergency egress. Larger PEDs are those the operator has determined weigh more than 2 pounds or are of a size that would impede egress.

**b.** Small PEDs must be secured (not loose) during surface movement, take-off, descent, approach and landing. Passengers should be encouraged to secure small PEDs on their person by placing them in an armband or garment pocket. Passengers may also secure small PEDs by placing them in the seat pocket. PEDs should not be left unsecured in an adjacent empty seat. Passengers can hold small PEDs as a means to secure, but this method is not preferable.

Seat back pockets generally are designed to hold a maximum of 3 pounds. The passenger safety card, magazines, other literature and air sickness bag account for approximately 1 pound. When an operator conducts a safety risk assessment to determine an acceptable weight limit for the seat pocket, these items should be taken into account. As a general "rule of thumb", small PEDs and other personal items placed in the seat back pocket should not exceed a total of 2 pounds and not protrude to the point of impeding egress. Additional guidance may be found in FAA InFO 09018.

One method of passenger safety communication is to define size parameters of small PEDs which could be safely secured in the seat pocket. Because some large laptops and other devices weigh less than 2 pounds but would be too large to be secured within the seat pocket adoption of language similar to the following may help eliminate conflict or confusion:

Small PEDs are defined as devices that do not exceed the following maximum dimensions or weight:
- X inches width
- X inches height
- X inches depth
- 2 pounds or less

See PED ARC report for additional information on small PED size and weight parameters.

http://www.faa.gov/about/initiatives/ped/

**c.** PED cords or accessories are not to impede emergency egress.

**d.** PED policy should discourage passengers from getting up out of their seats to access the overhead bins or other stowage areas at a point in time that would present a hazard to themselves or the passengers around them.

e. Many operators have adopted a list of PEDs and personal items that should not be used at any time onboard aircraft. If an operator chooses to establish such a list, here are some examples of items that have been identified:

- Other transmitting PEDs – PED tolerance may not address all transmitters so some devices should be prohibited unless additional analysis or testing is done to allow their use. These include:

  - Radio controlled toys
  - Transmitters (amateur, citizens band (CB), two-way (i.e. walkie talkies), 49 MHZ)

- E-cigarettes – FAA policy (see 14 CFR §121.306 and FAA Notice N8900.240)

- Other commonly prohibited PEDs – current policy would not prohibit the use of these but some carriers have chosen to do so.

  - Portable radios
  - Television receivers
  - Personal air purifiers
  - VHF scanner receivers

## 2.    Medical Portable Electronic Devices (M-PED):

Each airline must determine that its aircraft are PED tolerant to avoid evaluation of each specific PED make and model. A determination of aircraft PED tolerance with respect to passenger PEDs includes M-PEDs. The FAA believes that sufficient risk mitigation can occur to allow for safe operation of M-PEDs during critical phases of flight. The FAA does not have a safety regulation that would prevent M-PEDs from being voluntarily included in an airline's carry-on baggage program and/or personal items policy as part of the general class of passenger supplied and operated PEDs. The FAA encourages airlines to include M-PEDs in their carry-on baggage program and/or personal items policy in order to increase accessibility in air travel for people with disabilities. Some M-PEDs are life sustaining, like a ventilator, and cannot be turned off at any time during flight. M-PEDs have safely been in use during all phases of flight for decades, as part of Emergency Medical Service (EMS) and commercial operations. An airline's risk assessment and crewmember procedures would need to address proper stowage of larger M-PEDs and the inability to turn off certain types of these devices during aircraft operations. As addressed in section (1) of this Appendix, small M-PEDs must be secured (not loose) during surface movement, take-off, descent, approach and landing. Passengers should be encouraged to secure small M-PEDs on their person by placing them in an armband or garment pocket.

The agency further notes that air carriers should be aware of Department of Transportation requirements in 14 CFR part 382 - *Nondiscrimination on the Basis of Disability in Air Travel*, that address the use of certain M-PEDs. More information on part 382 can be found at the link below:

http://airconsumer.dot.gov/SA_Disability.htm

## 3.    Portable Oxygen Concentrators (POC):

While part 382 requires air carriers in the U.S. to accommodate passengers with disabilities, there is no regulation requiring airlines to provide medical oxygen during flights. Compressed and liquid oxygen is considered to be a hazardous material, and airlines will not allow passengers to carry it onto an airplane. Airlines may, however, allow passengers to bring portable oxygen concentrators (POCs) onto airplanes, as explained in Federal Aviation Administration (FAA) Advisory Circular Number 120-95 and Special Federal Air Regulation (SFAR) No. 106. These documents spell out the acceptance criteria for POCs and explain what air carriers may and may not require from passengers who need supplemental medical oxygen during all or part of their flights.

All POCs listed in SFAR 106 meet FAA requirements for M-PEDs.

To help air carriers obtain positive testing results for POCs listed in SFAR No. 106, the FAA posts the results of the RTCA DO-160 category M section 21 testing on its website. The FAA makes these documents available at the link below as they are received.

http://www.faa.gov/about/initiatives/cabin_safety/portable_oxygen/